# UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ATHENA CLARKE, JENNIFER KLINE, and others similarly situated,<br><br>        Plaintiffs,<br><br>    -against-<br><br>THE CITY OF NEW YORK, and the NEW YORK CITY DEPARTMENT OF EDUCATION,<br><br>        Defendants. | **CLASS ACTION COMPLAINT**<br><br>Jury Trial Demanded<br>    25-cv-536 |

The above-named Plaintiffs, through their counsel, stand before this honorable court seeking justice and compensation for unlawful religious discrimination carried out by their employer, the New York City Department of Education ("DOE") in concert with the City of New York (the "City"). Plaintiffs assert claims under Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 4200 U.S.C. § 2000e, *et seq*; 42 U.S.C.§1983, for the deprivation of rights under the First Amendment and Fourteenth Amendment of the United States Constitution; the New York City Human Rights Law ("CHRL"), NYC Administrative Code Title 8, and the New York State Human Rights Law ("SHRL"), NY Executive Law § 296, *et seq*. They bring this lawsuit on behalf of themselves, and others similarly situated.

## INTRODUCTION AND SUMMARY OF THE CASE

1

1.     This case arose because the City, working in concert with its DOE, engaged in widespread religious discrimination in an attempt to evade statutory obligations to accommodate religious practices of DOE employees that conflicted with the City's Covid-19 vaccine mandate.

2.     Through this lawsuit, Plaintiffs seek to safeguard religious freedom for themselves and others similarly situated and to restore justice and dignity to educators who spent their careers faithfully serving New York City's public-school children.

## JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. Plaintiffs further invoke the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367(a) to hear related claims arising under New York State law because they are so related to the federal claims that they form part of the same controversy.

4.     Venue is proper in this district under 28 U.S.C § 1391(b) because it is the district in which a substantial part of the events giving rise to Plaintiffs' claims occurred.

## PARTIES

5.     Plaintiff ATHENA CLARKE is a resident of Kings County, New York. Prior to being denied religious accommodation, Ms. Clarke was a tenured special education teacher in good standing. She worked in Brooklyn with over six years of service at DOE. Ms. Clarke is one of thousands harmed by Defendants'

2

discriminatory religious accommodation policies and seeks justice for herself and others similarly situated.

6.     Plaintiff JENNIFER KLINE is a resident of Lake County, Florida with sincerely held religious objections to the Covid-19 vaccine. Prior to being denied religious accommodation, Ms. Clarke was a tenured special education teacher working in good standing. She worked in Queens with over seventeen years of service at DOE. She is one of thousands harmed by Defendants' discriminatory religious accommodation policies and seeks justice for herself and others similarly situated.

7.     Defendant CITY OF NEW YORK is a municipal corporation of the State of New York and can sue and be sued. The City operates and employs people through its municipal agencies. Since 2002, the City has exercised Mayoral control over DOE pursuant to a grant of authority to the City from the State Legislature.

8.     Defendant DOE is a school board organized under, and existing pursuant to, the New York Education Law. Defendant DOE maintains its headquarters at 52 Chambers Street, New York, New York and operates in all five boroughs of the City of New York. The Mayor of the City of New York exercises mayoral control over the DOE.

## BACKGROUND FACTS

### *The Pandemic*

9.     In the fall of 2019, the Covid-19 virus began circulating in New York City and around the world.

3

10.    In March 2020, New York State declared a state-disaster emergency due to the Covid-19 pandemic.

11.    Schools were closed for in-person learning for the remainder of the Spring 2020 semester across the state.

12.    From March 2020 through June 2020, New York City conducted all educational programming through remote education.

13.    Plaintiffs and all other teachers and educators handled their work remotely during this period.

14.    In the fall of 2020, DOE schools reopened for in-person learning, with the option of remote instruction if families preferred that option.

15.    Many students returned to in person learning in classrooms.

16.    Teachers and most staff were required to return to in-person instruction in the fall of 2020.

17.    However, DOE liberally granted accommodations to most DOE employees who wished to work from home or remotely during the 2020-2021 school year.

18.    In or around December 2020, vaccines became available against Covid-19.

19.    But even though most teachers and staff along with a large percentage of students were back in person, there was no vaccine mandate during the 2020-2021 school year.

4

20.     DOE allowed Plaintiffs to continue to work unvaccinated for the entire rest of the school year and following summer of 2021.

21.     On June 23, 2021, Governor Cuomo announced that the pandemic emergency was officially over in New York State.

22.     By the end of July 2021, the scientific consensus among world public health leaders coalesced around three facts:

    a.  vaccinated people could still catch and spread SARS-CoV-2 and were equally as infectious as unvaccinated people when they did; and

    b.  herd immunity could not be achieved through vaccination; and

    c.  any vaccine protection waned significantly after a matter of weeks.

23.     By August 2021, governments around the world publicly acknowledged that vaccination would not stop the spread of the virus, and that everyone, vaccinated and unvaccinated alike, would likely catch Covid-19.

24.     On August 5, 2021, Centers for Disease Control and Prevention ("CDC") Director Rochelle at the time Rochelle Walensky acknowledged on national television that the vaccines could not stop transmission of Covid-19.

25.     During an interview with Wolf Blitzer, Dr. Walensky said: "what [the vaccines] can't do anymore is prevent transmission." When asked if asymptomatic vaccinated people could pass on the virus, Dr. Walensky further stated, "that's exactly right."[1]

---

[1] Blitzer, W. (2021, August 5). *Transcript: Interview with CDC Director Dr. Walensky.* The Situation Room, CNN. http://www.cnn.com/TRANSCRIPTS/2108/05/sitroom.02.html

*The DOE's "Emergency" Mandate*

26.    Rather than scale back any vaccine requirements, the Mayor reacted to the CDC's public acknowledgment that the Covid-19 vaccines cannot stop transmission by becoming more zealous about vaccine requirements.

27.    Earlier that summer, the City had issued a vaccine requirement (to take effect in September 2021) for DOE employees, but offered the alternative that employees could test weekly if they did not want to get vaccinated.

28.    On or about August 24, 2021, two and a half weeks after the CDC Director admitted on national television that the vaccines cannot stop transmission, Mayor Bill de Blasio and Commissioner Chokshi changed course, issuing the first version of a new temporary "emergency" regulation *mandating* Covid-19 vaccination for most DOE employees with no option to test in lieu of vaccination.

29.    No new emergency justified this new aggressive mandate.

30.    Most employees, including Plaintiffs, had already been working in person unvaccinated for over a year throughout the worst of the pandemic when the mandate was put in place.

31.    There were no urgent increases in hospitalizations or deaths necessitating the implementation of these policies in New York City when the Mandate was announced.

32.    Nor did it make sense to remove the option of testing in lieu of vaccination.

33.    The City knew, or should have known, that there was insufficient

6

evidence to conclude that Covid-19 vaccines could stop transmission.

34.    The City knew or should have known that the objective science available at the time showed clearly that those with natural immunity, such as Plaintiffs, had far superior and longer lasting immunity than those who were vaccinated.

35.    The City knew, or should have known, that there was insufficient evidence to support the theory that unvaccinated people posed more of a danger to the public than vaccinated.

36.    The City knew, or should have known, that it would not have caused substantial hardship to mitigate any speculative additional risk by allowing exemptions for those with natural immunity, allowing all other unvaccinated teachers to test weekly, symptom checks, social distancing, remote work and rapid testing, among other measures.

37.    The City also knew, or should have known, that many DOE employees had sincere religious objections that did not allow them to take vaccines.

38.    Nonetheless, both the City and DOE announced that not only were they imposing a no testing option Mandate, but they would also not even consider any religious or medical accommodation requests from the vaccine Mandate for any DOE employee.

39.    When making this announcement, Mayor Bill de Blasio repeatedly expressed hostility towards religious opposition to vaccines, suggesting there was no valid religious objection according to his understanding of scripture.

40.     While the Mandate did not originally allow for religious accommodation, there were carve-outs made in it for secular reasons that defeated the stated purpose of the Mandate in the same way or worse than religious accommodations for the fraction of the staff that needed them would have.

41.     For example, there was no mandate for students in the fall of 2021.

42.     This means that over one million school children were allowed to attend school each day unvaccinated after the mandate went into effect.

43.     Given this fact, herd immunity would not have been possible even if the vaccines could have stopped transmission, as students would still be exposed to their unvaccinated classmates even if 100% of all teachers and staff were fully vaccinated.

44.     If all DOE staff were vaccinated, they would still reflect less than ten percent of the total population in schools.

45.     It was well-established science that ten percent vaccination rates could never stop transmission of Covid-19 in a community, even for vaccines that can prevent infection and transmission in the recipient.

46.     The vaccine status of one teacher in a classroom with twenty to fifty unvaccinated students could not have any impact on stopping the spread of Covid-19, even if the vaccines did stop transmission.

47.     The Mandate allowed other carve-outs for secular reasons as well.

48.     For example, unvaccinated bus drivers were allowed to continue driving students in enclosed buses due to staffing issues.

8

49.     And unvaccinated members of the public could come to the schools to vote and man volunteer tables, among other reason.

50.     Several New York State court decisions have held that the reasoning for the Covid-19 vaccine mandates was irrational and cannot pass the rational basis test in an article 78 proceeding.

51.     The DOE Mandate states on its face that it primarily relied on the state's healthcare worker mandate to justify its imposition of the DOE Mandate.

52.     The healthcare worker mandate was later struck down by the New York State Supreme Court as arbitrary and capricious, in part because of the New York State Department of Health's admission that the vaccines cannot stop the spread of the Covid-19 virus and in part because the New York State Department of Health lacked the authority to issue the "emergency" mandate.

53.     The state's appeal of that decision was dismissed, and the Supreme Court's decision stands as the law.

54.     Similarly, in October 2022, the City's municipal worker mandates were declared null, void, and unenforceable ab initio in an article 78 proceeding in New York State Supreme Court, because the Court found that the City's executive branch lacked the power to impose conditions of employment, but also because the Court determined it was arbitrary and capricious to mandate Covid-19 vaccination in the workplace when the City allowed the public to continue to freely interact unvaccinated with the workers and workplaces.

55.     And in September 2023, the New York State Supreme Court held that

the City's undue hardship defense for denying religious accommodation to DOE workers was arbitrary and capricious. In making this determination, the Court pointed out that the City offered no valid reason why some people were accommodated while others similarly situated were not, and did not explain how one million unvaccinated students could safely go to school each day but teachers and other administrators posed a direct threat.

56. Whether or not the City prevails in its appeals against the City mandates, these holdings show that a reasonable person could find that the vaccine mandates cannot meet rational basis review, leave aside the compelling interest test, and that the government did not meet its burden of proving the "undue hardship" defense.

### Pfizer's Influence

57. Upon information and belief, one reason that the City decided to pass such aggressive mandates and keep them in place so long despite the scientific consensus that they could not stop transmission was due to political and economic pressure and/or incentives from Pfizer, Inc ("Pfizer").

58. Pfizer exercises significant financial influence in New York City politics.

59. Pfizer is headquartered in New York City and was the only pharmaceutical company to gain FDA approval of their Covid-19 vaccine in 2021.

60. The DOE Mandate was not timed to meet any new health emergency, but it was expressly timed to coincide with Pfizer's receipt of FDA approval for the

first licensed Covid-19 vaccine in or around August 2021.

61.    Pfizer is a major donor and employer in New York City.

62.    Pfizer donated money to help elect Mayor de Blasio.

63.    Pfizer also donated money that went to help elect Mayor de Blasio's successor, Eric Adams.

64.    Upon information and belief, both Mayor de Blasio and Mayor Adams own stock in Pfizer.

65.    Pfizer's stock prices would be significantly impacted by the amount of vaccine uptake in the first two quarters after vaccine approval (ending September 30, 2021, and December 31, 2021).

66.    It has been well-documented that vaccine mandates impact Pfizer's stock prices significantly too.

67.    New York City's mandates were the first "no accommodation" employee vaccination mandates in the country.

68.    Upon information and belief, eliminating, or at least vastly reducing, the availability of accommodations to vaccine mandates, was part of Pfizer's business model.

69.    Pfizer knew, before the Mandate went into effect, that its vaccine was not effective against the new strains of Covid-19, including Delta and Omicron strains.

70.    Aggressive vaccine mandates could help ensure that the vaccine would be profitable as people began to realize that the vaccinated were catching Covid-19

as readily as the unvaccinated – because if there were mandates, employees would have no choice but to keep taking the vaccines if they wanted to keep their jobs.

71.    Upon information and belief, Pfizer representatives were in communication with the Mayor's office prior to the enactment of the Mandate and encouraged the Mayor to enact aggressive mandates on or before the end of September, 2021.

72.    Upon information and belief, Pfizer and the City attempted to implement New York City's no or low accommodation mandate to serve as a model that could be adopted by other cities after it was established in New York City.

73.    Pfizer agreed to give the NYC DOE over one million dollars in grants after the mandate was implemented.

***Labor Disputes and Lawsuits***

74.    Whatever the motive, New York City labor unions unanimously decried the DOE Mandate from the start as reckless and unlawful and announced that they would be taking legal action.

75.    Leaders from all major impacted unions, as well as the Municipal Labor Committee ("MLC"), and leaders from each of the member unions of the MLC all put out statements that the DOE Mandate violates basic legal rights.

76.    Mass protests, lawsuits, and labor disputes ensued immediately upon the announcement of the Mandate.

77.    On or about September 9, 2021, the MLC and sixteen unions filed a lawsuit ("MLC Litigation") in State Court, challenging the Mandate and the

Defendants' refusal to consider reasonable accommodations pursuant to their statutory duties.

78.    On September 14, 2021, the Supreme Court, New York County, issued a temporary restraining order ("TRO") enjoining the City from enforcing the Mandate "solely because the Department of Health and Mental Hygiene Order's mandate did not reference the possibility of any medical or religious exemption." *The New York City Mun. Labor Committee v. The City of New York,* No. 158368/2021, 2021 WL 4502854, at *2 (N.Y. Sup. Ct. Sep. 22, 2021).

79.    The next day, on September 15, 2021, the DOE Mandate was rescinded and reissued, with an amendment clarifying that "[n]othing in this order shall be construed to prohibit any reasonable accommodation otherwise required by law."[2]

80.    The New York State Supreme Court accordingly vacated the TRO, stating that it was "obviate[d]" by the Commissioner's amendment allowing for religious and medical accommodation. *Mun. Labor Committee,* 2021 WL 4502854, at *3.

81.    What was not before the Court was that the Defendants' religious accommodation policies were clearly designed to try to evade the DOE's responsibility to consider religious accommodation in good faith, despite the Mandate's amendment.

***DOE Implements and Ratifies the "Stricken Standards"***

---

[2] The Mandate was also further amended later in September 2021, but not substantively for purposes of this Petition other than to push back the effective date as a result of further lawsuits.

82.    In a parallel proceeding, the United Federation of Teachers ("UFT"), Local 2, AFT, AFL-CIO ("UFT") filed a Declaration of Impasse on September 1, 2021, contending, among other things, that the DOE's failure to provide religious and medical accommodations was unlawful and that the DOE further failed to afford due process regarding job and benefits protection.

83.    On September 10, 2021, an impact arbitration decision was rendered by Arbitrator Martin Scheinman requiring that the DOE and the City both had to provide UFT members with reasonable religious accommodation (<u>Exhibit 1 – incorporated herein to show what the policy said, not for the truth of any statement therein</u>).

84.    Subsequently, Arbitrator Scheinman issued materially identical awards covering Counsel of School Supervisors and Administrators ("CSA") employees and District Council ("DC37) DOE employees.

85.    The policies are collectively referred to hereafter as the "Stricken Standards" since they were later struck down as unconstitutional by the Second Circuit Court of Appeals.

86.    The arbitrator, Martin Scheinman served as a major donor and fundraiser for Mayor de Blasio and his neutrality is and was contested at the time that DOE adopted the Stricken Standards.

87.    The Stricken Standards were clearly designed to deny most applicants by unconstitutionally narrowing the definition of what beliefs could qualify for religious accommodation.

88.    On their face, the Stricken Standards express denominational preferences and categorically exclude most religions from protection and access to accommodation.

89.    For example, the Stricken Standards provide the following criteria for determining who could access accommodation: "religious exemptions for an employee to not adhere to the mandatory vaccination policy must be documented in writing by a religious official (e.g., clergy). Requests shall be denied where the objection is personal, political, or philosophical in nature. Exemption requests shall be considered for recognized and established religious organizations (e.g., Christian Scientists)." Stricken Standards at 9.

90.    The language in the above quoted paragraph was almost entirely drafted and proposed by Defendants' agents and attorneys – not just from the DOE, but also those representing the City.

91.    Multiple problems stand out in this definition of what constitutes so-called acceptable religious beliefs.

92.    First, the policy favors Christian Scientists, predefining Christian Science as the only enumerated example of a "recognized" and "established religious organization." This gives Christian Scientists an unfair advantage.

93.    Second, the policy requires the government to decide which other religions than Christian Science are "recognized" as "established religious organizations."

94.     Pursuant to the Stricken Standards, if an applicant belongs to a religion that is not deemed "established" and "recognized" by the government employer, whatever that means, the person must be denied.

95.     Defendants knew, or should have known, that the government cannot "establish" which religions are "recognized" and thus valid and which are not "recognized" or "established" and thus invalid.

96.     Third, the policy also provides that religious objection based on personally held or "philosophical" religious beliefs must be denied.

97.     But under the federal, state, and local standards, personally held or unorthodox religious beliefs are just as protected as those that are endorsed by official church dogma.

98.     In fact, even moral or philosophical beliefs are defined by the EEOC and governing law as expressly protected religious beliefs, but under the Stricken Standards, they were excluded from protection even if the beliefs were sincerely held.

99.     Fourth, the Stricken Standards require that the religious objection "must be documented in writing by a religious official (e.g. clergy)."

100.    The certification requirement discriminates against those who practice religions that do not belong to a hierarchical organization or who have different religious beliefs than their pastor or church leader.

101.    Defendants were on notice that the clergy requirement was illegal.

102.    It is long-established law in New York that governments cannot require a person to show a clergy letter or belong to an "established religion" to have their

religious beliefs protected. *See, e.g., Sherr v. Northport-E. Northport Union Free Sch. Dist.*, 672 F. Supp. 81, 92 (E.D.N.Y. 1987).

103.    Fifth, the Stricken Standards require that, even if the DOE were to determine a person does belong to an "established" and "recognized" religion, and that religious organization provided a clergy letter, the applicant must still be denied if the "leader" of their faith has publicly expressed support for vaccination.

104.    "Leader" is not defined in the Stricken Standards, but in practice, the DOE repeatedly interpreted this concept broadly to deny accommodation to whole categories of religious employees based on Defendants' assumptions about who the leader of a faith might be.

105.    Pursuant to these determinations, DOE representatives repeatedly asserted that all Jews, Muslims, Hindus, Buddhists, Catholics, and even non-denominational Christians other than Christian Scientists had to be denied.

106.    In sum, the DOE openly admitted that it conditioned access to accommodation based on membership in preferred religious organizations.

107.    To the extent that anyone was accommodated who belonged to one of the religions DOE categorically excluded, it was either because they were lucky enough to get an arbitrator who was willing to violate DOE's policies, or because DOE was trying to avoid liability for their open discrimination after a lawsuit was filed by accepting a few token Jews, Buddhists, or Catholics.

108.    Either way, the stated policies, which required categorical discrimination, had a disparate impact on those with personally held religious beliefs,

and those belonging to one of the faiths that the DOE categorically argued must be excluded.

***DOE showed additional bad faith by initially denying 100% of applicants without review.***

109.    Notwithstanding that the Stricken Standards already were designed to categorically deny most applicants other than Christian Scientists, Defendants applied the Stricken Standards to exclude even more employees from protection than the discriminatory policy allowed.

110.    As bad as the Stricken Standards were, the one thing that the policy did for employees was to guarantee that the DOE had to grant religious accommodation if an applicant qualified under its criteria.

111.    There was no provision for a denial based on "undue hardship" under the Stricken Standards.

112.    Rather, pursuant to the arbitrators' order, at both the initial DOE review and in the appeals, any applicant who qualified "within the specific criteria identified above **shall be permitted the opportunity to remain on payroll**…"

113.    The Stricken Standards stated that it applied to both to the DOE's initial determinations and to the appeals to the arbitrator.

114.    However, within hours or days of submitting their application, every single applicant who initially applied under the Stricken Standards, including Plaintiffs, received the same autogenerated email from DOE, stating:

Dear [NAME],

We have reviewed your application and supporting documentation for a religious exemption from the DOE COVID-19 vaccine mandate. Your application has failed to meet the criteria for a religious based accommodation.

Per the Order of the Commissioner of Health, unvaccinated employees cannot work in a Department of Education (DOE) building or other site with contact with DOE students, employees, or families without posing a direct threat to health and safety. We cannot offer another worksite as an accommodation as that would impose an undue hardship (i.e. more than a minimal burden) on the DOE and its operations.

Sincerely, *HR Connect* Medical, Leaves, and Records Administration

Please do not reply to this message via e-mail. This email address is automated.

115.    The autogenerated denials admitted that they were made in accordance with the Stricken Standards, stating at the end:

> **This application was reviewed in accordance with applicable law as well as the Arbitration Award** in the matter of your union and the Board of Education regarding the vaccine mandate. Under the terms of the Arbitration Award, you may appeal this denial to an independent arbitrator. If you wish to appeal, you must do so within one school day of this notice by logging into SOLAS https://dhrnycaps.nycenet.edu/SOLAS and using the option "I would like to APPEAL". As part of the appeal, you may submit additional documentation and also provide a reason for the appeal.

116.    In addition to violating the arbitrator's award by issuing undue hardship denials to all applicants, when the policy did not allow for undue hardship denials, the autogenerated denials violated statutory standards in multiple ways.

117.    <u>First</u>, the DOE did not engage in any good-faith individualized attempts to accommodate employees before issuing blanket "undue hardship" denials to 100% of applicants.

118.    No one at the DOE individually reviewed any of the applications before

sending out the autogenerated emails denying accommodation.

119.    Applicants, including Plaintiffs, were not contacted by any person at DOE to discuss their applications before they were denied.

120.    No cooperative dialogue was offered or took place before the denials were issued.

121.    The same or substantially the same email was sent to all applicants.

122.    DOE did not review any objective data or analysis of what it would cost to accommodate religious employees remotely, nor did they assess any of the statutory factors to establish that any employee would have posed a direct threat if allowed to opt out of the vaccine requirement.

123.    The DOE acted with such bad faith, that they even sent out the same undue hardship autogenerated email to employees whose job was already remote, and those who did not have student-facing jobs in the first place.

124.    Failure to engage in individualized analysis, or cooperative dialogue, and categorical denial of every single employee, even employees who already worked remotely, based on the vague assertion that it would be an "undue hardship" to allow remote work– raise an inference of bad faith and pretext.

125.    <u>Second</u>, the denials incorrectly state that the Mandate did not allow DOE employees to work in person around other employees or students.

126.    It was not true that the Mandate did not allow DOE employees to work in person– on the contrary, the Mandate had been expressly amended to allow for religious accommodation, which would include in person accommodation if an

employee did not constitute a direct threat that could not be mitigated through reasonable accommodation.

127.    The Stricken Standards and the DOE's own policies show that DOE understood that the Mandate did not prohibit them from offering in person accommodation that would expose unvaccinated employees to other covered personnel.

128.    Ultimately, the DOE admits it accommodated at least 163 DOE employees (including teachers, administrators and other staff) under the Stricken Standards, many of whom continued to work in person in buildings with other covered personnel.

129.    Among the accommodated teachers, some taught remotely from home, while others were relocated to teach or work from one of the administrative buildings or remote worksites set up by the DOE.

130.    These worksites had plenty of extra room and were not filled to capacity.

131.    Some accommodated teachers were permitted to teach breakout sessions and various subjects and lessons remotely, while a co-teacher or teachers' aide was physically present in the classroom to coordinate the students in the class.

132.    Others were given more administrative work or allowed to work with students who elected to stay home.

133.    The DOE could have easily accommodated many more employees, including Plaintiffs, without significant hardship or expense.

134.    The Mandate also did not preclude in person teaching.

135.    By its express terms, it had been amended to state that nothing in the order precluded reasonable accommodation, which would include in person instruction so long as an employee was not a direct threat based on their accommodation from the vaccine requirement.

136.    DOE allowed at least one unvaccinated teacher to teach their class in person unvaccinated with students while the Mandate was in effect.

137.    In doing so, DOE did not face any fines or penalty from the City, though the City was aware that the employee returned to the classroom unvaccinated while the Mandate was still in effect.

138.    The fact that DOE accommodated at least 163 employees whose religious beliefs were impermissibly favored under the Stricken Standards leads to an inference that the remaining undue hardship denials were pretextual and unsupported since the denied employees were not distinguishable from a safety standpoint.

139.    As evidenced by the 163 accommodations made, the Mandate provided no justification for a blanket ban on in-person accommodation without individualized analysis of the statutory factors for each employee.

140.    By law, employers bear the burden of proving that an employee is a direct threat and of proving that no reasonable accommodation could be provided without undue hardship.

141.    Neither the DOE nor the City met this burden, as set forth in more

detail in other parts of this complaint.

142.   <u>Third,</u> the denials admitted - on their face - that Defendants applied the wrong legal standard for assessing whether accommodation would pose an undue hardship.

143.   The denials stated that Defendants used the "more than a minimal burden" (*de minimis*) standard.

144.   Under the SHRL and CHRL, the employer bears the burden of proving that accommodation would create a "significant" burden or expense, and under Title VII, the employer must prove substantial hardship, not *de minimis* hardship.

145.   Pursuant to federal, state and local law, employers also must prove that they made the undue hardship determination after assessing specific statutory criteria, using the best available evidence, on a good-faith individualized basis before denying an applicant.

146.   For example, under all three statutes, if the hardship has to do with a safety concern, the employer bears the burden of proving on an individualized basis that an employee would pose a direct threat before segregating them or imposing any adverse employment consequence on them.

147.   The direct threat analysis cannot be speculative or generalized. Rather, under the CHRL, "The employer must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or the best available objective information, to ascertain: the nature, duration and severity of the risk; the probability that potential injury will actually occur; and whether reasonable

accommodation, such as modification of policies, practices or procedures, will mitigate the risk." 9 CRR-NY 466.11(g)(2).

148.    Similar analysis is required under the SHRL and Title VII.

149.    Defendants did not make any good faith attempt to individually analyze these or the other required statutory factors for any applicant before conclusively denying them all based on alleged undue hardship.

150.    The best-available objective science at the time did not support a blanket policy that in person accommodation was *per se* a direct threat.

151.    The DOE did not prove or assess whether any employee was a direct threat due to their vaccination status before sending out the autogenerated blanket denials.

152.    The DOE did not prove or assess whether it would be an undue hardship to provide reasonable accommodation for any employee deemed a direct threat before sending out the autogenerated blanket denials.

153.    To illustrate the lack of care that the DOE put into the undue hardship determinations, some employees were already working remotely, or could have easily worked remotely, when they received the blanket undue hardship denials.

154.    Many who received the undue hardship denials in the fall of 2021 already had been granted accommodation to work remotely during earlier periods after in person learning had resumed and could have been granted the same accommodation again.

155.    Plaintiffs could have been easily accommodated in person or remotely,

as they had been for the entirety of the pandemic, without undue hardship or safety concerns.

156.    As set forth more fully in many other paragraphs in this Complaint, Plaintiffs did not pose a direct threat based on their vaccination status, and DOE failed to present any evidence that they did.

157.    The vaccines could not stop transmission and were for personal benefit only.

158.    Moreover, even if Covid-19 vaccines could meaningfully stop transmission, it is illogical to mandate vaccination for only a small fraction of the school population.

159.    It makes no scientific sense to say that one million students could safely come to school unvaccinated, riding in busses with unvaccinated school-district employed bus drivers (who were exempt from the Mandate due to staffing concerns) and commingling with thousands of their unvaccinated peers, but that they would suddenly be in severe danger just because one or two teachers in the building were also unvaccinated.

160.    If being in proximity with a few unvaccinated people was such a severe hazard, the rule should have applied universally to everyone in the population.

161.    A few extra unvaccinated people in each building could not make any difference to herd immunity when the bulk of the population in that building are unvaccinated as well.

162.    By the fall of 2021, it was already well-understood that the Covid-19

vaccines could not create herd immunity no matter what percentage of the population was vaccinated.

163.    As one of many examples, a 2021 Harvard Study showed that there was "no discernable relationship between percentage of the population fully vaccinated and new Covid-19 cases." Subramanian S. V. and Akhil Kumar. "Increases in Covid-19 are unrelated to levels of vaccination across 68 countries and 2947 counties in the United States." *European Journal of Epidemiology*, 1-4. 30 Sep. 2021, doi: 10.1007/s10654-021-00808-07.

164.    Even in 2021, the great weight of the evidence showed that unvaccinated employees did not constitute a direct threat and could be easily accommodated.

165.    Defendants were on notice of this fact.

166.    Defendants were also on notice that the *de minimis* standard did not apply before they fired Plaintiffs and most other unvaccinated employees for failing to violate their religious beliefs by getting vaccinated.

167.    Attached, and incorporated herein by reference as if fully set forth herein, are sworn declarations submitted in related litigation at various relevant points from public health experts at Johns Hopkins (Exhibit 2 – Dr. Makary), Yale (Exhibit 3 – Dr. Risch), and Stanford (Exhibit 4 – Dr. Bhattacharya).

168.    In related litigation, a group of Plaintiffs presented the DOE with the sworn affidavits from public health experts Dr. Makary and Dr. Bhattacharya, which explained that there was no scientific basis for refusing to accommodate DOE

26

employees based on undue hardship.

169.  Dr. Makary, who wrote the first declaration, was a professor of medicine and public health at Johns Hopkins and has since been appointed as Commissioner of the Food and Drug Administration.

170.  Dr. Bhattacharya, who wrote the second one, was a professor of medicine and public health at Stanford and has since been appointed as Commissioner of the National Institutes of Health.

171.  Both experts agreed that the unvaccinated did not pose a direct threat, and that multiple accommodations existed.

172.  Discovery in other cases shows that the City and DOE relied on no scientific evidence or study to make their undue hardship determination.

173.  For example, Defendants offered Eric Eichenholtz as an expert fact witness in a related case.

174.  Attorney Eichenholtz was the City's chief advisor on labor litigation, and upon information and belief, drafted or approved the unconstitutional criteria under the Stricken Standards.

175.  Mr. Eichenholtz admitted under oath that neither DOE nor the City considered whether or not unvaccinated employees were a direct threat or assessed whether there was significant risk of substantial harm, what the specific risk was, whether it was current, speculative or remote, or base these determinations on any objective medical or factual evidence for any particular individual.

176.  He further admitted that Defendants did not assess for any individual

whether accommodations could be made that lowered any risk below the stringent requirements of the direct threat level.

177.    Under the governing statutes, employers bear the burden of proving all these factors, which they could not do even if they had tried.

178.    The great weight of the objective science, even at the time the Mandate was imposed and shortly thereafter, showed the vaccine could not stop transmission and did not offer robust or durable protection from infection or symptoms.

179.    The declarations submitted by Drs. Bhattacharya and Makary establish that DOE employees did not pose a direct threat and could have been accommodated in person.

180.    Moreover, the vaccines were still at an experimental stage.

181.    There was insufficient data available to determine what the risks and benefits were, or that a benefit overrode risks to particular people, especially those with underlying health conditions.

182.    And, though Pfizer's vaccine was being rushed through for FDA approval, Pfizer did not actually offer any of the FDA approved vaccines in New York State.

183.    It was not possible to obtain an FDA approved Covid-19 vaccine in New York State at any time between August 2021 through September 2022.

184.    The only available vaccines that Pfizer made available in New York State during this timeframe were those authorized under Emergency Use Authorization ("EUA").

185.    EUA vaccines cannot be mandated, by the terms of their authorization.

186.    Additionally, children had the lowest risk from Covid-19 of any population, and their risk of severe harm from the disease was so low as to be statistically insignificant.

187.    Tellingly, every other school district in the state, including many neighboring school districts on Long Island, which had nearly identical populations of students and staff, allowed teachers to test weekly in lieu of vaccination throughout the pandemic.

188.    These other school districts did not see any statistically significant increase in infection rates from the infection rates at the NYC DOE after the DOE's Mandate went into effect.

189.    Moreover, there were numerous additional measures that could have been taken, including but not limited to weekly testing, symptom checks, or other protective measures, each of which could have mitigated any perceived or actual increased risk of transmission from unvaccinated employees.

190.    Remote accommodation would not have been a significant hardship either.

191.    Plaintiffs had previously been accommodated remotely for short or long periods of time during the pandemic.

192.    The Mandate was supposed to be a temporary emergency measure (and indeed, did have to be continued or renewed repeatedly throughout the year and a half it was imposed).

193.    The DOE had accommodated widespread remote work for the entire previous school year and summer session, and the DOE could have continued to allow those needing religious accommodation to work remotely.

194.    Despite the DOE's argument that they had moved most instruction back to in person in 2021, the DOE continued to provide a parallel remote program for many students throughout the 2021-2022 school year.

195.    The DOE could have accommodated classroom teachers who needed to opt out by allowing them to teach in this remote program.

196.    Indeed, the DOE continued to advertise vacancies for and hire remote teachers throughout the 2021-2022 school year, even as they claimed it would be an undue hardship to accommodate any unvaccinated DOE teacher with religious concerns remotely.

197.    There were other ways that DOE employees could have been accommodated through remote work as well without significant hardship.

198.    For example, before sending out the denials, DOE set up buildings specifically for remote work for those who would be accommodated under the Stricken Standards.

199.    At all times relevant to this Complaint, those building stood largely empty and well below capacity.

200.    Teachers and paraprofessionals could have worked with a co-teacher (which many already had in place) and pushed in through Google Classroom (from home or the remote worksites) to work with individuals or groups or modules

throughout the day.

201.    There was also work that could be done that did not require in person presence that they could have been reassigned to temporarily until the "emergency" was over.

202.    Upon information and belief, the summary blanket denials were issued to demoralize and harass religious employees, who got the message, loud and clear, that DOE was not acting in good faith.

203.    Employees had poured their hearts out into their religious accommodation letters, which is a vulnerable thing to do.

204.    They were given only a few days to commit their most sacred innermost thoughts to paper, and to gather a clergy letter if they could.

205.    Receiving an autogenerated response, almost immediately, with a boilerplate denial from a "donotreply" email address felt like a mockery of their faith and showed many employees – both the recipients and their colleagues who were considering whether to apply or litigate - that further efforts were futile.

206.    Tellingly, many who received the autogenerated undue hardship denials did not even work in student facing positions – or in person at all in some cases - in the Fall of 2021.

207.    But these remote and administrative employees still received the same autogenerated email asserting they were denied because the Mandate did not allow employees to work unvaccinated around students.

208.    DOE's initial autogenerated denials stated, on their face, that they

were issued in accordance with the Stricken Standards.

209.    But pursuant to the Stricken Standards, DOE was not authorized to deny *any* applicant based on undue hardship.

210.    Rather, the Stricken Standards, which were supposed to apply (per the policy) to both the initial DOE review and the appeals to the arbitrators, had no mechanism for undue hardship denial.

211.    According to the Stricken Standards, employees who met the defining criteria for qualifying religious beliefs "shall be" accommodated.

212.    The DOE's decision to violate even the one helpful aspect of the Stricken Standards by proactively denying 100% of the applicants through an autogenerated email pretextually asserting "undue hardship" shows animus animus and bad faith and leads to a reasonable inference that all subsequent religious accommodation decisions and policies implemented by DOE were pretextual.

***The DOE refused to allow many employees to appeal their denials***

213.    The DOE's policies made it very difficult for employees to apply for religious accommodation and even harder to appeal their denials.

214.    The Stricken Standards were not widely announced, and deadlines were not clearly explained to employees.

215.    Many employees were never told when the "deadline" to apply for religious accommodation was, only that they had to get vaccinated before September 27, 2021, and that this deadline was later moved to October 1, 2021, due to the Second Circuit's temporary restraining order issued in September 2021.

216. The deadlines were also irrelevant.

217. In truth, pursuant to all three accommodation statutes, an employer cannot impose an arbitrary cutoff deadline to apply for religious accommodation.

218. Rather, the statutes each specify that the employer has an affirmative obligation to accommodate an employee or prospective employee's religious practices when the employer knows, or should know, that the employee needs accommodation, whenever that may occur.

219. Each one of the various arbitration awards provided a different "deadline" to get the expedited review available under the Stricken Standards.

220. Each was circulated, if at all, only a few days before these deadlines.

221. Plaintiffs and their similarly situated colleagues were in a state of emergency.

222. The start of a new school year is already a hectic time for educators.

223. This was particularly hectic, as many students were returning from a year and a half of remote instruction, and there was quite a bit to work out.

224. The DOE's sudden and aggressive announcement had DOE employees scrambling, attempting to secure loans and contingency plans in case they were suddenly out of a job, raise money to file lawsuits to challenge the blatantly unconstitutional religious accommodation policy, run around town trying to gather medical records and clergy letters, write long heart-felt letters that could explain their innermost sacred beliefs to secular and hostile strangers.

225. They had to do all of this while meeting extensive job responsibilities

at the start of the school year, which was just a month in when the mandate went into effect.

226.    To make matters worse, the SOLAS system, where the applications were supposed to be uploaded, froze repeatedly, especially during the deadlines to apply or appeal, leaving some unable to apply by the "due date."

227.    Those that were able to get their applications in before the "due dates" then had only 24 hours to appeal their initial DOE denials.

228.    These denials were sent by email, and many employees did not see them within the twenty-four hours allotted.

229.    Too often, the denials were issued on the Sabbath or a holy day, leaving those with religious practices that forbid Sabbath work with no time to appeal.

230.    And, once again, many employees were unable to appeal, since the SOLAS system crashed during their brief window to appeal.

231.    Many others felt it was futile to appeal, after receiving DOE's insulting autogenerated generic denials in response to their good-faith and heartfelt accommodation requests and hearing from colleagues that everyone was getting the same denial, even those who already worked remotely.

232.    Employees that submitted religious accommodation requests "late" were allowed to apply and were issued formal denials through a nearly identical autogenerated email as those who applied on time, but they were not allowed to appeal.

233.    And, of course, those who were shut out of appealing due to problems

with the SOLAS website were also denied the right to appeal.

234.   Those who did get to appeal did not fare much better.

235.   Most were provided with no explanation whatsoever, just given a paper that had an "x" next to the word "Denied."

236.   The decision whether to grant a zoom hearing or not was arbitrary.

237.   Employees who met the criteria in the Stricken Standards were denied the right to a hearing and denied with no further explanation than an "x" next to the word "denied."

238.   Some applicants were allowed a zoom hearing.

239.   There was no apparent reason why some were granted, and others denied the right to have a hearing.

240.   Arbitrators were given unfettered discretion whether to allow a hearing.

241.   Neither DOE nor the arbitrators kept any records explaining the decisions and DOE admitted in other lawsuits and position statements to the EEOC that it cannot explain the reasons why some were granted a hearing, and others denied.

242.   At the zoom hearings, the arbitrators and DOE representatives engaged in what can only be described as heresy inquisitions, in which they discriminated even more zealously than the already discriminatory policy required.

243.   For example, DOE openly and repeatedly took the position that all Jews must be denied because of a Jerusalem Post article stating that a Rabbi in

35

Israel was vaccinated.

244.    The Jerusalem Post article was provided to the DOE by the City with the instruction that it showed all Jews should be excluded.

245.    DOE representatives repeatedly referenced this article in zoom hearings to assert that all Jews must be categorically denied accommodation.

246.    Jewish applicants from related lawsuits repeatedly documented that though they explained that their own Rabbi did not share the Israeli Rabbi's opinion, that Judaism is a diverse religion, and that a random Rabbi in Israel could not be deemed the "leader" of all Jews, they were still told that Jews could not qualify under the Stricken Standards because of the Jerusalem Post article.

247.    Similarly, DOE also took the repeated position that all Catholics had to be denied, because Pope Francis is vaccinated.

248.    There is substantial debate within the Catholic faith, like many other faiths, about whether it is religiously permissible to take a Covid-19 vaccine.

249.    In fact, a whole council of Catholic Bishops set forth a document asserting that it is likely *not* permissible for Catholics to take any of the Covid-19 vaccines due to the use of aborted fetal cell lines in production and development of the vaccines.

250.    Moreover, while Pope Francis is vaccinated and expressed his public opinion that vaccination might be permissible despite the connection to abortion, he also instructed Catholics that they must each consult their religious conscience to make the choice for themselves.

251.    Nonetheless, DOE argued repeatedly in the zoom hearings that all Catholics should be denied because the Catholic Pope was vaccinated.

252.    DOE maintained this position even if the applicant provided a letter from their own Priest or religious leader stating that they had a valid religious belief.

253.    The instruction that the Pope's vaccine status should lead to categorical exclusion of most Christians came from the City.

254.    DOE representatives zealously furthered this discriminatory policy and repeatedly argued that all non-denominational Christians other than Christian Scientists should be denied due to the Pope's beliefs.

255.    Multiple lawsuits detain, in sworn pleadings, how DOE representatives repeatedly argued that anyone who belonged to a non-denominational Christian faith must be denied, both because the Pope is vaccinated (even though non-denominational churches do not follow the Pope) and because the nondenominational churches are allegedly not "established and recognized" religious organizations according to the Defendants.

256.    Even in cases where applicants submitted letters from their own religious leaders, explaining that the whole congregation opposed vaccination, DOE argued that the Pope's beliefs controlled all Christians other than Christian Scientists, and the applicant had to be denied, even if sincere.

257.    DOE went so far as to argue in at least one documented case to argue that a Buddhist applicant should be denied because his views were not shared by the Catholic Pope even though the DOE representative acknowledged that DOE

found his religious beliefs sincere.

258.    DOE also often argued that all Buddhists had to be denied because the Dalai Lama was vaccinated.

259.    The Dalai Lama is a spiritual leader of the Gelug ("Yellow Hat") sect, which is one of at least four sects of Tibetan Buddhism.

260.    There are many other sects of Buddhism - perhaps thousands of other sects, outside of Gelug Buddhism.

261.    Moreover, according to spiritual texts, Buddha told his followers not to take any leader when he was dying, but rather, that each must rely on the dharma to examine the truth for themselves.

262.    But DOE still repeatedly argued that all Buddhists should be categorically denied because the Dalai Lama was vaccinated.

263.    Similarly, the DOE representatives routinely pulled out a letter purporting to be from a Seventh Day Adventist leader to assert that all Seventh Day Adventists must be denied.

264.    This letter was provided to the DOE by the City, with instructions to deny all Seventh Day Adventists.

265.    DOE also argued repeatedly that all Muslims must be denied due to the alleged discovery of an alleged "leader" of that diverse faith who was vaccinated.

266.    Upon information and belief, the City instructed the DOE to categorically deny all of these faiths.

267.    The DOE's discriminatory statements and ignorant assumptions about

faith were common and well-documented throughout the accommodation process.

268.    Arbitrators often joined in in the discriminatory positions and comments, accusing applicants of being wrong about what their faith required, or essentially, of being heretics for not allegedly following Pope Francis or the Dalai Lama or the Israeli Rabbi or whoever they decided to deem the leader of the faith.

269.    DOE representatives encouraged such harassment from the arbitrators, joining in and doing nothing to remediate the comments when made.

270.    DOE also categorically denied several types of belief within a religion, discriminating on religious reasons they did not understand or agree with.

271.    Especially, DOE representatives argued that any religious objection based on concerns about the use of aborted fetal cell lines was presumptively invalid.

272.    The City provided DOE with a letter from Health Commissioner David Chokshi, in which the Commissioner argued that concerns about aborted fetal cells did not merit religious protection.

273.    Commissioner Chokshi also provided this letter to the arbitrators without sharing it with Plaintiffs or other impacted employees, urging them to deny religious protection to those with religious concerns about the use of aborted fetal cell lines.

274.    It is well-documented that aborted fetal cell lines were used in the development of all three of the available Covid-19 vaccines.

275.    Though he ultimately admitted that all the available vaccines used aborted fetal cell lines, at least in development, Commissioner Chokshi's letter

argued that religious concerns about this fact were misguided and wrong. He went on to support his position about a religious dispute by stating: "An array of religious groups have stressed the importance of COVID-19 vaccination to save lives from COVID-19 and have called on all people to get vaccinated. As an example, the Catholic Church has issued a clear statement that Roman Catholics can in good faith receive COVID-19 vaccines that use fetal cell lines in development. Vaccination is the most important thing people can do to protect themselves and others from COVID-19."

276. Commissioner Chokshi's opinion that the use of aborted fetal cells does not merit religious protection is impermissible governmental entanglement in religious questions and constitutes discrimination.

277. The government is expressly prohibited from lending its power to one side in a religious dispute, and this is exactly what Commissioner Chokshi did in his letter to the arbitrators.

278. Arbitrators responded to this pressure, repeatedly mentioning it in zoom hearings, or grilling applicants and accusing them of heresy for failing to share the exact same beliefs as the Pope regarding aborted fetal cell lines.

279. Moreover, the DOE repeatedly used Commissioner Chokshi's letter in zoom hearings, arguing that it proved that concerns about the use of aborted fetal cell lines did not merit religious protection.

280. After their zoom hearings, each applicant received a denial, with no explanation whatsoever, just an "x" next to the word "Denied."

281.    Conversely, at least 163 other DOE employees were accommodated after the administrative appeals, some of them classroom teachers.

282.    Upon information and belief, most of these employees were accommodated after a group of educators filed for an emergency injunction protecting them from the discriminatory religious accommodation policies on or about October 4, 2021.

283.    Upon information and belief, DOE hoped that by accommodating some employees from various religious groups previously categorically denied, it could try to defend against their obvious and widespread discrimination.

284.    But whatever the reason, DOE showed that it could accommodate employees by accommodating these 163 who were deemed to meet the unconstitutional criteria applied by DOE and the arbitrators.

285.    Some of the accommodated classroom teachers were given alternative assignments.

286.    Others were assigned to teach some of the online students who remained in the remote program.

287.    And many were accommodated by allowing (or hiring) a co-teacher to stay in the classroom while the accommodated teacher taught via Google Classroom.

***The City aided, abetted and colluded in DOE's discrimination.***

288.    The City is jointly liable for the DOE's discriminatory religious accommodation policies and practices.

289.    As a threshold matter, in 2002, the New York State Legislature granted

the City "Mayoral Control" over New York City's public schools. At all times relevant to this Complaint, pursuant to this authority, as extended and amended over the years, the Mayor's office exercised control over DOE and its operations.

290.    At all times relevant to this Complaint, the Mayor's office worked closely with DOE to oversee and direct the religious accommodation policies and their discriminatory implementation.

291.    The City was also jointly responsible for carrying out the arbitration award, as reflected in the opening paragraphs of the opinion, which list the City as a party that was required to carry out the Stricken Standards. [Ex 1 at 6-7].

292.    The City also actively participated in harassing and discriminating against DOE employees who sought religious accommodation from the Covid-19 vaccine mandate, aiding and abetting violations of the statutory protections for religious accommodation.

293.    The Mayor's office and Mayor's legal counsel initially directed DOE not to offer any religious or medical accommodation from the Mandate.

294.    The Mayor's office and/or Mayor's legal counsel participated in drafting the proposed language for what criteria to use in judging a valid religious accommodation requests, which were later adopted in the Stricken Standards.

295.    Upon information and belief, the criteria for religious exemption were composed entirely, or substantially, of language and procedures proposed by the City's attorneys.

296.    Attorney Eric Eichenholtz, who was, at all times relevant to this

Complaint, working under the direction and guidance of the City of New York, was one of the City's attorneys who drafted the proposed criteria adopted in the Stricken Standards.

297.   At the time, Mr. Eichenholtz directed the labor and employment litigation group.

298.   As such, he was essentially in charge of the City's legal defense to the discrimination charges.

299.   After assisting Defendants with blatant, widespread religious discrimination, both in the original DOE policies and then during the pretextual Citywide Panel "reviews" (which he was in charge of), Mr. Eichenholtz was promoted to Managing Attorney for the New York City Law Department.

300.   The City was also intimately involved in directing the DOE in the implementation of these policies and aiding and abetting the exclusion of as many applicants as possible from accommodation based on unconstitutional criteria.

301.   In a press briefing held on September 23, 2021, the day before the DOE appeal hearings began, Mayor de Blasio was asked how the City intended to implement the religious exemption policies for DOE employees and what criteria the City would use. He responded:

> **Mayor**: Yeah, it's a great question. Thank you. Yes. And very powerfully Pope Francis has been abundantly clear that there's nothing in scripture that suggests people shouldn't get vaccinated. Obviously, so many people of all faiths have been getting vaccinated for years and decades. **There are, I believe it's two well-established religions, Christian Science and Jehovah's Witnesses that have a history on this, of a religious opposition.** But overwhelmingly the faiths all around the world have

been supportive of vaccination. **So, we are saying very clearly, it's not something someone can make up individually. It has to be, you're a standing member of a faith that has a very, very specific longstanding objection**.[3]

302.    This statement admits an intention to categorically discriminate against most religions and only grant religious accommodation to members of certain faiths that have "a very, very specific longstanding objection" according to the Mayor.

303.    It is also an admission that the City was involved in and directing DOE to discriminate against most faiths in the appeals.

304.    If the City had no involvement, the Mayor would have stated that the City was not involved, in response to questions about how the City was going to decide which teachers to accommodate.

305.    Instead, he admitted that the City was involved, and that it planned to categorically discriminate against all faiths but Christian Science and Jehovah's Witnesses.

306.    Moreover, the Mayor would not have said "we are saying, very clearly" that a person has to be "a member of a faith that has a very, very specific longstanding objection" but rather would say the DOE was taking that position if the City was not involved.

307.    "We" indicates the Mayor's participation and collusion with this

---

[3] Office of the Mayor, NYC. (2021, September 23). *Transcript: Mayor de Blasio Holds Media Availability* [Press release]. https://www.nyc.gov/office-of-the-mayor/news/644-21/transcriptmayor-de-blasio-holds-media-availability

discriminatory policy.

308.    There is additional evidence that the City was intimately involved in and aided and abetted the DOE's discriminatory policies.

309.    The Mayor's office and/or City's legal counsel provided the letter from the Jerusalem Post to DOE and advised DOE to deny Jewish applicants based upon that article.

310.    The Mayor's office and/or City's legal counsel also directed DOE to categorically exclude Buddhists, because of the Dalai Lama.

311.    The Mayor's office and/or City's legal counsel also directed DOE to deny Muslims, because of a random City-defined "leader" of Muslims who the City believed was vaccinated.

312.    The Mayor's office and/or City's legal counsel directed the DOE to deny Catholics, because Pope Francis was vaccinated.

313.    The Mayor's office and/or City's legal counsel directed the DOE to deny Seventh Day Adventists, because of an alleged leader's position statement which they provided to the DOE.

314.    The Mayor also took an official City position on religious questions, announcing to the press that "Pope Francis has been abundantly clear that there's nothing in scripture that suggests people shouldn't get vaccinated" when explaining that the City would not allow people with personally held religious beliefs that differed from the leaders of their faith to get accommodation.

315.    The City also provided a letter from Commissioner Chokshi to DOE

and the arbitrators and instructed them to use it to deny those with religious objections based on the use of aborted fetal cell lines.

316.   The Mayor and/or City's legal counsel also directed DOE to deny all personally held religious beliefs.

***DOE's religious accommodation policies declared unconstitutional.***

317.   On or about September 21, 2021, a group of educators brought a proposed class action lawsuit against the City and DOE, titled *Kane v. de Blasio et al*, in the Southern District of New York arguing, among other things, that the DOE's religious accommodation policies were unconstitutional.

318.   This verified complaint, which was served on the Board of the DOE and the City, notified both Defendants that the Stricken Standards were discriminatory and violated the rights of <u>all</u> DOE employees seeking religious accommodation.

319.   Both Defendants acknowledged receipt of the notice by entering the *Kane v. de Blasio* case.

320.   The Complaint was timely served on the Department of Education and the City of New York.

321.   Multiple other employees also served notices of claim, alerting the City and the DOE of classwide claims that needed to be adjusted, and fatal problems with their discriminatory religious accommodation policies.

322.   Plaintiff Clarke also served an EEOC claim on Defendants in or around October 2021, which serves as functional notice of her claims against DOE and the City.

323.    Neither Defendant adjusted the class wide claims or Plaintiff Clarke's individual claims within the statutory period.

324.    In November 2021, the Second Circuit Court of Appeals held, first in a motion panel and then a merits panel, that the DOE's religious accommodation policies were unconstitutional, and the plaintiffs were likely to succeed on the merits of their claim and deserved injunctive relief.

325.    As the Second Circuit pointed out, the religious exemption criteria in the Stricken Standards are blatantly unlawful.

326.    First, the Court held that DOE's policies were not neutral, pointing out that it violates the most basic governing standards of state and federal law to discriminate against those with personally held religious beliefs, or deny accommodation based on someone else's religious beliefs, even the leader of one's own faith.

327.    The Court particularly chastised the Defendants for denying Catholics and other Christians just because the Pope was vaccinated.

328.    Second, the Court held that the policies were not generally applicable, as Defendants had discretion whether to grant accommodation.

329.    The Court rejected Defendants' attempts to pin the illegality on the arbitrators or to argue that *Kane* plaintiffs had to sue the union, not the DOE and the City.

330.    Nothing in the arbitration award, or in the governing collective bargaining agreement waived employees' rights to challenge the religious

discrimination inflicted by DOE or the City in Court.

331.   Both Defendants knew or should have known that the Stricken Standards are blatantly unconstitutional, and that the Government cannot make or enforce unconstitutional policies, nor can it encourage, aid or abet discrimination.

332.   Notwithstanding the obvious illegality of the Stricken Standards, the DOE adopted and enforced the policy to decide religious accommodation requests to the Mandate and the City participated in and was complicit in these discriminatory denials.

333.   In *Kane*, in the proceedings before the Second Circuit, Defendants' attorneys admitted that the religious accommodation policies adopted by DOE were likely unconstitutional.

334.   The City asked the Court to let them try to mitigate the harm by providing a "fresh review" by a newly created "Citywide Panel", spearheaded by Defendants' attorneys, particularly, Mr. Eichenholtz.

335.   The City promised that any employee whose religious beliefs qualified under lawful standards would be reinstated with back pay.

336.   The DOE agreed to this plan.

337.   In November 2021, first a motion panel and then a merits panel of the Second Circuit Court of Appeals held that the Mandate, as applied through DOE's religious accommodation policies, were likely unconstitutional and issued an order requiring the City to give fresh consideration through a new "Citywide Panel" and reinstate those who qualified with backpay.

338.   Though the Second Circuit's order did not apply to non-named plaintiffs in the *Kane* lawsuit, the orders acknowledged that the Court's decision to limit relief to named plaintiffs in the preliminary injunction order was impacted by the fact that the City promised to make the Citywide Panel review and reinstatement available more broadly on a voluntary basis.

339.   However, the Citywide Panel did not review the vast majority of employees denied under the Stricken Standards.

340.   According to later representations by Defendants counsel in related litigation, the Citywide Panel only reviewed about 500 of an estimated 5,000 to 7,000 applicants denied religious accommodation from the DOE Mandate.

341.   According to DOE, only employees who had been able to submit an appeal within 24 hours of their initial denial were reviewed by the Citywide Panel.

342.   But those who were deprived of an appeal suffered from the discriminatory and pretextual policies too and had no recourse even after Defendants admitted that their original policies were unconstitutional.

343.   Moreover, many applicants who did appeal under the original Stricken Standards, were never provided with a Citywide Panel as promised.

***The Citywide Panel denials were also pretextual and showed ongoing animus***

344.   By volunteering to handle the remedial process after the original DOE religious accommodation process was found unconstitutional, but then failing to mitigate the harm for Plaintiffs and those similarly situated, the City took on

responsibility for Plaintiffs' harm.

345.    The City's decision not to review the majority of denials under the Stricken Standards is a constructive denial, that does not comply with statutory standards.

346.    The Citywide Panel reviews did not comply with the statutory standards either and created further equal protection problems.

347.    The reviews were not carried out in good faith.

348.    Out of an estimated five hundred reviewed, only one applicant's denial was reversed by the Citywide Panel.

349.    This reversal was made *subjudice* and was only granted so Defendants could argue to the Court that the Citywide Panel was a valid remedial measure to the initial acknowledged discrimination.

350.    In other words, it was pretextual.

351.    The Citywide Panel did not engage in cooperative dialogue about possible accommodations with any applicant, despite the statutory requirements that it do so.

352.    Between February 2022 and August 2022, the Citywide Panel sent out autogenerated emails from an email address called "noreply@salesforce.com" which stated that the denial was the final denial, and that employees had to get vaccinated within three days.

353.    The reasoning was generic, typically stating in generic language that DOE had demonstrated that it would be an undue hardship given the need for safe

in-person learning and sometimes tacking on a statement indicating that the applicant had failed to establish that their religious beliefs preclude vaccination.

354.   Most of the denied employees were then terminated a few weeks or months after receipt of the rejection from the Citywide Panel.

355.   Hundreds of employees never received a decision at all, just a termination notice while their application for review by the Panel was still pending.

356.   Many of these employees have never received a decision from the Panel to this day.

357.   The Citywide Panel reviews were also infected by the same animus that plagued the initial denials of accommodation.

358.   First, the Citywide Panel imposed a different undue hardship standard on those given fresh review than had been imposed on those accepted under the discriminatory policy.

359.   Specifically, the Citywide Panel applied a complete blanket undue hardship ban on accommodation for all teachers and most administrators, even those with sincere religious beliefs, claiming that DOE "had demonstrated" it would be an undue hardship to accommodate anyone who worked in a building with children.

360.   By contrast, under the Stricken Standards, if an employee's religion met the discriminatory definition for determining they had a qualifying religious belief, they had to be accommodated without regard to undue hardship.

361.   Under the discriminatory Stricken Standards policy, at least 163

employees were therefore accommodated, some of them classroom teachers.

362. The rest of the applicants were denied the same accommodation, not because they would somehow be harder to accommodate than the 163 who were granted accommodation under the discriminatory policy, but because DOE disfavored their religions and particular religious objections.

363. In sum, the Citywide Panel's more rigorous blanket undue hardship bar for those who qualified under "lawful" standards versus those that qualified under the openly discriminatory standards, constituted a fresh incident of discrimination (since it was not applied to those who were impermissibly favored under the old policy).

364. Second, the Citywide Panel's blanket undue hardship determinations violated statutory standards.

365. In related litigation, the City offered Mr. Eichenholtz, who created and was in charge of supervising the Citywide Panel, to be deposed for the purpose of addressing the Citywide Panel's policies.

366. Mr. Eichenholtz was the "architect" of the Citywide Panel and oversaw it and had veto power over determinations.

367. He admitted in his sworn deposition that neither the City nor the DOE analyzed any of the statutory factors before denying applicants based on undue hardship.

368. He further admitted that neither the City nor the DOE ever assessed any objective evidence to determine that employees could not safely be

accommodated before issuing the undue hardship denials.

369.    He further admitted that the Citywide Panel did not know or assess whether the vaccine could stop transmission of disease or whether unvaccinated employees were more dangerous than vaccinated ones.

370.    Mr. Eichenholtz further admitted under penalty of perjury that DOE never provided information to the Citywide Panel "as to the number of employees it could afford to employ without causing undue hardship."

371.    He also swore that the "inability to pay employees" who were not able to work in person "has not come up" nor had DOE submitted any information about increased costs that could present an undue hardship if employees were accommodated.

372.    Mr. Eichenholtz said the Citywide Panel did not ask the DOE to explain whether the remote worksites it set up were at capacity (they were not).

373.    He also said that he was not aware of any direct threat analysis conducted for any employee.

374.    Mr. Eichenholtz could not recall any panel member assessing whether Covid-19 vaccination could limit the spread of Covid-19.

375.    He finally conceded that the Panel had imposed "no evidentiary requirement" from any agency on the undue hardship issue. When pressed, Mr. Eichenholtz stated that he did not think analysis of any statutory factors was necessary for an appellate body like the Citywide Panel, and he had made sure there was no requirement that the DOE or any other agency "provide that kind of data."

376.    Bizarrely, Mr. Eichenholtz admitted that neither he nor the panel ever relied on any evidence or data to conclude that unvaccinated employees might pose a substantial risk of significant harm if allowed to work in person unvaccinated.

377.    He confirmed that the Citywide Panel did not assess the duration of any risk or any of the other statutory factors on direct threat either.

378.    From this testimony alone, it is patently clear that the Citywide Panel, like the DOE before it, failed to meet its burden of proof on undue hardship.

379.    Moreover, the Panel's blind reliance on DOE assertions of undue hardship, without any fresh review of the evidence, means that the DOE ultimately got to decide whether applicants would be accepted on fresh review.

380.    The DOE had already been caught openly discriminating against these very employees.

381.    Their blanket assertion of undue hardship on appeal, which was accepted by the Panel without evidence or review, leads to a reasonable inference that the discrimination continued, and the denials were pretextual.

382.    This is especially true since DOE continued to accommodate the 163 who were impermissibly favored under the old unconstitutional policy, without providing any non-discriminatory explanation as to why those 163 posed less of a danger.

383.    Outrageously, throughout the winter of 2021-2022, when the Citywide Panel started making its undue hardship decisions, the DOE was sending *actively infected and infectious* vaccinated teachers with Covid-19 back into the classrooms.

384. Meanwhile, thousands of uninfected teachers with natural immunity were kept on leave without pay and even terminated on the unsupported claim that it would be an "undue hardship" to allow them to be around the students unvaccinated.

385. Third, the Citywide Panel applied the wrong legal standard to determine undue hardship.

386. In his deposition and in many sworn pleadings, Mr. Eichenholtz repeatedly admitted under oath that the City and DOE both used the unlawful "*de minimis*" standard for undue hardship rather than the significant or substantial standard required by the three controlling statutes even though they had been repeatedly put on notice that the statutes required more.

387. Using the unlawful *de minimis* standard, the City and DOE made blanket unsupported assumptions that any accommodation would be "more than a minimal burden" and justified denial of all classroom teachers on that basis.

388. Citywide Panel members under Mr. Eichenholtz' direction routinely went even further and continued to recommend that even applicants who already worked remotely should be denied based on unsupported "undue hardship" assumptions.

389. Mr. Eichenholtz did not reverse these undue hardship determinations even though he had the authority and responsibility to make the final decision in each case.

390. Fourth, the Citywide Panel failed to engage in cooperative dialogue

55

with any applicant about possible accommodations and challenges thereto before denying their applications.

391.    This leads to an inference that the undue hardship determinations were pretextual and discriminatory, especially because some of those denied under these blanket bans already worked remotely or in buildings without students.

392.    <u>Fifth</u>, nothing in the Mandate specified that DOE employees could not be given religious accommodation that would allow them to work in person.

393.    On the contrary, the Mandate specified that nothing in it prevented reasonable accommodation as required by law.

394.    Pursuant to statute, employers must grant religious accommodation unless they can show that there is a safety concern.

395.    Defendants' own decisions show that safety concerns were pretextual.

396.    For example, shortly after all unvaccinated employees were excluded, thousands of fully vaccinated DOE employees were infected with Covid-19.

397.    In or around January 2022, before the Citywide Panel undue hardship denials were issued and before most unvaccinated employees were terminated, DOE adopted an open policy of encouraging and cajoling *actively infected* teachers to come back to the classroom within five days of onset of infection due to staffing shortages.

398.    It was well-understood at the time that Covid-19 was still transmissible five days after onset in most cases.

399.    But, while DOE allowed actively infected teachers to teach children in person, they excluded Plaintiffs and their religiously opposed colleagues, who were

not infected and were willing to test and take other precautions to protect themselves and the students.

400. Moreover, DOE did not enforce the Mandate equally.

401. For example, DOE allowed thousands of employees to remain only partially vaccinated in violation of the Mandate.

402. DOE did this even though the Mandate required that employees get their second dose within 45 days and even though it was well-understood that one dose provided no protection against transmission or even personal progression of disease.

403. Yet, these teachers were allowed to keep teaching in person unvaccinated in violation of the Mandate.

404. The City was aware of this fact and did nothing to require compliance.

405. But the City and DOE were totally inflexible when it came to religious accommodation, refusing to even consider reasonable accommodation as required by the Mandate itself.

406. Sixth, the Citywide Panel failed to assess individual circumstances, claiming it would be an undue hardship to accommodate employees even when those employees already had remote non-student facing jobs.

407. Seventh, by the time the Citywide Panel began issuing undue hardship denials, the vast majority of its vaccinated workforce had gotten Covid-19.

408. When the undue hardship denials were issued, there was no good faith basis to assert that unvaccinated employees posed a direct threat due to their

religious practices.

409.    The objective scientific consensus overwhelmingly showed that vaccination could not stop transmission of Covid-19.

410.    By January 2022, it was beyond dispute that the vaccines were not stopping transmission.

411.    After the DOE excluded unvaccinated workers, rates of Covid-19 cases amongst the fully vaccinated staff skyrocketed from about 30-50 cases at any given time, to over 5,000 a day and other astronomical numbers in January 2022 among the fully vaccinated staff.

412.    Moreover, the City itself has admitted in other litigation that by the summer of 2022, any safety argument about accommodating unvaccinated employees had fully dissolved.

413.    Yet, Defendants refused to accommodate Plaintiffs and other denied employees in August 2022 when they sent out the offer of reinstatement to fired DOE workers, even though they knew that Plaintiffs needed religious accommodation from the Mandate.

### The City continued to discriminate

414.    The Citywide Panel also continued to apply discriminatory criteria to determine whether an applicant had, so called, qualifying religious beliefs.

415.    First, the Citywide Panel continued to apply a blanket ban on anyone whose religious belief included objection to the connection between the vaccines and abortion.

416.    All three of the available Covid-19 vaccines at the time used aborted fetal cell lines in production or development of the product.

417.    Emails exchanged between a Panelist and Mr. Eichenholtz provide evidence that Mr. Eichenholtz instructed the panel that such beliefs do not merit religious protection and should be rejected as invalid.

418.    Mr. Eichenholtz's own sworn testimony and statements show that he and the Citywide Panel improperly denied accommodation to applicants with religious objections to the use of aborted fetal cell lines, on the arrogant assumption that they are "wrong."

419.    When deposed, Mr. Eichenholtz admitted that he did not know whether aborted fetal cell lines were used in the development and production of the Covid-19 vaccines and had not researched this issue.

420.    But nevertheless, he continued to reject applicants with a concern about aborted fetal cell lines based on the assertion that they were "wrong."

421.    Mr. Eichenholtz has also filed numerous sworn pleadings in related cases which admit that the Citywide Panel regularly substituted judgment about whether abortion related concerns are "religious in nature" and deny sincere applicants who assert this religious concern based on the perception that they were wrong.

422.    Multiple employees with this religious objection received a notation in the spreadsheet kept by the Citywide Panel indicating that their beliefs do not actually preclude vaccination.

423.   Mr. Eichenholtz and the City's lawyers have admitted this notation signifies that the Citywide Panel rejected the belief based on the panel's disagreement about the verity of the concern, not the sincerity.

424.   The City has later explained that regardless of what the applicant sincerely believes, the City routinely substituted judgment to decide whether the applicant was wrong about their beliefs and whether the applicants' religious beliefs truly prohibit vaccination even if the applicant believes that they do.

425.   The Citywide Panel also continued to deny beliefs grounded in prayer or consultation with the moral conscience, on the mistaken theory that such beliefs are somehow personal and not "religious."

426.   Beliefs derived from prayer and conscience are religious in nature and are protected as such.

427.   As one of many examples, it is a foundational catechism of Catholicism that the Holy Spirit, and ultimately God, speaks to us and reveals truth through the conscience.

428.   Many Catholics believe they are required to consult their conscience and follow the guidance of the Holy Spirit when it is provided, regardless of what any other person may believe.

429.   Many other religious people have similar beliefs.

430.   But the Citywide Panel routinely decided that such beliefs are not religious because they allegedly allow a person to pick and choose what they believe they should do.

431.    This is ignorant, as many religious people would say that instructions from God or the Holy Spirit *do not* allow a person to pick and choose what they want to do, since religious people believe they are required to follow such guidance even over black letter law handed down by man.

432.    But in any event, the rejection of these beliefs is also discriminatory.

433.    In a nutshell, the Citywide Panel continued the same discrimination against unorthodox faiths that had been codified in the Stricken Standards, that is, requiring that a person's religious objection come from dogma or instruction from church leaders, rather than from guidance from God or other personally held sources of religious belief.

434.    The Citywide Panel also entangled itself to an unconstitutional degree with religious questions, denying applicants because their beliefs were allegedly not logical or articulated in a sufficiently coherent manner.

435.    The Citywide Panel also denied employees if they'd taken other vaccines, even if the employee explained that they took the previous vaccine before they converted to their current beliefs system, or that their religious objection did not apply to that vaccine (for example, if the other vaccine did not use aborted fetal cell lines in production or development).

436.    The Citywide Panel also refused to credit applicants' own interpretation of their faiths, instead adopting a policy that the City was tasked with the job of determining what their faith required of them.

437.    These are just some of the discriminatory policies applied by the City

to uphold all but one of the original denials.

438.    Ultimately, the fact that the Citywide Panel arrived at nearly the same result as the original admittedly discriminatory process leads to an inference that the City's reasons were pretextual.

439.    The goal of the Citywide Panel was to try to get out of liability for the acknowledged original discrimination by upholding nearly all the original discriminatory denials, rather than review them in good faith to remediate the discrimination, as promised.

440.    The history of Defendants' religious accommodation policies also supports the inference that the Citywide Panel's denials were pretextual.

441.    Before the Mandate was announced, Defendants' religious accommodation policy was to assume that an applicant had sincerely held religious beliefs and focus on whether a request would present an undue hardship.

442.    In all other contexts, the DOE did not require extensive recitation of a person's religious basis for a religious accommodation request, and routinely granted religious accommodation requests where a person did not specify the specific religious tenants that guided their need for accommodation.

443.    Denials based on sincerity or adequacy of religious beliefs were rare before the Mandate, both at DOE and at other City agencies.

444.    After the Mandate was implemented, Defendants changed the policy and attempted to circumvent accommodation requirements by issuing blanket undue hardship denials, without individualized analysis, categorically excluding

whole categories of religious belief as invalid, and aggressively denying beliefs as somehow "not religious in nature" or not valid or sincere without any good-faith basis to do so.

445.   Even if there had been a legitimate interest in limiting the number of exemptions given, the government cannot lawfully winnow the number down by discriminating against certain faiths or beliefs it disfavors.

446.   But this is precisely what the City and DOE did, both in the original denials and in the Citywide Panel appeals.

### Defendants extended the Mandates – and the unlawful Stricken Standards

447.   Continued animus can also be evidenced through the City's failure to rescind or repudiate the original Stricken Standards.

448.   After imposing the DOE Mandate, the City issued hundreds of additional "emergency" executive orders, extending the vaccine mandates to nearly every employee in New York City.

449.   Tellingly, even after the City's own attorneys admitted in the *Kane* case that the Stricken Standards policy was likely unconstitutional (and the Second Circuit confirmed they were definitely unconstitutional), the City failed to repudiate them.

450.   Instead, the City *extended the use of the Stricken Standards to more agencies* – striking deals and encouraging nearly every City agency to offer the Stricken Standards as one of two options for employees to apply for accommodation.

451.   The City's failure to repudiate the Stricken Standards is yet more

evidence of animus, which infects both the mandates and the religious accommodation determinations thereunder.

452.   This issue was not before the Second Circuit in November 2021, when the Court of Appeals first considered whether the Mandate was itself neutral and generally applicable on interlocutory appeal.

453.   Nonetheless, the Second Circuit still ruled that the religious accommodation policies were not neutral or generally applicable.

454.   Perhaps the most telling sign of continued animus occurred in the context of unemployment insurance proceedings.

455.   Months after the Second Circuit chastised Defendants for denying applicants because the Pope was vaccinated and made it very clear that such criteria were blatantly unconstitutional, the DOE continued to argue in appeal after appeal, that former employees denied religious accommodation must be denied benefits too, because the Pope was vaccinated and therefore their religious beliefs did not merit protection.

456.   These same attorneys were also making determinations at the Citywide Panel level.

457.   Their continued and widespread use of discriminatory standards that the City was already chastised for shows blatant continued animus.

***The Mandates were not generally applicable***

458.   As more executive orders were issued, it also became apparent that the Mayor exercised unfettered discretion to make carve-outs, exceptions, or new

requirements for secular reasons, or for any reason at all.

459.    For example, Mayor Adams issued Emergency Executive Order 62 ("EEO 62") on March 24, 2022, making a carve-out for athletes, entertainers, and their make-up artists and entourages.

460.    On its face, EEO 62 states that the exception was made due to economic reasons, and other reasons not related to stopping the spread of Covid-19.

461.    Some of Mayor Adams' top donors had lobbied for this carve-out.

462.    Mayor Adams announced the controversial carveout at Citi field, the home of the New York Mets.

463.    New York Mets owner Steve Cohen had donated at least 1.5 million dollars to a political action committee supporting Mayor Adams just months before.

464.    Other top donors to the Mayor in the entertainment industry also benefited from the carve-outs.

465.    Due to the carve outs, stars like Kyrie Irving and various entertainers and their make-up artists and entourages could return to work unvaccinated, working in person in enclosed spaces in close proximity to fans and colleagues, but the janitors and minimum wage workers at the fields or theaters, along with most other hard-working people in New York City, were being denied religious accommodation and losing their jobs if they could not take the vaccine.

466.    Significant outcry accompanied the carve outs.

467.    Harry Nespoli, chair of the Municipal Labor Committee ("MLC") said "There can't be one system for the elite and another for the elite and another for the

essential workers of our city."

468.    Not surprisingly, this favoritism also worried Jay Varma, a physician, epidemiologist, and senior advisor to Mayor Bill de Blasio for public health and COVID-19, who publicly expressed the concern that the new carve-outs would open the City to "legal action" on the basis that its remaining mandates were "arbitrary and capricious."

469.    The City was well-aware by March 2022 that there was no public health necessity for the Mandates.

470.    The majority of its fully vaccinated staff had by that time caught Covid-19 despite the Mandate.

471.    During the 2021-2022 school year, approximately sixty thousand fully vaccinated DOE employees caught Covid-19 *after the mandate was imposed* to exclude unvaccinated staff.

472.    Many more had already had Covid-19 before the mandate was imposed.

473.    But the City refused to drop the rest of the mandates or accommodate employees who could not be vaccinated due to their religious beliefs in good faith.

474.    On August 11, 2022, after over a year of verbal acknowledgments that the vaccine could not stop transmission, the CDC officially revised its guidance to stress that it was not appropriate to differentiated between vaccinated and unvaccinated due to the overwhelming scientific consensus that Covid-19 vaccines cannot stop infection and transmission.

475.    Instead of accommodating or reinstating employees who'd been denied

religious accommodation, DOE sent out a letter later that August 2022, making a fresh offer to DOE employees who'd been terminated or were on leave due to their vaccine status that they could come back and be reinstated to their old positions – but only if they got vaccinated by September 2022.

476. Many employees, including Plaintiff, asked for religious accommodation again, but they were all denied.

477. Some were able to submit applications through SOLAS, but they received the same vague "undue hardship" denial they'd received before or no response at all.

478. Others sent in email requests, or mailings asking that they be able to be reinstated as offered but accommodated so that they did not have to violate their religious beliefs.

479. They were ignored and denied reinstatement.

480. Defendants also knew, when it sent the letter to each of those employees who'd been previously denied religious accommodation, that the applicants required religious accommodation.

481. They were obligated, therefore, to offer them an accommodation unless they could prove undue hardship.

482. There was absolutely no good faith basis to even argue undue hardship at that point, leave aside prove it.

483. In September 2022, religious employees denied accommodation who were still on leave were all terminated for failing to violate their faith and get

vaccinated.

484.    On September 20, 2022, Mayor Adams announced in a press conference that he would repeal the private sector vaccine mandates, and the mandate for students and parents participating in after-school activities but would keep in place the public sector mandates and the DOE mandate for employees.

485.    When asked how he could justify keeping the public sector mandates, the Mayor admitted that there was no reason, stating: "I don't think anything dealing with COVID is [sic] makes sense and there's no logical pathway of one can do [sic]."

486.    Without any logical explanation why, the City kept the DOE Mandate in place until February 2023, when the *Kane* plaintiffs were scheduled to argue their appeals over the unlawful DOE policies before the Second Circuit.

487.    On the eve of those arguments, the City announced it would finally repeal the rest of the mandates, and argued to the Court that this should moot the lawsuits.

488.    But despite the repeal, DOE refuses to hire back most of the fired unvaccinated workers to this day.

### *Retaliation*

489.    Not only did Defendants fail to accommodate employees' sincerely held religious beliefs, they also harassed and retaliated against employees with religious objections to the vaccine.

490.    As a threshold matter, there was no basis to impose some of the

draconian requirements that DOE imposed on employees denied religious accommodation due to alleged "undue hardship."

491.   For example, employees were coerced to sign a waiver of their right to challenge the determination or face termination "for cause" and lose their good standing, paid time off credits (which belonged to them by law and contract) and health insurance while they waited on leave without pay.

492.   These benefits belonged to Plaintiffs and their colleagues pursuant to the relevant contracts.

493.   Moreover, finding employees guilty of misconduct for failing to violate their religious beliefs was retaliatory.

494.   Yet, DOE repeatedly certified to the unemployment offices that employees terminated for failing to meet the vaccine requirement had committed misconduct.

495.   Additionally, nothing in the Contract requires vaccination as a condition of employment.

496.   Vaccination was not a condition of employment when Plaintiffs or other tenured teachers entered into their contracts with the DOE.

497.   Pursuant to the contract, tenured teachers cannot face any of these consequences, including loss of salary, without a 3020a hearing, which was not provided.

498.   Moreover, the Education Law prohibits imposition of a waiver for any DOE employee under such conditions.

499.   Defendants also could easily have at least allowed employees with sincere religious beliefs to work elsewhere while they were kept on leave without pay, or to return to their former positions once the mandate was lifted.

500.   Instead, they imposed a condition that they could not work anywhere while on "leave without pay" from DOE.

501.   DOE further retaliated by attaching problem codes to the employee files of those who were separated for failing to get vaccinated.

502.   Upon information and belief, the problem codes are associated with employee's finger-print records, which are shared with the Federal Bureau of Investigation.

503.   These problem cosdes were also visible to vendors and potential employers outside of the DOE system.

504.   The problem codes continue to this day to prevent many employees fired for failing to violate their religious beliefs from getting a job at DOE or elsewhere.

505.   Even after the DOE repealed the vaccine mandate for DOE employees, DOE continues to use these problem codes and other methods to block those who were terminated for failing to get vaccinated in violation of their religious beliefs from coming back.

506.   For those that are offered employment, DOE continues to impose an arbitrary waiver requirement on some, but not all employees as a condition of return.

507.    DOE told UFT that *all* employees would need to sign a waiver of their right to sue to come back, deterring many from trying.

508.    In practice DOE imposes this waiver requirement selectively, forcing some to sign as a condition of return but neglecting to even mention it for others.

509.    Second, DOE refuses to reinstate employees who were denied religious accommodation, instead requiring that these mostly tenured teachers and educators apply as new hires.

510.    Third, DOE continues to use the problem code to thwart efforts for those denied religious accommodation to return to DOE, even as a new hire.

511.    For example, there is a staffing crisis at DOE.

512.    In related litigation, employees with spotless employment records have submitted sworn statements that they had interviews and were offered a job, but then their job offer was rescinded after problems with their "security clearance" were reported.

513.    Some employees were told point blank that the security clearance issue is that they have a problem code attached to their file.

514.    Some have seen the problem code.

515.    These problem codes are typically imposed on employees who are not hirable due to heinous offenses, like child abuse.

516.    DOE has long been aware of this issue, as it has been repeatedly brought up in EEOC complaints and related litigation but refuses to address it.

517.    There is currently a Congressional Investigation into the problem code

issue, and members of the United States Congress have demanded answers from the City and DOE.

518.    Neither Defendant has bothered to answer these inquiries even though they are required to do so.

519.    There have also been hearings by the City Council, and many employees from DOE and the City have testified about the ongoing retaliation and discrimination they face.

520.    Fourth, DOE has attempted to block all efforts at receiving unemployment compensation.

521.    For example, when employees would apply, DOE would routinely object and state that they were fired for misconduct or were ineligible for a "good cause" determination because the Pope or others did not agree with the employee's religious choice.

522.    DOE routinely made these discriminatory arguments even after the Second Circuit chastised them for conditioning access to accommodation on the beliefs of a religious leader like the Pope.

## PLAINTIFFS' INDIVIDUAL FACTS

### Athena Clarke

523.    Ms. Clarke reiterates all the facts of this complaint as if fully set forth in her individual section.

524.    In September 2021, Ms. Clarke was a tenured special education teacher, commencing her seventh year of service at the DOE.

525.    Ms. Clarke is a devout Christian.

526.    As part of her faith, Ms. Clarke routinely seeks guidance from prayer to make decisions, including medical decisions.

527.    Ms. Clarke has long felt that vaccines are not in alignment with her religious beliefs, based on the guidance and her reflections.

528.    One of Ms. Clarke's core religious beliefs as a Christian is that participation in abortion is a sin.

529.    Many vaccines use aborted fetal cell lines in development and production.

530.    Ms. Clarke also generally believes that God created the body perfectly, and it is against God's will to submit to medical interventions unless sick.

531.    Due to her religious beliefs, Ms. Clarke has not vaccinated her children and has refused to take yearly flu shots or other adult vaccines like the Tdap booster her doctor recommended.

532.    Ms. Clarke prayed about whether she should take the Covid-19 vaccine, and received clear guidance that she could not take the vaccine without violating her faith.

533.    Ms. Clarke timely submitted a request for religious accommodation from the Covid-19 vaccine through the SOLAS portal.

534.    She attached to her request a letter from her Bishop, who has been her religious leader since she was a teenager.

535.    In her application, Ms. Clarke explained she has a sincerely held

religious objection to the COVID-19 vaccine and needed accommodation.

536.    Ms. Clarke's request offered several alternative options, such as, *inter alia,* handwashing, mask-wearing, and weekly testing.

537.    On or about September 20, 2021, Ms. Clarke received the same autogenerated email sent to all other applicants, denying her request based on alleged "undue hardship" based on the de minimis standard.

538.    No one from the City or the DOE individually reviewed Clarke's application before denying her.

539.    Defendants never questioned Ms. Clarke's sincerity or requested further information about her religious beliefs before denying her.

540.    Ms. Clarke received a second denial on or about September 28, 2021, again, without explanation or individualized analysis.

541.    It was not an easy decision for Ms. Clarke to opt out of the Covid-19 vaccine, because the stakes were so high given that her employer refused to accommodate her.

542.    However, the guidance from prayer and reflection was too clear for her to waiver from her faith, despite the severe consequences.

543.    On or about October 1, 2021, Ms. Clarke was involuntarily placed on leave without pay, and informed that because she had failed to comply with the Mandate, she could not report to work, receive compensation, use annual leave, CAR or sick time, enter a work site or work anywhere else to try to earn money.

544.    In other words, Ms. Clarke, a tenured educator, was removed from her

position and placed on disciplinary leave without pay without the benefit of hearing, as required by New York State Education Law § 3020-a, and without a pathway to grieve the action.

545.   In or about November 2021, the Second Circuit held that the DOE's religious accommodation policies, as applied, were likely unconstitutional, and ordered the City and the DOE to re-evaluate applications for religious accommodation, reinstating those whose beliefs qualify under lawful standards.

546.   After the Second Circuit issued this decision, in November or December of 2021, Ms. Clarke immediately wrote to the DOE, Dr. Chokshi, attorneys for the City and DOE, and several other high level decision makers at each to request that her application be re-reviewed under lawful standards.

547.   This notice functionally complied with notice of claim requirements under the Education Law, and the DOE failed to adjust the claims within ninety days of receipt.

548.   In her letter, Ms. Clarke explained that the original policy discriminated against her personally held religious beliefs, and she was entitled to receive a fair evaluation under lawful standards by the newly created Citywide Panel.

549.   Despite their promise to the Second Circuit, and Ms. Clarke's request for a fresh review, the Citywide Panel failed to review Ms. Clarke's application.

550.   They did not even offer her the courtesy of a response.

551.   Instead, after waiting nearly a year on leave without pay while

awaiting the promised fresh review by the Citywide Panel, in August 2022, DOE terminated Ms. Clarke for failing to comply with the Mandate, with no response from the Citywide Panel.

552.    Thus, Ms. Clarke was only ever reviewed under the unconstitutional policy.

553.    Ms. Clarke's sincere religious objections qualify for accommodation.

554.    Moreover, as discussed more fully in other sections of this complaint, Ms. Clarke could have been accommodated in person or remotely without posing a direct threat or causing undue hardship.

555.    Defendants bear the burden of proving undue hardship.

556.    They cannot meet this burden as set forth more fully throughout this complaint and below.

557.    Ms. Clarke worked for over a year in person during the height of the pandemic, without posing a threat to anyone.

558.    During the entirety of the year, Ms. Clarke tested weekly for Covid-19.

559.    Moreover, by the fall of 2021, Ms. Clarke (and most of her class, who had already been back at school in person for over a year) had already recovered from Covid-19 and had natural immunity.

560.    The objective science in the fall of 2021 showed that natural immunity was far superior and longer lasting than vaccine immunity.

561.    As stated above, by October 2021, when Ms. Clarke was first placed on leave without pay rather than accommodated, it was already objectively understood

that the vaccines could not stop transmission, and that nearly everyone, vaccinated or not, was going to catch Covid-19 at some point.

562.   By August 2022, it was irrefutable that the vaccine could not stop the spread, and that the unvaccinated posed no greater danger to others than the vaccinated.

563.   Moreover, to the extent that the unvaccinated posed any greater risk of transmission, Defendants bear the burden to prove that this risk could not have been mitigated in any other way than to forcibly suspend and then terminate Ms. Clarke. As set forth in greater detail in other paragraphs of the Complaint, DOE could not meet this burden.

564.   In the fall of 2021, the DOE had already received affidavits from two of the top public health professors in the country articulating the many ways that employees could have been safely accommodated in person.

565.   Ms. Clarke was ready, willing and able to continue testing and symptoms check as she had been doing, and as every other school district in the state allowed teachers to do.

566.   She was also ready, willing and able to consider any other accommodation available.

567.   DOE did not consider any science or evidence to conclude that no safe accommodation was possible before denying Ms. Clarke based on undue hardship.

568.   Moreover, the Mandate itself acknowledged that it allowed for reasonable accommodation, which did not preclude in person accommodation.

569.    As discussed elsewhere in this complaint, many teachers were accommodated under the policy throughout the duration of the Mandate, at least one of them in person in a school building.

570.    Nothing about Ms. Clarke made her any more dangerous to the school than the unvaccinated teachers allowed to work in person or at administrative offices.

571.    Additionally, even if DOE could have proven that it was unsafe to allow Ms. Clarke to work in person in the classroom, DOE would still have to prove that it was a substantial and significant economic hardship to allow Ms. Clarke to work outside of the classroom. This they did not even attempt.

572.    Defendants' attorneys admitted under oath that neither the City nor DOE examined any economic evidence or factors to determine that Ms. Clarke could not be accommodated, while 163 others who had favored religious beliefs under the discriminatory policy could be.

573.    Rather, according to Defendants' own attorney testimony, Defendants used the wrong undue hardship standard to presume that any accommodation would presumably meet the erroneous "de minimis" burden standard since it would involve some kind of expense or hassle.

574.    Other teachers who were accommodated after being impermissibly favored under the Stricken Standards were provided with long-term substitutes or other co-teachers so that they could teach through Google classroom or other remote platforms while the co-teacher or assistant was physically present to keep order in

the classroom.

575.    Ms. Clarke could have done the same. In fact, she already had a co-teacher, so a long-term substitute might not even be necessary in her case.

576.    Ms. Clarke could have also been reassigned to write IEP's, teach students in the remote education program for home-bound students, or zoom into classrooms to teach particular break out groups.

577.    In August 2022, shortly after they terminated her, DOE offered to reinstate any employees terminated because of noncompliance with the vaccine mandate so long as they were vaccinated by September 6, 2022.

578.    Though Defendants knew Ms. Clarke required religious accommodation, they did not offer Ms. Clarke any accommodation.

579.    Upon information and belief, DOE further retaliated by attaching a problem code to Ms. Clarke's employment files which has not been removed to date.

580.    In the fall of 2021, within the statutory deadline to file an EEOC complaint or a notice of claim, Ms. Clarke submitted an EEOC complaint, asserting that the City and the DOE had violated Title VII, along with the religious rights of its' employees, and engaged in unlawful retaliation.

581.    She stated that all DOE's denials were unlawful, including hers, and that she had sincerely held religious beliefs that had to be accommodated.

582.    This notice also complied with the functional notice of claim requirement governing state law claims.

583.    The Defendants failed to adjust her claims within the statutory period.

584.    On December 30, 2024, Ms. Clarke received a right to sue letter from the EEOC.

585.    Ms. Clarke's lawsuit is now being filed within ninety days of receipt of the right to sue letter.

586.    Ms. Clarke suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies for which she deserves compensation under numerous causes of action.

**Jennifer Kline**

587.    Ms. Kline reiterates all other paragraphs of this complaint as if fully set forth herein.

588.    Before she was callously denied religious accommodation and terminated, Ms. Kline had served DOE for nearly seventeen years.

589.    Dual certified as a special education and general education teacher, Ms. Kline was teaching Special Education in 2021.

590.    She was a beloved teacher and had been nominated for the Big Apple teacher of the year award. She also has many letters from parents thanking and praising her, and copies of letters requesting she be the students' teacher during her time at DOE.

591.    Ms. Kline is also an extremely devout Christian.

592.    Ms. Kline began working with special education students based on her guidance from prayer.

593.    She was so dedicated to her job that she intentionally decided not to

have children so that she could put her full attention and focus on helping the children in her classrooms.

594.    During the 2020-2021 school year, Ms. Kline could have requested to work remotely, as many other teachers did.

595.    But she did not take this course.

596.    Instead, Ms. Kline worked in person throughout the entire school year of 2020-2021.

597.    She was not vaccinated during this entire period.

598.    In the fall of 2021, Ms. Kline returned to teach in person unvaccinated without issue.

599.    Ms. Kline had natural immunity, which was known even at the time to be far superior and more long lasting than vaccine immunity.

600.    Most of Ms. Kline's students also had natural immunity by the fall of 2021, having attended school in person the entirety of the previous year.

601.    Ms. Kline could not take a Covid-19 vaccine because of her religious beliefs.

602.    Like Ms. Clarke, Ms. Kline believes that God created our bodies and immune systems, and they should not be tampered with proactively.

603.    She also believes in the sanctity of the blood as a religious vessel of God, and that it is a sin to inject unholy materials, especially products derived from or produced with the use of aborted fetal cell lines.

604.    In September 2021, Ms. Kline promptly submitted a detailed request for

religious accommodation.

605.    She did not have a clergy letter, as her religious beliefs were derived from guidance received through personal reflection and prayer.

606.    Ms. Kline was denied through the same autogenerated email sent to all employees, even those who already worked remotely.

607.    She timely appealed, and was denied without any explanation whatsoever, and no opportunity for a zoom hearing.

608.    In or around November 2021, Ms. Kline learned about the Second Circuit's decision in *Kane* and the City's promise to provide a fresh review using lawful standards.

609.    Ms. Kline heard that the SOLAS system was accepting new applications for a review by the Citywide Panel.

610.    She submitted her religious accommodation request through the system but received no response.

611.    In or around December 2021, Ms. Kline wrote to multiple high level agents of the DOE and the City, including but not limited to the legal department and the Chancellor of the DOE, and the Mayor and Commissioner of Health at the City.

612.    In this letter, Ms. Kline explained that she required religious accommodation, and that she had been discriminated against and demanded that she get a fresh evaluation by the Citywide Panel, as the City had been ordered to provide to the *Kane* plaintiffs.

613.    Ms. Kline explained that she had personally held religious beliefs, that the original accommodation policy excluded such beliefs, and that this violated her constitutional and statutory rights. She further demanded that the Defendants remedy this harm by providing her with a Citywide Panel review using lawful standards.

614.    The Citywide Panel never responded nor did the DOE.

615.    Instead, on or about February 11, 2022, the DOE terminated Ms. Kline without providing her any response to her request for fresh review.

616.    To date, Ms. Kline still has not received any answer from the Citywide Panel.

617.    Ms. Kline was therefore only ever reviewed under the Stricken Standards, which even Defendants have admitted were unconstitutional.

618.    Ms. Kline has sincerely held religious beliefs that conflict with receiving a Covid-19 vaccine.

619.    Ms. Kline did not pose a direct threat to anyone, as further detailed throughout the complaint. As one of many examples, Ms. Kline worked in person unvaccinated for over a year in a classroom with her students without issue before the mandate was adopted.

620.    Ms. Kline could have continued to safely teach in person, and was ready, willing and able to submit to regular testing, handwashing, symptom checks or any other reasonable accommodation deemed necessary.

621.    Ms. Kline also could have taught remotely. She already had an

83

assistant, and she could have taught classes through Google classroom or another remote platform already in existence at the DOE while her assistant was present to handle any behavioral issues.

622.    Ms. Kline could have also been assigned to remotely instruct homebound students, or those still engaging in remote learning, which was still an option at DOE, or she could have been reassigned to do administrative work or write IEP's.

623.    Defendants allowed 163 other employees who had been unlawfully privileged under the discriminatory policy to continue on payroll through all of these options.

624.    Defendants failed to present any evidence that any of these options would have been an undue hardship to allow Ms. Kline the same opportunity.

625.    Instead, Defendants failed to evaluate Ms. Kline's request in good faith or provide a fresh review after they admitted to having used an unconstitutional policy to judge her initial application.

626.    Not only did they terminate her but, upon information and belief, they then attached an insidious "problem code" to her files.

627.    As further discussed above, these problem codes are impacting teachers' ability to get work in the greater New York City area and are the subject of a Congressional and Citywide investigation.

628.    Ms. Kline has suffered enormously as a direct result of Defendants' discriminatory actions.

629.    After she was terminated, she could not find comparable work anywhere

despite her qualifications.

630.    Without any income or way to support herself, she had to liquidate a large portion of her retirement account just to survive, then lost her rent controlled apartment, and was forced to leave the state and start over, carrying substantial debt.

631.    Ms. Kline suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies for which she deserves compensation under numerous causes of action.

## FIRST CAUSE OF ACTION

### (Failure to Accommodate in Violation of Title VII)

632.    Plaintiffs incorporate all other paragraphs of this Complaint as if fully set forth herein.

633.    As and for a First Cause of Action, Plaintiffs assert that both the City and DOE Defendants failed to accommodate their religious beliefs in violation of Title VII, and Defendants de Blasio and Chokshi aided and abetted this discrimination unlawfully.

634.    Title VII imposes an affirmative obligation on employers to make reasonable accommodations for their employees' (or potential employees') religious beliefs and practices. 42 U.S.C §2000e(j); 20 C.F.R. §1605.2(b).

635.    Plaintiffs were entitled to accommodation, but were denied religious accommodation, by the DOE *and* the City, in violation of Title VII.

636.    After the City was forced by a temporary restraining order to amend the Mandate to allow for religious exemptions, and the DOE and the City were forced by

an arbitrator to provide religious accommodations, each responded by pretending to offer it, but instead colluding to deny as many applicants as possible, including Plaintiffs.

637.   As supported by specific factual allegations and stated inferences in this complaint, the goal was never to actually assess reasonable religious objections in good faith. Rather, the most likely inference from the full facts and circumstances alleged throughout this complaint is that Defendants' shared goal was to find a pretext to deny as many people as possible.

638.   To that end, Defendants made arbitrary decisions to shut employees out of access to accommodation at every possible turn and ignored the substantial evidence that the system was crashing and many were shut out from appealing or applying.

639.   First, all Defendants proposed and then adopted and enforced discriminatory criteria for choosing who to accommodate.

640.   Upon information and belief, Attorney Eichenholtz, acting under the direction of Defendant de Blasio as well as high level administrators at the DOE approved and/or drafted the discriminatory criteria for who qualified for religious accommodation in the Stricken Standards.

641.   Either way, the government cannot adopt or enforce a discriminatory policy like the Stricken Standards.

642.   Among other discriminatory classifications, the Stricken Standards conditioned access to accommodation on membership in a preferred religious

organization.

643.    The Stricken Standards also impermissibly required a clergy letter and that so-called religious "leaders" agreed with each employee's religious beliefs concerning Covid-19 vaccination.

644.    Under the Stricken Standards, personally held views were categorically excluded, and the City and DOE admitted that they intended to exclude all Catholics and most other religions than Christian Scientists relief.

645.    The DOE then participated in the appeals to zealously argue for discriminatory reasons to deny applicants, for example, because the Pope did not share their views, resulting in the denial of over 90% of the appeals to the arbitrator.

646.    The City aided and abetted and encouraged this discrimination, submitting an unlawful letter to the arbitrators from Defendant Commissioner Chokshi, which encouraged the arbitrators to deny everyone whose religious concern included opposition to abortion, impermissibly trying to use his authority to put his weight behind a doctrinal split in the church.

647.    Second, though the arbitrator's award required accommodation without regard to undue hardship (at least for those who qualified under the discriminatory criteria), DOE initially denied every single applicant on the pretextual claim of "undue hardship" based on the unlawful "more than a minimal burden" without ever assessing in good faith whether they could have accommodated any employee.

648.    These determinations were pretextual, and not made in good faith, as evidenced by the fact that the same generic denials were even sent to those who

already had remote jobs.

649.    These determinations were also infected with the same animus that infected the appeals and the entire religious accommodation policy adopted, enforced and implemented by the Defendants collectively.

650.    Defendants did not individually review the applications before sending out the denials.

651.    The same denial was sent out to employees who already worked remotely or easily could have done so, including Plaintiffs.

652.    The denials stated on their face that the standard used was the "more than a minimal burden" or *de minimis* standard, which was found unlawful by the United States Supreme Court in *Groff v. de Joy,* 143 S. Ct. 2279 (2023).

653.    The denials also stated on their face that they were issued in accordance with the Stricken Standards, which were found unconstitutional by the Second Circuit.

654.    Neither the DOE nor the City considered the required statutory factors before denying relief based on undue hardship.

655.    It would not have been an undue hardship to accommodate any of the applicants, including Plaintiffs, as addressed in great detail throughout the complaint.

656.    The objective science at the time showed that plaintiffs did not pose a direct threat based on their vaccine status, and plaintiffs had each worked in person for the past year and a half unvaccinated without issue.

657.    Moreover, DOE accommodated at least 163 similarly situated employees, whose religious beliefs were impermissibly favored and could have similarly accommodated plaintiffs.

658.    DOE did not provide any non-discriminatory reason for why Plaintiffs should not also be accommodated like their favored colleagues.

659.    Third, Defendants knew that the SOLAS system, which was the method given to DOE employees to apply for accommodation, was crashing and glitching and shutting many people out of being able to apply by DOE's arbitrary deadlines or appeal.

660.    Yet, even when employees alerted supervisors and others responsible for ensuring reasonable accommodation at DOE that they needed religious accommodation and were unable to apply through SOLAS, DOE refused to individually consider their applications.

661.    Those that did manage to submit their appeal were subjected to further arbitrary and unreasonable decisions.

662.    No explanation was offered for why some got a zoom hearing, and others were denied.

663.    Those that did get a review by an arbitrator were typically denied with no explanation, just an "x" next to the word "denied."

664.    DOE admits it has no record or reason for any determinations on appeal.

665.    But the sworn submissions of dozens of DOE employees reveals that

DOE was aggressively attempting to persuade the arbitrators that they had to categorically deny most religions, and any beliefs based on personal prayer or abortion.

666.    After Plaintiffs was denied religious accommodation, Plaintiffs and their similarly situated religious colleagues were placed on leave without pay for failing to violate their faith by taking a Covid-19 vaccine and eventually terminated, forced to resign, forced to go on extended unpaid leaves, and/or forced to violate their sincerely held religious beliefs.

667.    Fourth, after the Second Circuit held that the DOE's religious accommodation policies were not neutral or generally applicable, and were blatantly violative of the First Amendment, Defendants failed to remediate the harm as the City had promised the Second Circuit they would.

668.    Instead, the City refused to consider thousands of employees denied religious accommodation under the original admittedly unconstitutional scheme, including Plaintiffs, even though they knew that these employees were seeking religious accommodation, and the DOE aided and abetted this refusal.

669.    Fifth in August 2022, the DOE offered to reinstate those employees it had terminated or forced out after failing to accommodate them to their prior positions and level of seniority. But even though the CDC had just issued guidance affirming the long known scientific consensus that the vaccinated and unvaccinated posed the same level of risk of transmission, the DOE failed to provide accommodation to those it knew, or should have known, was seeking religious

accommodation, and denied every application on pretextual "undue hardship" again based on the de minimis standard.

670.    DOE and the City were required to accommodate any employee *or prospective employee*, including Plaintiffs, who they knew or should have known required accommodation.

671.    DOE knew Plaintiffs required accommodation and refused to accommodate them in August 2022 so that they could come back without violating her religious beliefs to the position offered by DOE.

672.    To the extent that Defendants claim "undue hardship" as a defense, Plaintiffs reserve the right to rebut such allegations in more detail and with further evidence, as undue hardship is an affirmative defense and cannot give rise to dismissal for failure to state a claim.

673.    Under Title VII, the burden is on the employer to demonstrate "that he is unable to reasonably accommodate an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employers' business." 42 U.S.C. §2000e(j).

674.    For a Title VII claim, undue hardship is shown "when a burden is substantial in the overall context of an employer's business". *Groff v DeJoy*, 143 S Ct 2279, 2294 (2023). "[A]n employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Id*. at 2295 (internal citations omitted).

675.    To prevail on this defense, Defendants must show they considered all

options for accommodation in good faith and proved, prior to denial, that such options were untenable according to statutory factors and analysis of objective evidence assessed against each individual's circumstances.

676. Defendants did not meet their undue hardship burden, and the denials on this basis were pretextual and unlawful.

677. EEOC guidance and Supreme Court precedent have clarified in recent years that denials based on the "de minimis" standard are unlawful.

678. Yet, all of Defendants' undue hardship denials stated, on their face, that they were made based on the de minimis standard.

679. The denials also violate EEOC guidance from 2021.

680. Even in 2021, before the Mandate became effective, the EEOC provided guidance to employers on handling accommodations to Covid-19 vaccine mandates.

681. Among other relevant provisions, the guidance stated "Under Title VII, an employer should thoroughly consider all possible reasonable accommodations, including telework and reassignment. In many circumstances, it may be possible to accommodate those seeking reasonable accommodations for their religious beliefs, practices or observances."

682. Defendants failed to consider all possible reasonable accommodations, or any possible individualized accommodations.

683. The 2021 EEOC Guidance also stated that "If the employer denies the employee's proposed accommodation, the employer should explain to the employee why the preferred accommodation is not being granted. An employer should consider

all possible alternatives to determine whether exempting an employee from a vaccination requirement would impose an undue hardship."

684.   Defendants failed to explain any alternatives considered or to consider any alternatives to full exemption.

685.   Instead, Defendants denied 100% of applicants based on vague assertions of "undue hardship", even those, like Plaintiff, who had administrative jobs that could have been done remotely without issue.

686.   Then they argued aggressively to deny any that appealed based on discriminatory and unlawful definitions of what constituted a valid religion.

687.   Tellingly, after the appeals in the fall of 2021, the DOE *did accommodate* at least 163 employees, some of them teachers, who posed no different threat than Plaintiffs and the thousands denied.

688.   DOE made this determination based on criteria having nothing to do with safety or economic differences, and only to do with impermissible criteria such as membership in a preferred religious organization.

689.   As a direct and proximate result of Defendants' failure to accommodate them, Plaintiffs and their similarly situated colleagues denied religious accommodation suffered, and continue to suffer economic damages, severe mental anguish and emotional distress, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, including physical symptoms, for which they are entitled to an award of monetary damages in an amount to be determined at trial.

690.   Plaintiffs are also entitled to injunctive and other equitable relief, including reinstatement with no break in service, front pay and back pay in salary and all benefits and employment terms, including retirement credits, compensatory damages, including pain and suffering, nominal damages at an amount to be determined at trial, and attorney's fees. 42 U.S.C. §§ 1981a(a)(1), 2000e-5(g)(1), (k).

691.   Plaintiffs are also entitled to punitive damages in an amount to be determined at trial. Under Title VII, Plaintiffs can "recover punitive damages . . . [by] demonstrat[ing] that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1).

692.   And Plaintiffs are entitled to reasonable attorneys' fees and costs.

693.   Pursuant to the single filing rule, Plaintiffs respectfully reserve the right to add more Plaintiffs and a proposed class of those similarly situated under the single filing rule to make this litigation more cost-effective for them to pursue. Plaintiffs also respectfully request that their claims be consolidated with the lawsuit in *Hogan v. City of New York,* 23-cv-8727, and specifically reference that claim as additional Title VII claims that they are eligible to "piggy back" off of.

694.   Pursuant to the single filing rule, all members of the proposed class in this case and in *Hogan* are entitled to Title VII relief on the same basis without individually exhausting administrative remedies. *See Tolliver v. Xerox Corp.,* 918 F.2d 1052 (2d Cir. 1990).

695.   The claims of the administrative claimants and the rest of the proposed

class and group all arise out of the same circumstances and within the same time frame. This is sufficient to allow the entire class to join in this claim pursuant to the single-filing rule. *Id.* at 1058.

696.    Additionally, though they need not have in this action, the administrative claims and responses from Defendants provided notice that the issues were class wide.

697.    Defendants and the EEOC were also on notice that the issues were class wide through the filing of hundreds of other claims from similarly situated DOE employees, and multiple related proposed class-action lawsuits referencing the widespread violation of Title VII and anticipated actions regarding same.

698.    Plaintiffs assert the Single Filing Rule assertions for each of the Title VII claims made herein.

## SECOND CAUSE OF ACTION

### (Discrimination in Violation of Title VII)

699.    Plaintiffs reincorporate all paragraphs of this Complaint as if fully written herein.

700.    In addition to failure accommodate claims, Plaintiffs asserts straight religious discrimination claims against both Defendants – including but not limited to "pattern and practice", "disparate impact" and "as applied."

701.    Title VII was enacted with the purpose of prohibiting employment discrimination based on religion, among other protected characteristics. 42 U.S.C § 2000e et seq. 71.

95

702.    Under Title VII, it is an unlawful employment practice for an employer: (1) to fail or to refuse to hire or discharge any individual, or to otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin. 42 U.S.C §2000e-2(a).

703.    Plaintiffs each have sincerely held religious beliefs that prevent them from taking the vaccines.

704.    Plaintiffs were qualified to hold her position, as evidenced by the fact that they were DOE employees in good standing before they were denied religious accommodation.

705.    The fact that accommodation was offered shows that it was not an employment qualification to be vaccinated, since employees could receive religious accommodation and still be qualified to work at the DOE even if they were not vaccinated, and at least 163 employees did receive such accommodation to continue to work for the DOE unvaccinated.

706.    Moreover, related litigation has already held that the City lacked the authority to require vaccination as a condition of employment for DOE employees, and Defendants are precluded from relitigating that issue here.

707.    Plaintiffs suffered adverse employment conditions as a result of Defendants' discrimination, including, *inter alia*, being denied religious accommodation, suspended without pay, terminated, charged with "misconduct", denied unemployment compensation, having a Problem Code attached to her record, and facing irreparable damage to her reputation and employment prospects.

708.    These adverse actions occurred under circumstances giving rise to an inference of discrimination.

709.    In fact, the evidence in this case raises much more than just an *inference* of discrimination, which is the most that is required under notice pleading standards.

710.    Defendants' adoption, implementation, ratification and enforcement of a facially discriminatory religious accommodation policy, which conditioned access to accommodation on membership in a preferred religious organization, and excluded access to those with unorthodox religious beliefs, or an opposition to abortion, shows discrimination as a matter of law.

711.    The Supreme Court has held that an employer's adoption of a policy that makes express classifications based on a protected characteristic constitutes "direct evidence of discrimination," which is sufficient as a matter of law to win relief absent an affirmative defense. *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111 (1985).

712.    In so holding, the Supreme Court explained that "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of

discrimination." *Id.* at 121 (referencing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)).

713.    Use of such classifications demonstrates a discriminatory purpose as a matter of law, without regard to the decision-makers' animus or subjective intent. *See Miller v. Johnson*, 515 U.S. 900, 904–05 (1995); *see also Hassan v. City of New York*, 804 F.3d. 277, 295 (3d Cir. 2015) ("Put another way, direct evidence of intent is 'supplied by the policy itself.'").

714.    The Plaintiffs' case here is even stronger than *TWA*, because unlike the age discrimination statutes, there is no affirmative defense to a policy that discriminates between orthodox and unorthodox religious beliefs, or preferences some faiths and religious beliefs over others.

715.    The Stricken Standard policy made express classifications based on protected characteristics – to wit – membership in a disfavored religious group and defined all other religious beliefs as somehow not meriting the same protection as those the policy favored.

716.    Contrary to the Stricken Standards' unlawful criteria, the term "religion" includes all aspects of religious observance and practice, as well as belief. 42 U.S.C §2000e(j).

717.    Protected religious beliefs also include "moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views." 29 C.F.R. 1605.1; 42 U.S.C §2000e(j).

718.    It is well-settled law, acknowledged by the Supreme Court of the United

States all the way down to the district courts and administrative agencies as well as state court systems, that an individual seeking to demonstrate a sincerely held religious belief under New York State or federal statutory or constitutional standards need not prove that his belief is part of the recognized dogma of a religious sect. *See, e.g., Widmar v. Vincent*, 454 U.S. 263 (1981) ("The beliefs need not be consistent with the dogma of any organized religion, whether to not the plaintiffs belong to any recognized religious organization.")

719.    "The fact that the religious group to which the individual professes to belong may not accept such belief will not determine whether the belief is a religious belief of the employee." 29 C.F.R. 1605.1.

720.    An employee's belief or practice can be "religious" under Title VII even if the employee is affiliated with a religious group that does not espouse or recognize that individual's belief or practice, or if few – or no – other people adhere to it. *Welsh v. U.S.*, 398 U.S. 333, 343 (finding that petitioner's beliefs were religious in nature although the church to which he belonged did not teach those beliefs); *Thomas v. Rev. Bd. Of Ind. Emp't Sec. Div.*, 450 U.S. 707, 715 (1981) (disagreement among sect workers as to whether their religion made it sinful to work in an armaments factory irrelevant to whether belief was religious in nature because "[t]he guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect.").

721.    Employers, especially government employers, must not entangle themselves in religious questions when assessing a request for religious

99

accommodation.

722. Employers, especially government employers, cannot substitute judgment for the employee about whether the belief is religious in nature.

723. Nor can employers, especially government employers, deny an applicant because her religious beliefs overlap with similar secular concerns – religious employees are entitled to have both religious and secular concerns, and this does not diminish protection of the employee's religious practices.

724. The Supreme Court of the United States cautions: "it must be remembered that, in resolving these exemption problems, one deals with the beliefs of different individuals who will articulate them in a multitude of ways. In such an intensely personal area, of course, the claim of the registrant that his belief is an essential part of a religious faith must be given great weight." *U.S. v. Seeger*, 85 S.Ct. 850, 863 (1965); *See also EEOC v. United Health Programs of Am., Inc.*, 213 F. Supp. 3d 377, 393 (E.D.N.Y. 2016) ("Delineating the meaning of 'religion' for purposes of Title VII often requires resort to First Amendment cases, where nontraditional religious practices are a frequent source of litigation.").

725. It is impermissible "to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989).

726. As set forth throughout this Complaint, Defendants each colluded violated each of these basic rules and more.

727. In addition to adopting a written policy that makes express

classifications and favors certain religions over others, hostile comments by high-level City actors' and DOE agents about the invalidity of sincere religious objections grounded in concerns about abortion or personal prayer, or derived from religions other than Christian Science, constitute further direct evidence of discrimination.

728.    As and for another count of direct evidence of discrimination, the City and DOE further discriminated against Plaintiffs by subjecting those who did not qualify under the Stricken Standards to a more onerous undue hardship standard than those who were favored under the unconstitutional criteria.

729.    Under the Stricken Standards, those who met the discriminatory definition "shall be accommodated" and no provision was made for an undue hardship defense. Pursuant to that policy, at least 163 people were accommodated.

730.    But when the Citywide Panel gave supposed "fresh consideration" to the applications of some of those denied under the original Stricken Standards, they applied a blanket undue hardship ban on accommodation for any teacher and most other employees – thus imposing a less generous standard.

731.    By adopting a substantially different undue hardship standard for those who were deemed to meet the discriminatory criteria of the Stricken Standards, both DOE and the City showed direct discrimination against unorthodox religious beliefs.

732.    Moreover, they continued to apply the same unconstitutional bar against accommodation of personally held religious beliefs and beliefs grounded in concerns about abortion.

733.   Under the direct evidence standard of review, it must be presumed that the adverse employment actions were pretextual and discriminatory, and, under this framework, Defendants cannot survive summary judgment without asserting an affirmative defense.

734.   No such defense is available because it is black letter law that the government may not target religious minorities for disparate treatment, no matter how well-intentioned the subject regulation may be. *Trump v. Hawaii*, 138 S. Ct. 2392, 2423 (2018).

735.   In the alternative, even if this were not a direct evidence case, Plaintiffs also set forth a prima facie case under the *McDonnell Douglas* framework or any other framework that is permissible to apply.

736.   Plaintiffs have pleaded facts that if true lead to an inference of discriminatory intent

737.   As one of many examples, Plaintiffs assert that DOE representatives and the City's representatives have repeatedly made public comments and official comments dismissing and showing animus towards religious opposition to vaccination (other than supposedly for Christian Scientists).

738.   Plaintiffs also provided ample evidence that gives rise to an inference of further discrimination.

739.   For example, even though they'd been ordered to make religious accommodations (by a court and by an arbitrator), Defendants denied 100% of all applicants immediately upon receipt of their application, leading to the unavoidable

conclusion that the denials were pretextual, and based on discrimination rather than a good faith undue hardship finding.

740.   The DOE's representatives then argued repeatedly that applicants should be denied for discriminatory reasons in the appeal hearings before an arbitrator provided under the Stricken Standards, claiming all Jews, Muslims, Catholics and Buddhists, should be presumptively disqualified based on their religion, among other discriminatory policies.

741.   This leads to an inference that all aspects of the religious accommodation policies were infected by the same animus.

742.   The evidence also leads to an inference that the Citywide Panel's affirmance of all denials except one were infected by the same animus and were also pretextual.

743.   This is compounded by hostile and dismissive comments made by the Mayor and Mr. Eichenholtz, who was placed in charge of the Citywide Panel process by the Mayor.

744.   It is also shown by the email sent to Mr. Eichenholtz by a trainee on the panel, who confirmed that Mr. Eichenholtz had told her that beliefs related to a concern about abortion would not be accommodated.

745.   It is also shown by the Citywide Panel's notations received in related discovery, which show that the Citywide Panel continued to reject personally held beliefs, such as guidance from prayer, unlawfully substituting judgment to find that such beliefs, while sincere, are somehow "not religious in nature" or "do not preclude

the applicant from getting vaccinated."

746.    Defendants' discrimination impacted all applicants for religious accommodation, many of whom were told, point blank told that they were being denied relief because their religious "leader" allegedly did not share their beliefs, among other discriminatory reasons.

747.    Plaintiffs should also prevail under a disparate impact theory of discrimination.

748.    Disparate impact discrimination is also barred by Title VII, and "occurs when an employer uses facially neutral policies or practices that a have a disproportionately adverse effect on protected groups." *Ricci v. DeStefano*, 557 U.S. 557, 577–78 (2009).

749.    "Disparate-impact claims do not require a showing of discriminatory intent." *United States v. Brennan*, 650 F.3d 65, 90 (2d Cir. 2011). Rather, "a plaintiff establishes a prima facie violation by showing that an employer uses 'a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin.'" *Ricci v. DeStefano*, 557 U.S. 557, 578 (2009) (citing 42 U.S.C. § 2000e–2(k)(1)(A)(i)).

750.    An employer can rebut a prima facie case "by demonstrating that the practice is 'job related for the position in question and consistent with business necessity.'" *Id.*

751.    The plaintiff, in turn, can rebut that showing by "showing that the employer refuses to adopt an available alternative employment practice that has

104

less disparate impact and serves the employer's legitimate needs." *Id*. (citing §§ 2000e–2(k)(1)(A)(ii) and (C)).

752.   "The basis for a successful disparate impact claim involves a comparison between two groups—those affected and those unaffected by the facially neutral policy." *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 575 (2d Cir.2003).

753.   Most people can take a Covid-19 vaccine without violating their religious beliefs.

754.   But a recognized minority of people cannot.

755.   Those who cannot were disparately impacted by the Covid-19 vaccine policy, and the draconian religious accommodation policies that were imposed as a result.

756.   The employers cannot show that imposing the Mandate was consistent with business necessity, as the vaccines do not stop transmission.

757.   But even if they could, the DOE could have been far less punitive with those employees who were unable to take the vaccine.

758.   DOE did not have to put a scarlet letter on people's files, or strip them of tenure, or coerce them into signing waivers, or try to prevent them from getting work anywhere – at the DOE or elsewhere, or refuse to do 3020a hearings, which by law, they were required to provide to all tenured employees before making any change to conditions or benefits.

759.   And the DOE could have come up with ways to accommodate employees, like weekly testing, which was sufficient at every other school district in

the state and could have worked at the DOE too.

760.    And there is of course a disparate impact claim among religions, as some religions and types of religious beliefs were preferred over others during the religious accommodation process.

761.    The Second Circuit already held that Defendants offered no non-discriminatory reason for categorically excluding certain religious beliefs from eligibility.

762.    As a direct and proximate result of each Defendants' discrimination, Plaintiffs suffered harms, including but not limited to those set forth in the first cause of action.

763.    Plaintiffs seek injunctive and declaratory relief, and damages, including nominal, actual, compensatory, and punitive damages, along with attorneys' fees pursuant to this cause of action.

764.    Plaintiffs also seek reasonable attorneys' fees and costs.

## THIRD CAUSE OF ACTION

### (Retaliation and Harassment in Violation of Title VII)

765.    Plaintiffs incorporate all other paragraphs of this Complaint as if fully set forth herein.

766.    Plaintiffs sought religious accommodation from the vaccine mandate, which is protected activity pursuant to statute.

767.    Defendants were aware that Plaintiffs sought to protect their religious rights, as Plaintiffs applied for accommodation.

768.    Rather than accommodate Plaintiffs' religious needs, Defendants denied accommodation, terminated them, and attached damaging problem codes to their employment files.

769.    Defendants also denied Plaintiffs a 3020a hearing, even though it is illegal to take adverse action against a tenured employee or attach a finding of "misconduct" to their files without such hearing.

770.    Defendants also have attached a coercive waiver that prevents those with religious objections from returning unless they waive their right to challenge the religious discrimination they faced.

771.    As a direct and proximate result of each Defendants' discrimination and retaliation, Plaintiffs suffered harms, including but not limited to those set forth in the first cause of action.

772.    Plaintiffs seeks injunctive and declaratory relief, and damages, including nominal, actual, compensatory, and punitive damages, along with attorneys' fees pursuant to this cause of action.

773.    Plaintiffs also seek reasonable attorneys' fees and costs.

## FOURTH CAUSE OF ACTION

### (Violation of SHRL)

774.    Plaintiffs repeat and realleges all paragraphs of this Complaint as if fully set forth herein.

775.    For the reasons set forth in the first three causes of action, *supra*, Plaintiffs asserts parallel claims under the SRHL against both defendants for failure

to accommodate, discrimination, harassment, retaliation and aiding and abetting discrimination in violation of the SHRL.

776.   At all relevant times, the SHRL has been in full force and effect, and has applied to both Defendants' conduct.

777.   Defendants worked in concert to deprive Plaintiffs of reasonable accommodation.

778.   The SHRL provides:

It shall be an unlawful discriminatory practice for an employer, or an employee or agent thereof, to impose upon a person as a condition of obtaining or retaining employment, including opportunities for promotion, advancement and transfers, any terms or conditions that would require such person to violate or forego a sincerely held practice of his or her religion...unless, after engaging in a bona fide effort, the employer demonstrates that it is unable to reasonably accommodate the employee's or prospective employee's sincerely held religious observance or practice without undue hardship on the conduct of the employer's business.

N.Y. Executive Law § 296(10(a).

779.   It is also a violation of the SHRL for any party to aid or abet another in the violation of rights guaranteed thereunder.

780.   Undue hardship is defined under the SHRL as "an accommodation requiring significant expense or difficulty (including significant interference with the safe or efficient operation of the workplace...)." N.Y. Executive Law § 296(10(d)

781.   If the undue hardship is alleged based on a safety concern, "the employer must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or the best available objective information to ascertain: the nature, duration and severity of the risk; the probability that the potential injury

108

will actually occur, and whether reasonable accommodations, such as modification of policies, practices or procedures, will mitigate the risk." 9 CRR-NY 466.11.

782.    At all relevant times, DOE was Plaintiffs' employer, or potential employer, as defined by the SHRL.

783.    The City was also the DOE's agent, in remediating the original acknowledged harm from the Stricken Standards denial, and controlled the DOE, directing, aiding and abetting the discriminatory practices at every level of review as set forth more fully in all paragraphs of this complaint.

784.    For the same reasons set forth above in the First Claim, both Defendants violated the SHRL by failing to accommodate Plaintiffs.

785.    The same standards which define protected religious beliefs under federal standards govern state and local statutory accommodation requests, though the SHRL and CHRL are more generous and expressly include creed as a protected category of religious belief.

786.    Similar standards govern the undue hardship determination, though there is a heightened burden on employers under the SHRL to show a *significant* burden and to assess specific factors using the most current objective evidence prior to denial of relief.

787.    Failure to engage in cooperative dialogue about undue hardship also leads to a strong presumption of discrimination under the state statutory requirements.

788.    Defendants have not and cannot prove that accommodating Plaintiffs would have required significant expense or difficulty from DOE.

789.    Defendants have not and cannot prove that accommodating Plaintiffs would have significantly interfered with the safe or efficient operation of the DOE's workplaces.

790.    Defendants have not and cannot prove that accommodating Plaintiffs would have required the DOE to violate a bona fide seniority system.

791.    Defendants failed to engage in any interactive process with Plaintiffs regarding potential accommodations or the difficulties posed by any prior to denial.

792.    Defendants violated the SHRL by denying Plaintiffs' requests for reasonable accommodation without first engaging in an interactive process and assessing the statutory factors.

793.    Instead of accommodating Plaintiffs' religious beliefs, Defendants retaliated against Plaintiffs by suspending and terminating them if they failed to violate their religious beliefs.

794.    For the same reasons set forth in the preceding claims, and herein, Defendants also are liable under the SHRL for discrimination, harassment and retaliation based on religion.

795.    The SHRL adopts the same tests as Title VII for assessing discrimination, retaliation and harassment claims but is supposed to be even more liberally construed towards plaintiffs.

796.    Aiding and abetting discrimination is expressly also listed as a standalone violation of the SHRL even if the colluder is not the employer.

797.    As set forth in great detail throughout the Complaint, the City and the Mayor aided and abetted the DOE's discrimination and failure to accommodate Plaintiffs and their colleagues.

798.    Defendant Chokshi furthered this aiding and issuing a letter to the arbitrators arguing that Plaintiffs with religious objections to abortion had invalid concerns and should be barred from accommodation.

799.    As a government official, Defendant Chokshi cannot lend his power to give unfair advantage to one side in a religious dispute, such as he did here.

800.    Mayor de Blasio similarly crossed the line by repeatedly asserting that the City would not allow DOE to accommodate those with personally held religious beliefs, or anyone who doesn't belong to the Jehovah's Witness or Christian Science faith.

801.    As a direct and proximate result of each Defendants' discrimination, retaliation and harassment, Plaintiffs suffered harms, including but not limited to those set forth in the first cause of action.

802.    Plaintiffs seek injunctive and declaratory relief, and damages, including nominal, actual, compensatory, and punitive damages, along with attorneys' fees pursuant to this cause of action.

803.    And Plaintiffs are entitled to reasonable attorneys' fees and costs under the SHRL. Executive Law § 297(10).

## FIFTH CAUSE OF ACTION

### (Violation of CHRL)

804.   For the reasons set forth in the first four causes of action, *supra*, Plaintiffs assert claims under the CHRL against all defendants for failure to accommodate, discrimination, harassment, retaliation and aiding and abetting discrimination in violation of the CHRL.

805.   Plaintiffs repeat and realleges all paragraphs of this Complaint as if fully set forth herein.

806.   At all relevant times, the CHRL has been in full force and effect and has applied to Defendants' conduct.

807.   Pursuant to the CHRL:

It shall be an unlawful discriminatory practice for an employer or an employee or agent thereof to impose upon a person as a condition of obtaining or retaining employment any terms or conditions, compliance with which would require such person to violate, or forego, a practice of, such person's creed or religion,…and the employer shall make reasonable accommodation to the religious needs of such person.

N.Y.C. Admin Code § 8-107(3)(a).

808.   Like the SHRL, the CHRL also provides a standalone violation if an entity is found to have encouraged, aided or abetted the violation of any rights provided therein.

809.   As set forth in Claims 1-4, Defendants colluded to deny accommodation to Plaintiffs and their similarly situated class members.

810.   As a result of each Defendants' actions, Plaintiffs were suspended and

112

terminated.

811.    Defendants' collective and individual actions violated Plaintiffs' rights and proximately caused her adverse employment consequences.

812.    DOE and City Defendants also failed to engage in the required cooperative dialogue with Plaintiffs before denying their accommodation requests, which is a separate and independent act of discrimination under the CHRL.

813.    The CHRL prohibits denial of accommodation until the employer engages in a cooperative dialogue.

> The determination that no reasonable accommodation would enable the person requesting an accommodation to satisfy the essential requisites of a job or enjoy the right or rights in question may only be made after the parties have engaged, or the covered entity has attempted to engage, in a cooperative dialogue.

N.Y.C. Admin. Code § 8-107(28)(2).

814.    Pursuant to statute, the cooperative dialogue must include analysis and discussion about any possible accommodation and the challenges they might face, so that the employee has a chance to engage with the process and offer suggestions too which can be considered in good faith before denial.

815.    This amendment was made in response to a Court of Appeals holding that the failure to engage in cooperative dialogue, while very important and indicative of whether an employer acted in good faith, was not enough to result in a summary judgment determination absent more.

816.    The legislative history of the CHRL amendment notes that the amendment was meant to cure this holding, and to make failure to engage in

cooperative dialogue an independent basis for finding summary judgment against the employer, even if undue hardship could have ultimately been proven.

817.    Other important amendments are relevant too.

818.    In 2005, the New York City Council amended the CHRL by passing the Local Civil Rights Restoration Act of 2005 (the "Restoration Act"), N.Y.C. Local L. No. 85.

819.    "In amending the []CHRL, the City Council expressed the view that the []CHRL had been 'construed too narrowly' and therefore 'underscore[d[ that he provisions of New York City's Human Rights Law are to be construed independently from similar or identical provisions of New York state or federal statutes.'" Restoration Act § 1.

820.    To bring about the change, the Act established two new rules of construction. First, it created a "one way ratchet" by which interpretations of state and federal civil rights statutes can serve only "'as a *floor* below which the City's Human Rights law cannot fall.'" Restoration Act § 1. Second, it amended the CHRL to require that its provisions "be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title[,] have been so construed." Restoration Act § 7 (amending N.Y.C. Admin. Code § 8-130).

821.    In 2011, New York City enacted the Workplace Religious Freedom Act, amending sections 8-102 and 8-107, to adopt a stiffer standard for assessing undue

hardship. The committee report noted that the City Council's intention was "to provide greater protection to workers under the City Human Rights Law than the federal, and even the State, human rights provisions provide." N.Y.C. Council, Report of Committee on Civil Rights on Proposed Int. No. 632, Aug. 16, 2011.

822.    Under the CHRL, undue hardship is defined:

"Reasonable accommodation" as used in this subdivision, shall mean such accommodation to an employee's or prospective employee's religious observance or practice as shall not cause undue hardship in the conduct of the employer's business. The employer shall have the burden of proof to show such hardship. "Undue hardship" as used in this subdivision shall mean an accommodation requiring significant expense or difficulty (including a significant interference with the safe or efficient operation of the workplace or a violation of a bona fide seniority system.)

N.Y.C. Admin. Code § 8-107(3)(b).

823.    Plaintiffs were able to perform the essential duties of their jobs with reasonable accommodation.

824.    Accommodating Plaintiffs would not require significant expense or difficulty from the Defendants, who bear the burden of proof and have not met that burden.

825.    Accommodating Plaintiffs would not require the Defendants to violate a bona fide seniority system. Defendants bear the burden of proof on this defense and have not met that burden.

826.    Accommodating Plaintiffs would not significantly interfere with the safe or efficient operation of Defendant's workplace. Defendants bear the burden of proof on this defense and have not met that burden.

115

827. Plaintiffs asserted sincere religious objections and there was no basis to question their sincerity.

828. Defendants did not question Plaintiffs' sincerity.

829. Instead, they denied them based on undue hardship.

830. Defendants did not meet their burden of proving undue hardship.

831. Defendants did not establish that Plaintiffs posed a direct threat because of their vaccine status, nor can they do so, as set forth more fully above.

832. Plaintiffs also assert discrimination, harassment, and retaliation claims pursuant to CHRL, as more fully described in the SHRL and Title VII causes of action, which apply the same standards, though the CHRL is to be the most favorably construed towards plaintiffs.

833. As a direct and proximate result of Defendants' unlawful discriminatory practices, Plaintiffs suffered and continue to suffer substantial losses, for which they are entitled to an award of monetary damages which exceeds the jurisdiction limits of all lower courts, along with reinstatement, declaratory nominal, compensatory and other relief.

834. As a direct and proximate result of Defendants' failure to accommodate Plaintiffs, Plaintiffs suffered, and continue to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which they are entitled to an award of monetary damages in an amount to be determined at trial.

835.    As a direct and proximate result of Defendants' failure to accommodate, Plaintiffs are also entitled to injunctive and declaratory relief, nominal and compensatory damages, pain and suffering and punitive damages.

836.    As set forth above, Defendants' conduct was willful and showed a reckless disregard for Plaintiffs' rights, and the rights of all similarly situated colleagues. In denying accommodation, Defendants violated their own policies as well as well-established law, all while flouting multiple court orders.

837.    Plaintiffs are also entitled to attorneys' fees, expert fees, and other costs under the CHRL N.Y.C. Admin Code §8-502(g).

## SIXTH CAUSE OF ACTION

### (Violation of the U.S. Constitution - Equal Protection Clause)

838.    Plaintiffs reincorporate all paragraphs of this Complaint as if fully written herein.

839.    Plaintiffs asserts that DOE's adoption of a facially discriminatory religious accommodation policy, which conditioned access to accommodation on membership in a preferred religious organization, and excluded access to those with unorthodox religious beliefs, constitutes direct evidence of discrimination in violation of the Equal Protection Clause of the United States Constitution.

840.    Defendants are judicially and collaterally estopped from arguing that the Stricken Standards policy is non-discriminatory.

841.    As the Second Circuit already noted: "The City concedes that the Arbitration Award…'may' have been 'constitutionally suspect,' [] and its defense of

that process is half-hearted at best. Indeed, it offers no real defense of the Accommodation Standards at all." *Kane v. de Blasio,* 19 F.4th 152, 167 (2d Cir. 2021). "We confirm the City's 'susp[icion]' …" *Id.*

842.    First, the Court held that the written policy is not neutral, because on its face, it singles out unorthodox beliefs and faiths for disparate and unequal treatment: "We conclude, first, that the procedures specified in the Arbitration Award and applied to Plaintiffs are not neutral. The Supreme Court has explained that 'the government, if it is to respect the Constitution's guarantee of free exercise, cannot impose regulations that are hostile to religious beliefs of affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices.' *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n,* ---U.S.---, 138 S. Ct. 1719, 1731 (2018)." *Id.* at 168.

843.    Moreover, hostile comments by high-level City actors' and DOE agents about the invalidity of sincere religious objections grounded in concerns about abortion or personal prayer, or derived from religions other than Christian Science, constitute additional direct evidence of discrimination.

844.    Next, the Court also acknowledged additional direct evidence of discrimination in the application of DOE's facially unlawful standards, for example, through DOE's pattern of recharacterizing people's beliefs as personal rather than religious. "Denying an individual a religious accommodation based on someone else's publicly expressed religious views – even the leader of her faith – runs afoul of the Supreme Court's teaching that [i]t is not within the judicial ken to question the

centrality of particular beliefs or practices of faith, *or the validity of particular litigants' interpretation of those creeds." Id.* at 168-169 (emphasis in original).

845.    Because Defendants adopted written and de facto policies with express classifications based on which religion a person belonged to, and because of the other Direct Evidence of discrimination set forth above, Plaintiffs' denials of accommodation must be presumed to be pretextual and discriminatory under this framework, and Defendants cannot survive summary judgment since there is no affirmative defense.

846.    As set forth more fully in the complaint, Defendants' religious animus infected every level of review and every policy choice Defendants applied to religious accommodation decisions or consequences impacting Plaintiffs' case.

847.    As a direct and proximate result of Defendants' discrimination, Plaintiffs suffered, and continue to suffer damages and harm.

848.    Plaintiffs are entitled to injunctive and other equitable relief, including reinstatement with no break in service, front pay and back pay in salary and all benefits and employment terms, including retirement credits, compensatory damages, including pain and suffering, nominal damages at an amount to be determined at trial, and attorney's fees. 42 U.S.C. §§ 1981a(a)(1), 2000e-5(g)(1), (k).

849.    Plaintiffs also seek declaratory relief along with nominal damages. *Id.*

## SEVENTH CAUSE OF ACTION

### (Infringement of Free Exercise Clause – United States Constitution)

850.    Plaintiffs repeat and realleges all paragraphs of this Complaint as if fully set forth herein.

851.    The Free Exercise Clause of the First Amendment to the United States Constitution prohibits the government from burdening the free exercise of religion.

852.    The First Amendment provides, in pertinent part, that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof…" U.S. Const. amend. I.

853.    The Supreme Court has held that "a law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny." *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 546 (1993).

854.    Where there is evidence of animus, or where there is a mechanism for exemption or lack of general neutrality requirements, an infringement must be strictly scrutinized, and the Defendants bear the burden of showing that they applied a law or policy using the least restrictive means available to further a compelling state interest.

855.    Plaintiffs' sincerely held religious beliefs prohibit them from taking a Covid-19 vaccine.

856.    Defendants' denials of accommodation substantially burdened Plaintiffs' free exercise of religion, in that they were forced to violate their faith if they wanted to keep her job and avoid serious consequences.

857. Defendants' refusal to accommodate Plaintiffs' religious practices created coercive pressure on them to change or violate their sincerely held religious beliefs.

858. The Mandate, which Defendants used to justify the denial of accommodation, was not neutral nor was it generally applicable.

859. The Mandate is not generally applicable, because the Mayor and other members of the Executive Branch are empowered to make exceptions to the Mandates in their sole discretion.

860. Since the DOE Mandate was issued, the Mayor has issued over a hundred executive orders, extending and expanding coverage of the City's vaccine mandates to various different groups, and then making carve-outs and exceptions according to secular reasons that undermine the Government's stated reason the same way that a religious carve out would.

861. The Mandates is also not generally applicable because it makes exceptions for secular reasons that defeat the purpose of the Mandate in the same manner.

862. For example, the DOE Mandate allows bus drivers to remain unvaccinated, even though they are in enclosed busses with unvaccinated children, and it allows students to remain unvaccinated and attending class in person, though they are just as able to spread Covid-19 to their peers as teachers, but it requires teachers to be vaccinated.

863.   The Mandate is also not generally applicable, because, on its face, it allows employers to exercise a mechanism for individualized exception – to wit, medical or religious accommodation.

864.   Pursuant to state and municipal law, discretionary mechanisms for exemption existed whereby each of the Defendants was not only allowed but required to consider whether to grant religious or medical accommodation when an employee applies.

865.   These exemption reviews are defined to be individualized processes, which are, like the "good cause" standard, open to interpretation and not a ministerial act, like determining whether a person has a doctor's note. Thereby, discretion is routinely applied in deciding whether to accept or deny an application for accommodation.

866.   The DOE also adopted a policy for religious accommodations, thereby defeating any argument that the Mandates were general applicable without a mechanism for accommodation, as applied, and the City also added an express provision, coupled by a promise to a state court, that religious accommodation and exemption would be allowed.

867.   The religious accommodation policies implemented and enforced by the DOE and the City were also themselves government policies that burdened religion, and they were not neutral nor generally applicable either.

868.   As recognized by the Second Circuit, DOE's adoption of a discriminatory written policy defeats neutrality.

869.    Comments by decision-makers also defeat neutrality.

870.    Because the policies were not neutral, strict scrutiny applies.

871.    The Second Circuit also already held that the Defendants' religious accommodation policies were not generally applicable, because decision-makers exercised discretion about whether to grant or deny accommodation, thereby evidencing a mechanism for individualized exemption.

872.    Because the policies were not generally applicable, strict scrutiny applies.

873.    Defendants, who are each state actors, did not have a compelling interest in requiring Plaintiffs to be vaccinated.

874.    The vaccine cannot stop transmission, and there is therefore outside of the state's police powers.

875.    To the extent that the Defendants could prove that any significant danger existed because of Plaintiffs' vaccine status, reasonable accommodations such as weekly testing, daily symptom checks, mask use or allowing remote or off-site meetings could have been implemented without undue hardship.

876.    In refusing to accommodate Plaintiffs' sincerely held religious beliefs, Defendants did not use the least restrictive means of furthering any compelling state interest.

877.    More importantly, as the Second Circuit pointed out, Defendants did not have a compelling interest in any event in conditioning access to accommodation on membership in a favored religious organization.

878. Nor do Defendants have a compelling interest in applying a more favorable undue hardship analysis to those found to meet the criteria for the impermissibly favored religions.

879. Defendants' actions injured and continue to injure Plaintiffs, by chilling their right to practice their religion and imposing lasting consequences and harm to their emotional, psychological, physical, and financial wellbeing, as well as their reputation.

880. As a direct result of the violation of her First Amendment rights, Plaintiffs are still unlawfully removed from their jobs.

881. Plaintiffs seek, and are entitled to, declaratory relief and nominal damages stating that the denial of their religious accommodation and subsequent employment consequences are void ab initio and violated their First Amendment right to freely practice their religion.

882. Plaintiffs are entitled to, and seek, reinstatement with no break in service, and full compensation for front and back pay of salary, benefits, retirement credits and all employment benefits, including anticipated raises, as if they had never been denied religious accommodation, along with compensatory damages, including pain and suffering and emotional damages, along with punitive damages and attorney's fees. *Tanzin v. Tanvir*, 141 S. Ct. 486 (2020).

## EIGHTH CAUSE OF ACTION

### (Violation of the Establishment Clause of the United States Constitution)

883.   Plaintiffs repeat and reallege all paragraphs of this Complaint as if fully set forth herein.

884.   The Establishment Clause of the First Amendment to the United States Constitution prohibits the State from preferencing any particular religion or religious dogma or belief, or abridging Plaintiffs' rights to free exercise of religion.

885.   Defendants each violated the Establishment Clause by expressing a preference for certain faiths and leaders over others and by expressing animus towards religious objection to vaccination.

886.   The City and Defendant Chokshi went so far as to submit letters to the arbitrators, in which they impermissibly took a position on religious matters.

887.   As one of many examples, the Commissioner of Health, David Chokshi, sent an email and letter to the SAMS arbitrators, letting them know that the City did not consider abortion to be a valid religious concern, and stressing that the Pope was vaccinated.

888.   The DOE took this so far as to adopt a facially discriminatory policy, which favors Christian Scientists on its face, and requires discrimination against minority and unorthodox faiths.

889.   The various preferences expressed by the state actors for some religions and religious leaders or religious beliefs over others trigger strict scrutiny of Defendants' denial of Plaintiffs' religious beliefs as a violation of the Establishment Clause.

890.    Defendants cannot meet the burden of proof to show that their denial of accommodation was narrowly tailored to further a compelling state interest.

891.    Plaintiffs seek and are entitled to declaratory relief and nominal damages, injunctive relief including reinstatement with no break in service, back and front pay and benefits, actual, compensatory and punitive damages, along with attorneys' fees, costs and expenses.

## NINTH CAUSE OF ACTION

### (Substantive Due Process Violation – United States Constitution)

892.    Plaintiffs repeats and realleges each paragraph in the Complaint as if fully set forth herein.

893.    The Mandate violates Plaintiffs' fundamental substantive due process rights facially and as applied.

894.    Plaintiffs have a fundamental right to refuse medicine.

895.    In addition to the fundamental right to refuse even life-saving medicine, the Supreme Court has articulated multiple fundamental rights safeguarding the doctor-patient relationship, and the right to make medical decisions in accordance with one's chosen physician absent state interference.

896.    There is also a fundamental right to protect oneself against harm.

897.    This right rises to the level of a *jus cogens* right where, as here, the medical product mandated is still experimental.

898.    At the time that the Mandate was enforced, the only vaccines available against Covid-19 in the United States were those allowed under experimental use

authorization ("EUA"), which, by the terms of the EUA, could not be mandated or coerced.

899.    A different Pfizer product had been licensed just before the Mandate was imposed, but Pfizer did not make it available in the United States at any time before Plaintiffs were denied accommodation and placed on unpaid leave.

900.    At the time of the Mandate, and continuing today, there were inadequate studies available to determine the risks and benefits of the vaccine for any individual, leave aside those with serious health conditions that put them at greater risk of harm.

901.    Defendants had no compelling or even legitimate reason to mandate the vaccines or to deny religious or medical accommodation.

902.    The vaccines cannot stop transmission of disease, and it is therefore not within the police powers of the state to mandate them.

**WHEREFORE,** for all causes of action pleaded above, Plaintiffs prays that this Court grant judgment to her containing the following relief:

A.    A declaratory judgment that the Defendants' failure to accommodate Plaintiffs' sincerely held religious beliefs and all actions arising therefrom are void ab initio and constitute unlawful discriminatory practices pursuant to Title VII along with nominal damages and attorneys' fees and costs; and

B.    A declaratory judgment that the Defendants' failure to accommodate Plaintiffs' sincerely held religious beliefs and all actions arising therefrom are void ab initio and constitute unlawful discriminatory practices pursuant to the New York

City Human Rights Law along with nominal damages and attorneys' fees and costs; and

C.      A declaratory judgment that the Defendants' failure to accommodate Plaintiffs' sincerely held religious beliefs and all actions arising therefrom are void ab initio and constitute unlawful discriminatory practices pursuant to the New York State Human Rights Law along with nominal damages and attorneys' fees and costs; and

D.      A declaratory judgment that the Defendants' failure to accommodate Plaintiffs' sincerely held religious beliefs and all actions arising therefrom are void ab initio and constitute unlawful discriminatory practices pursuant to the Equal Protection Clause of the United States Constitution along with nominal damages and attorneys' fees and costs; and

E.      A declaratory judgment that the Defendants' failure to accommodate Plaintiffs' sincerely held religious beliefs and all actions arising therefrom are void ab initio and violate the Free Exercise Clause of the First Amendment of the United States Constitution along with nominal damages and attorneys' fees and costs; and

F.      A declaratory judgment that the Defendants' failure to accommodate Plaintiffs' sincerely held religious beliefs and all actions arising therefrom are void ab initio and violate the Establishment Clause of the First Amendment of the United States Constitution along with nominal damages and attorneys' fees and costs; and

G.    A declaratory judgment that the Mandate, as applied, is unconstitutional because it violates Plaintiffs' fundamental rights, along with nominal damages and attorneys' fees and costs; and

H.    An order that Defendants reinstate Plaintiffs to their former positions with full seniority, no break in service, status, retirement credits, salary increments, bonuses and benefits as if the denials of accommodation had never occurred; and

I.    An award of actual and compensatory damages in an amount to be determined at trial; and

J.    An award of costs in this action and any appeals, including reasonable attorney's fees; and

K.    An award to Plaintiffs for punitive damages in an amount to be determined at trial; and

L.    An order for civil fines and penalties pursuant to New York Executive Law §297(9); and

M.    An award of pre- and post-judgment interest on all amounts awarded to Plaintiffs and the class at the highest rates and from the earliest dates allowed by law on all causes of action; and

N.    Such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and Rule 38(b) of the Local Rules, Plaintiffs demand a trial by jury for all the issues pleaded herein so triable.

Dated: Ithaca, New York
      January 30, 2025

                            Respectfully Submitted,
                            Gibson Law Firm, PLLC

                            By:     /s/ Sujata S. Gibson
                                    Sujata S. Gibson
                                    120 E Buffalo Street, Suite 201
                                    Ithaca, NY 14850
                                    (607) 327-4125
                                    sujata@gibsonfirm.law

                                    **Attorneys for the Plaintiffs**