## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ATHENA CLARKE, and JENNIFER KLINE, | |
| Plaintiffs, | |
| -against- | **FIRST AMENDED COMPLAINT** |
| THE CITY OF NEW YORK, and the NEW YORK CITY DEPARTMENT OF EDUCATION, DAVE CHOKSHI, in his individual capacity, and ERIC EICHENHOLTZ, in his individual capacity. | Jury Trial Demanded 25-cv-536 |
| Defendants. | |

By and through their undersigned attorneys, Plaintiffs allege as follows:

## INTRODUCTION

1. This lawsuit arises because Defendants engaged in widespread religious discrimination when determining religious accommodation to its Covid-19 vaccine mandates.

2. Rather than engage in good faith individualized review to determine who could be safely accommodated, Defendants proposed, adopted, enforced and encouraged a policy (the "Stricken Standards") that allowed certain religious beliefs to be accommodated while other religions were categorically excluded from the possibility of accommodation.

3. After the Second Circuit held that these policies were likely unconstitutional, Defendants failed to remediate the harm for most of those denied under the policies, including both Plaintiffs here.

4. Plaintiffs allege violations of their fundamental statutory and constitutional rights, seeking declaratory and injunctive relief, as well as reinstatement, nominal, compensatory, actual

1

and punitive damages, attorneys' fees and other remedies, for harms arising from the actions complained of herein.

5. Plaintiffs are entitled to relief under the Second Circuit's holding in *Kane v. de Blasio,* 19 F.4th 152 (2d Cir. 2021), in which the Court held that the Stricken Standards were not neutral or generally applicable and the City failed to offer any defense that could justify them under strict scrutiny.

6. Plaintiffs are also entitled to relief under the Second Circuit's holding in *New Yorkers for Religious Liberty, Inc. v. City of New York* ("NYFRL"), in which the Court held that NYFRL plaintiff Natasha Solon asserted constitutional claims because she was never provided with the remedial "Citywide Panel" review ordered to remedy the harm for the original *Kane* plaintiffs*,* and thus was only ever given an opportunity to apply for religious accommodation under the Stricken Standards policy, which had already been held unconstitutional.

7. Just like Solon, neither Plaintiff in this case was ever given the remedial "Citywide Panel" review and were only ever offered accommodation if they met the discriminatory criteria in the Stricken Standards.

8. This case also involves extensive evidence of religious discrimination that exceeds the scope of the prior decision in *Kane* or *NYFRL*, leading to strict scrutiny and relief under a number of different causes of action, and establishing personal liability for individually named Defendants as well as municipal liability against the City and DOE.

9. Plaintiffs also assert statutory claims in this case.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because this action arises under the Constitution and laws of the United States, including 42 U.S.C.

§ 1983 and Title VII of the Civil Rights Act of 1964.

11. This Court has supplemental jurisdiction over Plaintiffs' state and local law claims pursuant to 28 U.S.C. § 1367(a).

12. Venue is proper in this District under 28 U.S.C. § 1391(b).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

13. **Plaintiff Athena Clarke:** Plaintiff Clarke filed a timely Charge of Discrimination with the EEOC (Charge No. 520-2022-03141). On **December 30, 2024**, the U.S. Department of Justice issued a Notice of Right to Sue for this operative charge (Exhibit A). Plaintiff commenced this action on January 30, 2025, within 90 days of receiving the Notice.

14. **Plaintiff Jennifer Kline (Single Filing Rule):** Plaintiff Kline asserts Title VII claims pursuant to the "single filing" or "piggybacking" rule. *See Tolliver v. Xerox Corp.*, 918 F.2d 1052 (2d Cir. 1990). Plaintiff Kline is similarly situated to Plaintiff Clarke, as both were tenured educators employed by the DOE who were denied religious accommodation and terminated under the same discriminatory policy. Defendants had notice through Clarke's and other EEOC filings of the systemic nature of the religious discrimination claims.

15. Both Plaintiffs were subjected to a fresh act of discrimination in **August and September 2022**, when Defendants offered to reinstate unvaccinated employees who were terminated or on leave but continued to categorically deny religious accommodation to those wishing to return.

16. Plaintiff Clarke's timely filed EEOC charges cover both the 2021 and 2022 acts of discrimination, rendering them timely for Plaintiff Kline to piggyback upon.

## PARTIES

17. Plaintiff ATHENA CLARKE is a resident of Kings County, New York. Prior to being

3

denied religious accommodation, Ms. Clarke was a tenured special education teacher in good standing. She worked in Brooklyn with over six years of service at DOE. Ms. Clarke is one of thousands harmed by Defendants' discriminatory religious accommodation policies.

18. Plaintiff JENNIFER KLINE is a resident of Lake County, Florida with sincerely held religious objections to the Covid-19 vaccine. Prior to being denied religious accommodation, Ms. Clarke was a tenured special education teacher working in good standing. She worked in Queens with over seventeen years of service at DOE. She is one of thousands harmed by Defendants' discriminatory religious accommodation policies.

19. Defendant CITY OF NEW YORK is a municipal corporation of the State of New York and can sue and be sued. The City operates and employs people through its municipal agencies. Since 2002, the City has exercised Mayoral control over DOE pursuant to a grant of authority to the City from the State Legislature.

20. Defendant New York City Department of Education ("DOE") is a school board organized under, and existing pursuant to, the New York Education Law. Defendant DOE maintains its headquarters at 52 Chambers Street, New York, New York and operates in all five boroughs of the City of New York. The Mayor of the City of New York exercises mayoral control over the DOE.

21. DEFENDANT DAVE CHOKSHI. Defendant DAVE CHOKSHI is sued in his individual capacity. At all times relevant to this Complaint, Defendant Chokshi served as the Commissioner of the New York City Department of Health and Mental Hygiene. Defendant Chokshi was personally involved in the deprivation of Plaintiffs' constitutional rights. Specifically, he stepped outside his role as a neutral policymaker to actively advocate for

4

the denial of specific religious beliefs held by Plaintiffs and others similarly situated. This included sending a letter to arbitrators instructing them that religious objections based on the use of fetal cell lines were invalid and did not merit protection, thereby stripping the accommodation process of neutrality.

22. Notice and Relation Back: Defendant Chokshi received constructive notice of this action upon its original filing via the Office of the Corporation Counsel, which represents him in this and related matters. He knew or should have known that, but for a mistake concerning the identity of the proper parties, this action would have been brought against him personally given the specific allegations regarding his conduct in the original Complaint [ECF No. 1].

23. DEFENDANT ERIC EICHENHOLTZ. Defendant ERIC EICHENHOLTZ is sued in his individual capacity. At all times relevant to this Complaint, Defendant Eichenholtz acted under color of state law as the Chief Assistant Corporation Counsel for Employment Policy and Litigation. Defendant Eichenholtz drafted the proposed criteria for who could be accommodated, adopted by the Arbitrator as the "Stricken Standards," and oversaw the Citywide Panel, including making the decision to exclude most employees from receiving a "fresh review."

24. Notice and Relation Back: Defendant Eichenholtz received constructive notice of this action upon its original filing via the Office of the Corporation Counsel. He knew or should have known that, but for a mistake concerning the identity of the proper parties, this action would have been brought against him personally given the specific allegations regarding his conduct in the original Complaint [ECF No. 1].

## FACTUAL ALLEGATIONS COMMON TO ALL PLAINTIFFS

### I.    The Pandemic and the City's Vaccine Mandates

25. In March 2020, New York State declared a statewide emergency due to the Covid-19 pandemic.

26. Contrary to Defendants' frequent assertion, New York City's vaccine mandates were *not* an "early pandemic measure" but instead were a year and a half after the pandemic began.

27. Defendant Chokshi did not announce the DOE mandate until August 2021, two months after then-Governor Andrew Cuomo declared that the pandemic emergency over in June 2021.

28. When the mandate was implemented, DOE teachers (including both Plaintiffs) had already been back working in person with students in DOE schools for over a year. DOE schools were closed from March through June 2020. But by the fall of 2020, in person learning resumed and teachers were required to work in person unless granted accommodation.

29. Vaccines became available to teachers in December 2020. But teachers, including Plaintiffs, were not required to take them. Instead, Plaintiffs were allowed to test weekly in lieu of vaccination, as every other school district in the state allowed throughout the entire pandemic.

30. In August late 2021, Defendant Chokshi, then commissioner of the New York City Department of Health and Mental Hygiene ("DOHMH") announced that the testing option would be removed effective October 2021.

31. Prior to that deadline, Plaintiffs were tallowed to teach unvaccinated in person with students through the height of the pandemic during the entire 2020-2021 school year, the summer of 2021, and the first quarter of the fall semester of 2021 before they suspended without pay on October 4, 2021, for failing to get vaccinated in violation of their sincerely held religious beliefs.

**II.    The Stricken Standards: DOE's Facially Discriminatory First Policy**

6

### A.   Litigation and Labor Disputes Forced Defendants to Allow for Accommodation

32. The DOE Mandate did not originally provide religious or medical accommodation but was amended to specifically provide such accommodation through lawsuits and labor disputes.

33. On September 14, 2021, in litigation brought by sixteen labor unions, Justice Laurence Love issued a Temporary Restraining Order ("TRO") enjoining enforcement of the August version of the DOE Mandate because it failed to provide for religious and medical exemptions.

34. On or about September 15, 2021, in response, Defendant Chokshi issued a new version of the DOE mandate which stated: "**Nothing in this Order shall be construed to prohibit any reasonable accommodations otherwise required by law**."

35. Justice Love dissolved the TRO the next day "solely" because the City's promised that this new version would allow for reasonable religious and medical accommodation and they had amended the DOE Mandate to so state.

36. Defendant Eric Eichenholtz, then Chief Labor and Employment attorney for the City, later admitted in sworn testimony as Defendants' 30(b)(6) witness that nothing in the amended DOE mandate precluded accommodation for an employee to work unvaccinated *in person or remotely*.

### B.  Unconstitutional Stricken Standards Policy Adopted to Avoid Accommodation

37. In parallel labor proceedings, the United Federation of Teachers, Local 2, AFT, AFL-CIO ("UFT") filed a Declaration of Impasse against the City and the DOE. On September 10, 2021, an arbitrator, Martin F. Scheinman issued an order that required both the City and DOE to permit religious exemptions to its DOE vaccine requirements. Identical orders were

issued for DOE employees covered by other unions (collectively referred to as the "Stricken Standards.")

38. Nothing in any of the DOE contracts or the awards waives the right of employees to file lawsuits for civil rights violations even if ordered or encouraged by arbitration awards.

39. On their face, the Stricken Standards, attached hereto as <u>Exhibit B</u> (not for the truth of what lies therein, but for the fact that the policy was issued and what it said) singled out Christian Scientists for favor, and categorically excluded "personally held" religious beliefs, and also any religious applicant whose so called "leader" of their faith had publicly supported vaccination.

40. Moreover, the Stricken Standards imposed a clergy requirement, stating that any request "must be documented in writing by a religious official (e.g. clergy)."

41. The policy not only forbade accommodation for employees who followed a personal religious path but went a step further. Under the discriminatory criteria, accommodation was not available to anyone who belonged to a religion that wasn't deemed "established" and "recognized" either.

42. To the extent that DOE evaluators decided an employee belonged to a "recognized" and "established" religious organization, and the employee presented a clergy letter, the applicant would still have to be denied "if the information was available online." In other words, if the church placed a description of their ministry online, the person would be denied an exemption.

43. Additionally, if a person did happen to belong to an "established" and "recognized" religious organization that is hierarchical and provided letters from clergy in support and the Church that did not make their views known online, that person would still have to be denied if any

8

"leader" of that person's "religious organization" had ever spoken publicly in favor of vaccination.

44. Decision-makers were given enormous discretion to define who the "leaders" of any given religion were.

45. Neither of the Plaintiffs here qualified under the Stricken Standards, because each Plaintiff's non-denominational Christianity was deemed too "personal" under Defendants reading of the Stricken Standards.

**C. The City and DOE's Implementation and Enforcement of Discriminatory Standards**

46. Both the City and DOE are liable for the implementation of the Stricken Standards against Plaintiffs and their colleagues.

47. Since 2002, the City has exercised Mayoral control over the DOE. Moreover, *both* the City and DOE were parties to the arbitrations and bound by it to the extent it was not in conflict with the law.

48. The Stricken Standards imposed a non-delegable duty on both the City and DOE to provide religious accommodation to DOE employees and stated that as "an alternative to any statutory reasonable accommodation process, the City" (and DOE) could use the criteria and process set forth in the arbitration order or any other statutory process.

49. The City and DOE could have followed the Arbitration order by implementing and endorsing lawful statutory accommodation policies, as the award stated that the City could use either the Stricken Standards or any other statutory process. Instead, they each chose to adopt, endorse and enforce the "Stricken Standards" to fulfill the Arbitration order.

50. The government cannot lawfully implement, enforce or even endorse discriminatory policies. Yet, the City and the DOE each elected to use the Stricken Standards as the

9

**exclusive** procedure pursuant to which DOE employees were able to file applications for religious accommodation from the DOE Mandate.

51. Worse, the criteria set forth in the arbitration order was largely proposed and drafted by the City's attorneys, under the supervision of individually named Defendant, Eric Eichenholtz, who was in charge of policy regarding religious exemptions and had decision-making authority for the City. Eichenholtz, as managing attorney of the Law Department, also represents both the City and the DOE in this litigation.

52. His proposed criteria for what constitutes a "valid" religious belief, which the arbitrator adopted, were facially discriminatory. Defendants knew or should have known these criteria were illegal. At the time they were imposed, this Circuit's precedent had already recognized for decades that a clergy certification requirement discriminates against those who practice religions that do not belong to a hierarchical organization or who have religious beliefs that differ from those of their priest or church leadership. And the Supreme Court and this Circuit had repeatedly clarified that personally held, unorthodox, and idiosyncratic beliefs were protected, and that the government is not entitled to deny accommodations by contesting whether an adherent is correct about the factual underpinnings of her beliefs.

53. Not only did Defendants propose and choose to use the Stricken Standards instead of lawful standards, but, at every step, both the City and DOE enforced the Stricken Standards policy in a way to maximize the burden on religious applicants and avoid good faith accommodation as discussed below and illustrated throughout this complaint.

54. For example, the one compromise that the Stricken Standards made in favor of religious employees was that for those lucky few who met all the unconstitutional criteria for a

10

qualifying religious belief, those employees "shall be permitted the opportunity to remain on payroll" without any carve out or mechanism for denial based on undue hardship.

55. But, in the initial review, the DOE sent out autogenerated denials to every single applicant, without reviewing any application individually, stating vaguely that the applicant did not "meet criteria" and any accommodation would be an "undue hardship" or "more than a minimal burden."

56. This same autogenerated denial email was sent to every single DOE employee who applied, even those who were already approved to work remotely that school year and those who could easily be accommodated remotely. It was also sent to employees who did meet the criteria in the Stricken Standards.

57. At the bottom, the autogenerated emails each stated that the denials had been made in accordance with the Stricken Standards <u>and</u> other statutory accommodation laws.  So, what Defendants did is they took the most discriminatory parts of the Stricken Standards (the City's discriminatory criteria) and combined them with a blanket denial because of "undue hardship" using Defendant's interpretation of a "de minimis" hardship standard that was impossible to meet.

58. According to Defendant Eichenholtz, the City and DOE took the position that any effort whatsoever was assumed to be too great to meet this low threshold and neither party ever assessed any request individually to determine cost or threat level.

59. Eichenholtz's theory was unlawful and he knew or should have known it. In 2021, the City and DOE knew they were subject not only to Title VII, which required even then substantially more than a blanket ban, but also the NYSHRL and NYCHRL which have required the employer to prove undue hardship on an individualized basis under the

11

"significant hardship or expense" standard, applying specific statutory criteria to prove threat versus economic hardship.

60. Defendants did not meet the significant hardship or expense standard applicable under the NYSHRL and NYCHRL or the substantial hardship standard applicable under Title VII.

61. No employee, including either Plaintiff, was ever offered any cooperative dialogue before being summarily denied. Specifically, neither DOE nor the City ever engaged in a "good faith" "written or oral dialogue" with any Plaintiff concerning "the person's accommodation needs; potential accommodations that may address the person's accommodation needs, including alternatives to a requested accommodation; and the difficulties that such potential accommodations may pose for a covered entity" as required under the New York City Human Rights Law prior to sending the autogenerated denial of accommodation.

62. Nor did DOE or the City ever engage in an individualized analysis of the required enumerated statutory factors or any economic or safety factors under any of the controlling three accommodation statutes before denying relief.

63. In fact, decision-makers at DOE admitted in sworn testimony that no one even reviewed the applications before sending out the blanket bad faith denials.

64. After receiving their autogenerated denials, DOE applicants were given one day to file an appeal with the SAMS arbitration firm, which provided the exclusive method of appeal, and which required conformity with the Stricken Standards.

65. Many were unable to file an appeal, because the SOLAS system crashed repeatedly and no further options were given.

66. Some DOE employees with sincerely held religious beliefs, including Clarke, did not appeal (or apply) because they thought it futile given the facially discriminatory criteria and insulting blanket autogenerated denials.

67. Most others, like Kline, who did appeal, were given another round of discriminatory and cursory denials, proving Clarke's belief that appeal was futile under the Stricken Standards.

68. The highest decision-makers at the City, including Eichenholtz, who oversaw the religious accommodation processes for DOE employees, and then-Mayor de Blasio, were aware of that DOE was sending autogenerated denials and failing to apply lawful standards. Despite the fact that the City was jointly ordered to provide accommodation, it failed to intervene or properly train to ensure that statutory standards were applied in a lawful manner.

**D. Official City Policy of Religious Discrimination on Appeal**

69. On appeal, the City and DOE are also jointly responsible for encouraging the arbitrators to apply the Stricken Standards in a maximally discriminatory way.

70. Arbitrators had complete discretion whether to grant a zoom hearing or just automatically deny an applicant, and either way, they did not have to document any reasons for their decisions other than writing an "x" next to the word "denied."

71. Employees that got a hearing were subjected to even more discriminatory treatment.

72. As detailed in this and the next section, the City adopted an official policy, passed on to the arbitrators and DOE, that Jews, Catholics, Muslims, Buddhists, most Christian sects (other than Christian Scientists and Jehovah's Witnesses), and many other faiths were categorically barred from accommodation under the Stricken Standards.

73. During the arbitration reviews, the DOE zealously argued for these discriminatory policies. For example:

13

a.  DOE representatives repeatedly admitted in depositions that they took the official position, in accordance with the City's instruction, that all Jews, Catholics, Muslims, Buddhists and most Christians were per se ineligible for accommodation based on the (often erroneous) assertion that the leaders of these faiths were vaccinated.

b.  DOE representatives and arbitrators repeatedly accused applicants of, essentially, being heretics or wrong because the Pope was vaccinated and he was, in their view, the authority for most Christians. This argument was levied at Catholics, but also at non-Catholics. DOE even asserted that a Buddhist with sincerely held religious beliefs had to be denied because his views allegedly were out of accord with Pope Francis.

c.  City officials, DOE representatives and arbitrators also stated openly that people with personally held religious beliefs, or who did not have a clergy letter, *had* to be denied even if they were sincere.

74. A significant fact for these Plaintiffs (not before the Second Circuit in the *Kane* litigation), that showed the City's involvement in the discrimination under the original policy was that Commissioner Chokshi himself wrote and disseminated a letter instructing the DOE and arbitrators to deny religious objections based on a concern about the use of aborted fetal cell lines.

75. In the letter, Commissioner Chokshi instructed decision-makers to deny religious beliefs based on an objection to the vaccines' connection to abortion.

76. Commissioner Chokshi admitted in the letter that cell lines from aborted fetuses were used in the development of the vaccines, either directly (for example to make tissues to grow the

adenovirus used in one of the vaccines) or for safety and efficacy testing required pre-licensure. Nonetheless, he asserted that religious objection was unwarranted because "[a]n array of religious groups have stressed the importance of COVID-19 vaccination to save lives from COVID-19 and have called on all people to get vaccinated. As an example, the Catholic Church has issued a clear statement that Roman Catholics can in good faith receive COVID-19 vaccines that use fetal cell lines in development."

77. Commissioner Chokshi also claimed that other products, like Tylenol, used aborted fetal cell lines the same way and suggested that no one could therefore have sincerely held objections to the vaccines because these products were so widespread.

78. Commissioner Chokshi's letter was wrong. First, he was wrong that the Catholic Church demanded vaccination. There was a split in the Catholic Church about whether it was permissible to take the Covid-19 vaccines given the connection to abortion, and a whole conference of Catholic Bishops took the position it was not. Moreover, Pope Francis acknowledged that the vaccines were tainted by abortion, but decided that for him, the possibility of saving others by getting vaccinated overrode this sin. He did not tell all Catholics to do the same – rather, he advised Catholics that they had to consult their moral conscience (which is the voice of the Holy Spirit and God in Catholicism) to decide whether to take it.

79. Second, Commissioner Chokshi was wrong about Tylenol and other over-the-counter products mentioned in the letter. Tylenol and other products mentioned by Chokshi did not use fetal cell lines for testing pre-licensure. Many of these products came to market before fetal cell lines were ever first used, and the corporations confirm they do not use fetal cell lines for any aspect of their product development.

15

80. Third, even if Tylenol and other products were tainted by use of aborted fetal cell lines in a similar fashion to Covid-19 vaccines, this alleged fact (which is wrong) was not well-known whereas it was very well known and discussed that the Covid-19 vaccines were tainted by the use of aborted fetal cell lines.

81. Fourth, the government is prohibited from taking sides in religious disputes or lending their power to resolve such disputes, favor one side or punish another. Commissioner Chokshi's letter did all three.

82. Commissioner Chokshi sent this letter to the DOE and also to the arbitrators hearing the appeals. The same letter was then sent to the Citywide Panel, which also relied on it, as evidenced by the denial of Sarah Buzaglo, who was denied by the Citywide Panel on the ground that her concerns about abortion conflicted with guidance from Commissioner Chokshi.

83. DOE representatives and arbitrators cited Commissioner Chokshi's letter as authority for denying accommodation to employees who had concerns about the use of aborted fetal cell lines in production or development of the vaccines, even in cases where they found the employee's religious objections sincere.

84. Both Plaintiffs' here have sincerely held religious objections that include an objection to the use of aborted fetal cell lines in development or testing of the Covid-19 vaccines. These policies barred them from being accommodated and/or made it significantly more difficult to be accommodated than their peers who met the criteria for a presumptively "valid" religious belief set forth in the Stricken Standards.

85. Another significant fact not before the Second Circuit was that the City, acting through its attorneys, the Law Department and the Department of Citywide Administrative Services

("DCAS"), provided arbitrators and DOE representatives with instructions and articles supporting their official policy to categorically exclude all Catholics, Jews, Buddhists, Seventh Day Adventists, most Christians and many others regardless of their specific objection, asserting that the "leaders" of these faiths were all in support of vaccination or the viewpoint that religious opposition to Covid-19 vaccines was not real.

86. During the arbitrations, DOE representatives and arbitrators admitted that these articles from the City were a reason why applicants of those faiths were being denied accommodation.

87. For example, multiple Jewish applicants were told that they could not be accommodated, even though they had sincerely held religious beliefs, because Jews were not allowed to be accommodated under the Stricken Standards under their reading of them. The adjudicators pointed to an article (sent to them by attorneys and agents for the City including DCAS) about a rabbi in Israel who was vaccinated. Even when applicants had a letter from their own rabbi and explained that Judaism is diverse and they are not bound by the views of a different random rabbi, they were told that they could not qualify because the "leader" of their faith as Defendants saw it, was the rabbi in Israel.

88. Hundreds of Christians, even non-denominational Christians like Plaintiffs, were told that they were per se ineligible because Pope Francis was vaccinated, even if the pastor of their own church submitted a letter explaining that their congregation was opposed to the Covid-19 vaccines.

89. Similar categorical denials were issued to Muslims, based on the City's provision of an article about a so-called "leader" of the Muslim faith who was vaccinated, Buddhists, based on a similar article about the Dalai Lama (even though there are thousands of sects of

Buddhism and the central tenet of Buddhism for any sect is that the religion is not hierarchical), and so forth.

### E. Mayoral Statements Confirming Discriminatory Intent

90. DOE and the City's widespread, acknowledged policies reflected ex-Mayor de Blasio's specific guidance and admission of how the City intended to handle the applications for religious accommodation.

91. Mayor de Blasio openly endorsed the Stricken Standards policies.

92. For example, in a press briefing held on September 23, 2021, the night before the arbitration hearings began, ex-Mayor de Blasio was asked how the City would decide which DOE employees would be accommodated or not. He replied that the arbitration award "rules" were "very, very clear about what constituted the types of criteria for these exemptions." He acknowledged the City was involved in coming up with the Stricken Standards and further stated: "the ground rules were 100 percent set through an arbitration process that involved the city..." He then noted that he was "struck at how few people applied for these exemptions" after hearing about the criteria the City set as if that was a very good thing.

93. When a reporter followed up at the same September 23, 2021 press conference, asking if he could go into some of the criteria the City would use to determine who got religious exemptions at DOE, Mayor de Blasio said:

> **Mayor**: Yeah, it's a great question. Thank you. Yes. And very powerfully Pope Francis has been abundantly clear that there's nothing in scripture that suggests people shouldn't get vaccinated. Obviously, so many people of all faiths have been getting vaccinated for years and decades. There are, I believe it's two well-established religions, Christian Science and Jehovah's Witnesses that have a history on this, of a religious opposition. But overwhelmingly the faiths all around the world have been supportive of vaccination. So**, we are saying** very clearly, it's not something someone can make up individually. It has to be, you're a standing member of a faith that has a very, very specific long-standing objection.

18

94. When the Second Circuit held in *Kane* that the record did not show sufficient involvement in the Stricken Standards process by the City to find that the Mayor's comments were relevant on a preliminary injunction motion, the Second Circuit did not have before it the first part of the Mayor's statement to the press in which he stated: "the ground rules were 100 percent set through an arbitration process that involved the city..."

95. Nor did the Second Circuit know that the arbitration award, on its face, ordered the City as well as the DOE to adopt and implement a religious accommodation policy, meaning the City was jointly liable and responsible for what was chosen and how it was implemented.

96. Nor did the Second Circuit have Commissioner Chokshi's letter, the articles provided by DCAS (Department of Citywide Administrative Services) encouraging the DOE and the arbitrators to categorically deny most religions, or the many other facts in this complaint that show City involvement and encouragement of the discriminatory policies originally in place at DOE.

97. As set forth in the individual and general fact sections of this complaint, the City was well-aware of the discrimination going on at DOE, it had a legal responsibility through the arbitration award to make sure it did not occur and correct it when it did, and instead of doing that it encouraged and endorsed the discriminatory policies at DOE.

**F. Defendants Exercised Discretion to Accommodate Some Religions but Deny Others.**

98. The discretionary system resulted in unequal results.

99. After the arbitration appeals, most applicants were provided denials with no further explanation than an "x" next to the word "denied."

100. 165 employees, however, whose beliefs were deemed to fit within the discriminatory criteria, were accommodated and remained accommodated throughout the DOE Mandate.

101. The 165 employees accommodated under the Stricken Standards included classroom teachers as well as many others whose jobs typically involved in-person work with students as well as administrators who worked in and outside of buildings with students.

102. Defendants accommodated some teachers by providing them with co-teachers and then allowing them to teach virtually from home or one of the remote sites set up by DOE for that purpose while their co-teacher was present in the classroom with students. Others were provided with more administrative work or other shifts in job responsibility.

103. As one of many examples, an art teacher whose religious beliefs were deemed to qualify under the Stricken Standards was allowed to work from home and join her class by Google Classroom, while the DOE hired a new long-term substitute to be physically present in her classroom with the students so she could teach from afar. This art teacher was able to continue working throughout the entire mandate through this accommodation and was never terminated and thus still has her job today.

104. Special education teachers like Plaintiffs typically already had co-teachers. It was common during the pandemic for the entire class and a co-teacher to be present in the building and the other co-teacher to be accommodated and allowed to teach break out groups and other subjects remotely. Plaintiffs could have easily been allowed to do this with minimal expense.

105. But Defendants did not bother to individually assess how much it would cost or provide any reason why they couldn't also be accommodated this way.

### III.   JUDICIAL RESPONSE AND SHAM REMEDIATION

**A.  The Second Circuit's Holdings in *Kane* Regarding DOE Employees**

106. On November 28, 2021, on a far sparser record than this, the Second Circuit Court of Appeals held that DOE plaintiffs were likely to succeed against the City and the DOE on free exercise claims. Specifically, the Court held that the religious accommodation policies used to implement the DOE Mandate were neither neutral nor generally applicable and that Defendants were unlikely to survive strict scrutiny, as they offered no compelling reason to engage in religious discrimination. *Kane,* 19 F4th at 167-169 (Kane I).

107. In the opinion and oral arguments, the Second Circuit particularly remonstrated Defendants for discriminating against personally held religious beliefs, conditioning access to accommodation on whether the belief was shared by so called leaders and second guessing an applicant's interpretation of what her own faith required of them.

108. Even the City's own defense attorneys, who worked under the direction of Defendant Eichenholtz, admitted in oral arguments that their religious accommodation policy was "constitutionally suspect." In the Decision and Order, the Second Circuit "confirmed the suspicion" and pointed out that Defendants had offered no excuse for the discriminatory policy.

109. The Second Circuit held that all the *Kane* plaintiffs, including Trinidad Smith, who had not applied under the Stricken Standards because she felt it was futile, were likely to succeed on their free exercise claims.

110. After vacating the denial of preliminary injunctive relief, the Court ordered the City to provide "fresh consideration" of all the *Kane* plaintiffs' requests for religious accommodation by a central citywide panel (the "Citywide Panel") which was to reinstate applicants with back pay if they qualified under lawful state and federal religious

accommodation statutes (in accordance with the standards required by the First Amendment).

111. To avoid an order requiring broader relief, the City agreed to provide the same review to other DOE employees denied under the Stricken Standards.

**B. Second Failure to Accommodate – Failure to Provide Remedial Review**

112. Despite the promise, neither the City nor the DOE ever offered Plaintiffs any remedial review.

113. The remedial reviews were handled by a newly created "Citywide Panel." At all times, the Citywide Panel was wholly under the control of the Mayor's office and was an arm of the City of New York.

114. The Citywide Panel was designed and overseen by Defendant Eichenholtz, who had by that time been promoted to Chief Assistant Corporation Counsel for Employment Policy and Litigation. As such, he was simultaneously responsible for defending the City from the *Kane* and other religious discrimination lawsuits and also for determining policy both for how the Citywide Panel "remedial" reviews would be conducted and which employees would get remediation.

115. Eichenholtz had participated in drafting the original blatantly unconstitutional Stricken Standards policy. Faced with the claims of thousands of DOE employees who had been denied under the Stricken Standards he helped write and advocate for, Eichenholtz (and the City) had a motivation to try to mitigate the damage to his client by upholding as many denials as possible in the "fresh review" process. The case was, after all, as the City refers to it still "sub-judice" and the outcome could have massive financial consequences to the

22

City and potentially employment consequences to Eichenholtz and others that had given the City such unconstitutional advice.

116. Though the City promised to remediate the harm from the Stricken Standards, under Eichenholtz's policies the Citywide Panel only reviewed about 500 out of the 5,000-7,000 DOE employees who'd been denied accommodation under Stricken Standards.

117. Eichenholtz, who had decision-making authority over the Panel's policies and approach, knew that thousands more DOE employees, like Plaintiffs, were denied religious accommodation under the Stricken Standards and required remediation. He and the City exercised discretion *not* to review Plaintiffs and the thousands of others who were denied under the original Stricken Standards.

118. First, the Citywide Panel adopted a policy under Eichenholtz of not remediating denials unless an employee had appealed under the original facially discriminatory policy - even though the Second Circuit had already found that plaintiffs who did not apply for appeal, like Trinidad Smith, were still likely to succeed – and even though the facially discriminatory policy was admittedly unconstitutional.

119. Second, the Citywide Panel failed to issue decisions to most of the Plaintiffs, like Kline, who did try to appeal under the facially unconstitutional process and who the Citywide Panel was supposed to be reviewing.

120. In this case, both Plaintiffs took the extra step of sending notices of claim to the Citywide Panel and all major decision makers at the DOE and City level that they required religious accommodation, had been unlawfully denied under the Stricken Standards, and required a Citywide Panel review.

121. Nonetheless, the Citywide Panel never engaged in a Citywide Panel review or issued either Plaintiff a decision prior to their terminations.

**C. Defendants' Animus Further Endorsed by City's Failure to Renounce Prior Standards**

122. Neither Plaintiff received a Citywide Panel review and should therefore be entitled to strict scrutiny as the Second Circuit already held that the process they were judged under was not neutral or generally applicable. However, the evidence that has emerged from discovery in other cases about the Citywide Panel reviews shows further evidence that taints all level of review.

123. Out of about five hundred applicants the Citywide Panel claims to have reviewed, Eichenholtz admitted in depositions that the Citywide Panel only reversed and reinstated one DOE employee -- *Kane* plaintiff William Castro.

124. Mr. Castro's job involved work in school buildings with students. His office was in a school building. Yet, the Citywide Panel did not claim "undue hardship" for Castro but reinstated him with back pay and allowed him to be accommodated for the remainder of the Mandate, and he is still employed today as a result.

125. Notably, Castro clarified in his materials to the Citywide Panel that he did NOT rest his religious objection on the aborted fetal cell line issue, which likely helped him.

126. Emails between Eichenholtz and Citywide Panel reviewers reveal that Eichenholtz had instructed the Citywide Panel that religious objections to abortion were not eligible and personally held religious beliefs were not eligible.

127. All DOE employees other than Castro received an autogenerated denial stating "does not meet criteria" without further explanation.

128. However, internal notes and emailed explanations sent to the *Kane* plaintiffs show that the Citywide Panel continued to apply many of the same discriminatory criteria.

129. In NYFRL, the Second Circuit reinstated the First Amendment claims of *Kane* plaintiff Heather Clark, who was denied by the Citywide Panel because her concerns about abortion and guidance from prayer were deemed sincere but ineligible under the Citywide Panel's policies. The Second Circuit held that such reasoning violates the First Amendment.

130. Discovery has revealed that the discrimination that Heather Clark faced was not unique. The Citywide Panel continued, as instructed by Eichenholtz, to reject so called "personally held" religious beliefs, including those, like Clark's, that are derived from guidance from prayer, and continued to reject applicants with religious objections to the use of aborted fetal cells like both Kline and Clarke, stating in internal notation that such beliefs, while sincere, do not qualify.

131. Defendant Chokshi also failed to repudiate his prior advice after the Second Circuit held that the original policies were unlawful. His standing instructions, which were to deny religious objections to abortion because the Pope and other leaders seemed okay with the connection, were relied upon and cited by the Citywide Panelists as well as the arbitrators.

132. Not only did the City and Eichenholtz fail to repudiate most of the discriminatory criteria in the Stricken Standards, but after the Second Circuit held they were unconstitutional in *Kane*, the City started offering the Stricken Standards as an option in nearly every City department.

133. So, at most City Departments, not just DOE, a two tiered system was adopted: those that met the discriminatory criteria were entitled to accommodation under a process that allowed for accommodation without regard to undue hardship, whereas those that did not qualify

under the discriminatory criteria had to go before the Citywide Panel, which applied a more difficult undue hardship standard.

134. Under the Stricken Standards, the criteria limited who could be accommodated. But, if an employee was lucky enough to meet the discriminatory criteria, the award stated that they "shall" be allowed to remain on the payroll. Thus 165 employees whose beliefs qualified, were accommodated and allowed to remain on payroll regardless of whether they were classroom teachers, worked in buildings with students or held any other type of position.

135. The Citywide Panel, on the other hand, allowed DOE to categorically deny those who otherwise qualified under statutory standards based on a blanket assumption that any accommodation of teachers (even those who were already remote or who had co-teachers who could handle the classroom component) was somehow enough of an effort to exceed the unlawful "de minimis" standard that the City unlawfully applied.

136. Various plaintiffs in the various lawsuits repeatedly alerted Eichenholtz and the City that the "de minimis" standard was not lawful, and they had to justify the denials under the individualized "significant" hardship or expense standard required by the NYSHRL and NYCHRL. The City ignored these warnings, which started as early as September 2021.

137. Eichenholtz was directing the religious accommodation policies throughout this period. Rather than discipline him or reign him in, the City continued to champion Eichenholtz's approach, promoting him from the Division Chief for Labor and Employment, to Executive Staff as Chief Assistant Corporation Counsel for Employment Policy and Litigation in late 2021, and finally to Managing Attorney of the entire New York City Law Department, where he is in charge of this litigation and all other litigation, overseeing the entire 850+ attorneys at the Law Department.

138. Defendant Eichenholtz was thus the final policymaker for the religious accommodation process instituted at DOE and by the City as its remediation throughout all relevant periods.

139. He also controls the litigation strategy because as Managing Attorney, he is ultimately in charge of it. The City's litigation approach reveals that they continue to apply the Stricken Standards without consequence. As recently as 2025, Defendant Eichenholtz still allows Law Department attorneys to submit briefs and other pleadings to federal courts which assert that Christians and Catholics should have their cases dismissed because Pope Francis is not vaccinated and thus they are presumptively ineligible since the leader of their faith disagrees. These same arguments were submitted to deny plaintiffs and others any possibility of receiving unemployment insurance.

## IV.  THE "UNDUE HARDSHIP" RATIONAL WAS PRETEXTUAL AND UNSUPPORTED

### A. Similarly Situated Employees Were Accommodated Without Regard to Undue Hardship

140. A major problem with maintaining the dual track (one for those who qualify under the discriminatory Stricken Standards and the Citywide Panel process for those who don't) is that the undue hardship burden is far heavier under the Citywide Panel approach.

141. As an alternative basis for denial, the City asserted in NYFRL that it would have denied all the *Kane* plaintiffs anyway because it was an undue hardship to accommodate employees who worked in buildings with students. This was pretextual as set forth below.

142. These Citywide Panel denials did not explain why 165 or more DOE employees who had been accommodated under the Stricken Standards, some of them classroom teachers, and most of whom worked in buildings with students, were accommodated and could continue to be accommodated while teachers with disfavored beliefs who had to go through remedial

Citywide Panel review could not be. Operating off of much earlier complaints, the Second Circuit did not know or consider that this two-tiered system had been created.

143. Nor did the Second Circuit review the fact that the City later admitted in depositions that the Citywide Panel never actually assessed undue hardship for DOE employees, but rather, allowed DOE to make this determination without any support, analysis or cooperative dialogue on the assumption that any hardship must be "more than a minimal burden."

144. Defendant Eichenholtz admitted in sworn testimony that the Citywide Panel was fully aware that at least 165 similarly situated DOE employees remained accommodated under the discriminatory "Stricken Standards." Crucially, he failed to proffer any non-discriminatory justification for why the DOE could sustain the burden of accommodating those 165 favored employees while claiming that accommodating Plaintiffs—who work in the same roles—constituted an "undue hardship."

145. Defendants' only defense—that the initial grant of 165 exemptions exhausted the DOE's capacity—is a confession of liability, not a defense. It is well-established that the government cannot rely on the "fruits" of its own discrimination to justify further denials. Just as an employer could not justify refusing to hire Black applicants by arguing that all available positions were already filled by White applicants pursuant to a discriminatory hiring policy, Defendants cannot claim "undue hardship" simply because they filled their available accommodation capacity with members of preferred faiths and did not want to extend the same offer to any more employees when ordered to remediate the harm.

146. By allowing this capricious double standard, the City and DOE created a two-tiered system that only further entrenched the discrimination that the Second Circuit had chastised them for. 165 of those who were found to qualify under the discriminatory criteria were

accommodated without regard to any alleged undue hardship. Those who appealed to the Citywide Panel were issued blanket undue hardship denials even if they already worked remotely or outside of classrooms and could easily be accommodated in person or remotely.

147. When offered as a 30(b)(6) witness, Mr. Eichenholtz admitted that neither the City nor the DOE assessed any economic factors or data to determine what it would cost in the overall budget to accommodate any employee either in the original DOE denials or at the Citywide Panel appeal level. He also admitted that the City and DOE did not assess any statutory factors on safety or any objective science before issuing undue hardship denials at any level of review.

## B. Safety Rational Was Unsupported

148. Eichenholtz also admitted that nothing in the DOE Mandate or the Municipal Mandate precluded in person or remote accommodation and at least one DOE classroom teacher was allowed to go back into the classroom and teach in person unvaccinated while the DOE Mandate was in effect. He offered no reason the same could not have been allowed for other DOE employees.

149. To the extent that Defendants argue that they had to deny Plaintiffs based on "undue hardship" related to safety that is pretextual. It was well-understood before they were terminated in 2022 that multiple safe routes of accommodation were available.

150. By the summer and fall of 2021, prior to when Defendant Chokshi began issuing vaccine mandates, the City had already seen a substantial reduction in Covid-19 related hospitalizations and deaths compared to earlier in the pandemic. For instance, in its' own executive orders, on June 2, 2021, the City reported zero new Covid-19 deaths and a test positivity rate of 0.83%, the lowest since testing began.

151. By August 2021, even with the Delta variant surpassing prior variants, hospitalizations did not surge. A December 2021 statement from NYC Health Commissioner Dr. Dave Chokshi stated that while cases and test positivity had increased, "we have not seen the same thing with respect to the markers of severe disease, particularly hospitalizations."

152. When Defendant Chokshi announced the Mandate shortly after that statement in August 2021, it was clear from the scientific data available that vaccination could not meaningfully stop transmission or community spread. *See, e.g.,* Exhibit D, Declaration of Dr. Risch, Yale, incorporated by reference herein.

153. By the end of July 2021, the scientific consensus among world public health leaders coalesced around three facts: (1) vaccinated people could still catch and spread SARS-CoV-2 and were at least equally as infectious as unvaccinated people when they did; (2) herd immunity could not be achieved with Covid-19 vaccines; (3) vaccine protection wanes significantly after a short period of time.

154. On August 5, 2021, Wolf Blitzer interviewed CDC Director Rochelle Walensky ("Dr. Walensky") on CNN. Dr. Walensky clarified that the data on vaccine effectiveness against the then-dominant delta variant are conclusive: though the vaccines appeared to prevent severe illness, they cannot stop infection or transmission. "But what they can't do anymore is prevent transmission." When asked if asymptomatic vaccinated people could pass on the virus, Dr. Walensky said, "that's exactly right."

155. After the Mandate was announced, but before Plaintiffs were suspended without pay for failing to get vaccinated in violation of their sincerely held religious beliefs, two of the nation's top public health experts wrote sworn declarations that were submitted by the *Kane* plaintiffs to all the Defendants. These Declarations were submitted by Dr. Jay Bhattacharya,

then at Standford and now head of the National Institutes of Health ("NIH") (incorporated herein by reference and attached as <u>Exhibit C</u>) and Dr. Marty Makary, then at Johns Hopkins and now Commissioner of the Food and Drug Administration ("FDA) (incorporated herein by reference and attached as <u>Exhibit E</u>).

156. The Declarations of Drs. Bhattacharya and Makary, citing the most up to date data and representing the best available objective science available at the time, explained to Defendants why they could safely allow DOE employees, including Plaintiffs, to keep working in person unvaccinated. They offered many alternatives to exclusion, including weekly testing, rapid tests, daily symptom checks, social distancing and other measures, and stressed that natural immunity (which each Plaintiff here had) was repeatedly shown to be far superior and more durable than the immunity conferred by the primary vaccine series.

157. Defendant Chokshi ignored these submissions and refused to issue any updated advice to the City or DOE.

158. The DOE, the City and Eichenholtz also ignored these submissions and continued to advise DOE to deny accommodation to those whose religious beliefs did not fit the discriminatory criteria.

159. As a 30(b)(6) witness, Eichenholtz admitted that neither the City nor the DOE *ever* assessed a single study or any data to determine if they could (or could not) safely accommodate employees in person or remotely even though the Mandate allowed for either and did not possess or review any data to refute the Declarations of Dr. Makary and Dr. Bhattacharya.

160. All other school districts in the state allowed teachers to test weekly in lieu of vaccination if they wanted to work in person with students. This included neighboring Long Island and other school districts with overlapping populations and similar safety profiles.

161. DOE was on notice that their policies were substantially underinclusive. By January of 2022, before Plaintiffs were terminated, it was undeniable that the Covid-19 vaccine was not stopping transmission. DOE had a daily tracker noting how many active employees had Covid-19 on any given day. Prior to the exclusion of all unvaccinated DOE employees, the numbers averaged around 40 or 50 infected teachers at any one time. After DOE employees were excluded, the numbers did not decrease but rather increased among the fully vaccinated staff. By January 2022, the fully vaccinated staff had some days where there were thousands of infected teachers on a given day. Defendants were well aware that vaccination was not stopping teachers from getting infected and passing Covid-19 on to others.

162. In or around January 2022, due to the staffing crisis caused by the exclusion of Plaintiffs and other religious objectors, DOE exercised its discretion by asking *actively infected* teachers to return to classrooms but still refused to allow Plaintiffs with religious objections to the vaccine to return to work even though they had natural immunity and were not infected. Allowing actively infected teachers to teach the largely unvaccinated student body undermines the government's interest in stopping the spread of Covid-19 to a far greater degree than allowing uninfected teachers with religious objections to teach in person unvaccinated.

163. Moreover, under the Defendants' policies, over one million students were allowed to go to school unvaccinated every day. Even if the Covid-19 vaccine mandate could have created herd immunity (which it could not, since it did not stop infection and transmission), only mandating staff and teachers could not create herd immunity when one million students were allowed to come into the classroom unvaccinated.

32

164. According to Anthony Fauci, who was largely directing Covid-19 policy at the time, between 70-90% of a given population (depending on what he thought the population would accept as the number) needed to be vaccinated to create herd immunity. The DOE mandate only covered less than 10% of the school building population.

165. Moreover, not only were 90% of the population (students) largely unvaccinated, but they rode to school each day with bus drivers who had no mandate whatsoever, and could freely transmit Covid-19 to them in enclosed busses on the way in.

166. Even if Defendants were able to show that they could not safely allow uninfected teachers with natural immunity in classrooms while their actively infected colleagues taught students in person, and over a million students were unvaccinated and driven to school by unvaccinated bus drivers, there were many accommodations short of termination available including but not limited to those suggested by Drs. Makary and Bhattacharya in the declarations that were provided to Defendants.

167. In person learning had not just started in the fall of 2021, as Defendants now try to assert, but rather had been in effect since the fall of 2020. Many teachers, including both Plaintiffs, had been working in person with students for a year and a half when they were terminated for undue hardship. Plaintiffs could have remained teaching in person and continued weekly testing, submitted daily symptom checks or the host of other accommodations suggested by the Declarations.

168. Or they could have worked remotely. Contrary to DOE's assertions, throughout the 2021-2022 school year, the DOE continued to offer remote education as an option to some students and was actively recruiting fully remote teachers throughout the school year rather

33

than reassigning qualified teachers like Plaintiffs who needed religious accommodation to do these jobs.

169. Remote work centers were set up after the arbitration award was issued, which were supposed to house any employees whose religious beliefs merited protection. However, these centers sat well-below capacity for the entirety of the mandate.

170. And, prior to the Mandate, employees had been liberally granted leave to work remotely, particularly special education employees who had co-teachers, and could also be reassigned to handle administrative tasks like writing and overseeing IEP implementation.

171. Importantly, the Mandates were always "emergency" and "temporary" in nature, and the state of emergency had to be reviewed and renewed every thirty days to justify their existence. There was no reason the same temporary accommodations could not have been granted after the vaccine mandate was in place.

172. At the very least, Defendants could have provided paid leave until employees could return, or allow employees who were on unpaid leave to pursue work outside of DOE until they could safely return, and return with seniority and tenure intact without signing a waiver of their right to challenge their denials of accommodation.

173. Instead of providing any reasonable accommodations, Defendants terminated Plaintiff Kline in February 2022 for failing to get vaccinated in violation of her sincerely held religious beliefs and then terminated Plaintiff Clarke in or around late August 2022 for the same reason.

174. Then the DOE offered them reinstatement in September 2022, but still refused to offer any religious accommodation even though it knew Plaintiffs needed religious accommodation from the vaccine mandate to return, and even though the CDC guidance at the time explicitly

stated that vaccinated and unvaccinated employees should be treated the same, as each could still get infected and spread Covid-19.

## V.   THE CITY ENCOURAGED RELIGIOUS DISCRIMINATION DESPITE MOUNTING EVIDENCE AGAINST MANDATES AND UNFETTERED DISCRETION.

175. At all relevant times, Defendant Chokshi and the Mayor had full discretion to repeal, amend, carve-out or pause any aspect of the Mandates or repeal them altogether. Yet despite mounting evidence that the Mandates were unnecessary, and knowledge that Plaintiffs and thousands of others needed religious accommodation, they did not amend their temporary "emergency" policies to provide relief.

176. Instead, Defendant Chokshi and Mayor de Blasio exercised their discretion to continue to renew the "emergency" mandate every 30 days well beyond when there was any rational justification for it.

177. On March 7, 2022, Mayor Adams and Commissioner Chokshi held a press conference, each noting how low the transmission rate was in the City. Commissioner Chokshi said: "According to our data, we are currently at a low alert level" and Mayor Adams clarified the City was experiencing historically low infection rates.  The Mayor stated "I'm glad to say that the rates are low enough that the mandatory program is no longer needed." On this basis, he removed a "Key to NYC" Mandate that had required patrons to show they were vaccinated at restaurants and certain other facilities. He also stated: "As of this week, the schools' positivity rate is 0.18 percent. So I'm announcing today that we are lifting the indoor mask requirements for DOE schools between K-12 starting Monday, March 7." Defendant Chokshi and the Mayor refused to resume the weekly testing option for the DOE Mandate, despite this progress.

35

178. The Mayor also announced in March 2022 that he intended to lift all restrictions over parades, festivals and parties, stating: "We have become so boring as a city. I want all my parades back. Every one of them. It is time for us to enjoy our city again. All of these noes, noes, noes [sic]. We've become a city of noes. I want to become a city of excitement. We're going to look to reinstate every parade, every festival, every block party…So if you received a no that we're not doing a parade, I need to find out why."

179. When asked by a reporter to explain how it was fair that "an unvaccinated tourist from Indiana" could go to whatever restaurant they wanted starting Monday, but an unvaccinated teacher, firefighter or EMS worker who lost their job could not, Mayor Adams did not state any public health reason, but instead said "you know, this went to court, this was the rule. How we determined fair and unfairness is in the court of law." With that, the City washed its' hands of any attempt to accommodate DOE employees unless mandated to do so.

180. When asked at a March 2022 press conference if he would repeal the employee mandates and reinstate those who were denied religious accommodation and lost their jobs now that the emergency was over, Mayor Adams again admitted the reason was not about public health, but rather animus to those who refused to comply:

> "The overwhelming number of New Yorkers, city employees did the right thing – the overwhelming number. It sends the wrong message to those New Yorkers who stated, even if i was reluctant, I'm going to follow the rules. That is what we are doing. We can't send the wrong message that when we say something, we're going to change and vacillate. That is what was stated people understood, particularly those who took the job with that understanding, we are people who took the job with the understanding and refused to comply. And so the information was clear. People have to follow the rules." https://www.nyc.gov/office-of-themayor/news/110-22/transcript-mayor-eric-adams-makes-announcement-covidmandates (last accessed June 20, 2025).

181. Neither DOE nor the City revisited any of the pending denials based on the low rates of Covid in schools in March 2022. At that time, Clarke was still on leave and could have been accommodated and reinstated. But she was not because she did not "follow the rules" by violating her faith in compliance with the City's mandate.

182. On March 24, 2022, Mayor Adams issued "Executive Order No. 62" (EEO 62) [ECF No. 60-2]. It amended the employee mandates with blanket exemptions for professional athletes, performers and other artists along with their make-up artists and entourages.

183. EEO 62 was entirely justified on economic rather than public health goals. The order states that these workers benefit the "City's economic recovery from the pandemic, often attracting large numbers of visitors to the City." He stated that it put athletic teams at a competitive disadvantage to bar unvaccinated players which in turn hurt the City's morale as well as economy.

184. But despite similar crushing and well-documented teacher shortages directly attributed to the Mandate, the City would not make any similar carve outs for teachers.

185. Furthermore, the Mayor knowingly allowed various City agencies to let thousands of unvaccinated employees work in person due to staffing shortages, administrative backlog, and mutual aid agreements until the Mandates were repealed in 2023, while their similarly situated colleagues were being denied religious accommodation and fired without any explanation of why they were possibly more dangerous than those allowed to keep working in person. For example, the City allowed two lifeguards, who gave mouth-to-mouth resuscitation, to work in person unvaccinated while Plaintiffs, and even remote DOE employees were denied any accommodation.

186. In *DePaola v. City of New York,* Index No. 85265/2022 (Sup. Ct. Richmond County), which is a related litigation on behalf of a New York City municipal worker who was denied religious accommodation in November 2022, but was granted medical accommodation in May 2022, NYPD submitted a sworn affirmation from Don Nguyen, the Assistant Commissioner of the Equal Employment Opportunity ("EEO") Office admitting that by May of 2022, Covid-19 vases and deaths were extremely low, and there was no safety issue preventing accommodation (for medical or religious reasons) in person with weekly testing so the City did not feel that there was a safety issue in accommodating employees.

187. In August 2022, the CDC issued written guidance stating that workplaces should not differentiate between vaccinated and unvaccinated employees, and that receipt of the primary series (all that was required by any of the Mandates) "provides minimal protection against infection and transmission."

188. On September 20, 2022, the City announced the private sector employee mandate would be repealed.

189. When asked at that time why the Municipal and DOE mandates would not also be repealed despite CDC guidance to treat all workers the same, Mayor Adams told the press, "I don't think anything in general with COVID makes sense and there's no logical pathway one can do." [sic]. Shortly thereafter, the Mayor admitted the City had never enforced the private sector Mandate for most (but not all) employers.

190. The Municipal and DOE Mandates were not repealed until February 2023, and then, only in an open attempt to moot the request for preliminary injunctive relief before the Second Circuit in NYFRL.

## VI.    FALL 2022 OFFER OF REINSTATEMENT AND THIRD FAILURE TO ACCOMMODATE.

191. In August 2022, around the same time that the CDC issued written guidance stressing that vaccinated and unvaccinated employees presented a comparable risk of spread, DOE sent letters to Plaintiffs and other terminated or suspended unvaccinated employees, offering them their same jobs back with no break in service if they would simply get vaccinated by September 5, 2022.

192. In August and September 2022, Defendants were fully aware that Plaintiffs needed religious accommodation to return to work under the new offer but despite all the evidence and guidance explaining that there was no safety barrier, DOE, acting under the direction of Eichenholtz and other City policymakers, did not grant any religious accommodation to Plaintiffs.

193. Most DOE employees who were denied religious accommodation and fired are still barred from returning to work due to coercive and retaliatory problem codes attached to their files, hostility and refusal to rehire, or the imposition of coercive "waivers" that they are required which would waive their right to seek redress for religious discrimination or back pay.

## VII.    SUMMARY OF MUNICIPAL LIABILITY UNDER MONELL (42 U.S.C. § 1983)

194. The constitutional deprivations described in this Complaint were not the result of isolated incidents or rogue employees, but were caused by official municipal policies, customs, or practices of the City and the DOE, for which they are liable under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

195. Specifically, without limiting other facts referenced or which are permissibly inferenced in this complaint, the municipal Defendants are liable based on the following:

- Express Policy (The Stricken Standards): The formal adoption and enforcement of the facially discriminatory "Stricken Standards" as the exclusive method for religious accommodation.

- Final Policymaker Liability: The specific acts and decisions of Defendant Eric Eichenholtz, who exercised final policymaking authority for the City and DOE regarding the design of the accommodation process, the implementation of the "Stricken Standards," and the exclusionary policies of the remedial Citywide Panel.

- Ratification: The high-level ratification of the discriminatory process by ex-Mayor de Blasio, who publicly endorsed the "ground rules" set by the arbitration and admitted the City's 100% involvement in setting the discriminatory criteria.

- The Joint Venture: The legal mandate of the September 10, 2021 Arbitrator's Award, which created a "joint venture" between the City and DOE, imposing a non-delegable duty on both entities to provide religious accommodation to DOE employees.

- Failure to Train or Supervise: The City's deliberate indifference in failing to train or supervise DOE personnel to ensure constitutional neutrality, despite the City's direct role as a party to the joint Arbitrator's Award.

## **INDIVIDUAL PLAINTIFF FACTS**

### A.    ATHENA CLARKE

196. Ms. Clarke reiterates all the facts of this complaint as if fully set forth in her individual section.

197. In September 2021, Ms. Clarke was a tenured special education teacher, commencing her seventh year of service at the DOE.

198. Ms. Clarke is a devout Christian. As part of her faith, Ms. Clarke routinely seeks guidance from prayer to make decisions, including medical decisions.

199. Ms. Clarke has long felt that vaccines are not in alignment with her religious beliefs, based on the guidance and her reflections.

200. One of Ms. Clarke's core religious beliefs as a Christian is that participation in abortion is a sin. Many vaccines use aborted fetal cell lines in development and production.

201. Ms. Clarke also generally believes that God created the body perfectly, and it is against God's will to submit to medical interventions unless sick.

202. Due to her religious beliefs, Ms. Clarke has not vaccinated her children and has refused to take yearly flu shots or other adult vaccines like the Tdap booster her doctor recommended.

203. Ms. Clarke prayed about whether she should take the Covid-19 vaccine and received clear guidance that she could not take the vaccine without violating her faith.

204. Ms. Clarke timely submitted a request for religious accommodation from the Covid-19 vaccine through the SOLAS portal.

205. She attached to her request a letter from her Bishop, who has been her religious leader since she was a teenager.

206. In her application, Ms. Clarke explained she has a sincerely held religious objection to the COVID-19 vaccine and needed accommodation. Among other objections, she stressed that she has a religious objection to the use of aborted fetal cell lines in bringing the vaccines to market. Her objections were also firmly grounded in prayer.

207. Ms. Clarke's request offered several alternative options, such as, *inter alia,* handwashing, mask-wearing, and weekly testing.

208. On September 20, 2021, Ms. Clarke received the same autogenerated denial email sent to all other applicants. No one from the City or the DOE individually reviewed Clarke's application before denying her. The email stated it had been issued in accordance with the Stricken Standards.

209. Ms. Clarke then received a second autogenerated email on September 28, 2021, saying substantially the same thing.

210. Defendants never questioned Ms. Clarke's sincerity or requested further information about her religious beliefs before denying her.

211. Ms. Clarke did not submit any further appeal at that time, having been denied twice, because the Defendants had made it clear they would not accommodate her beliefs and it was futile to keep attempting to get them to do so.

212. It was not an easy decision for Ms. Clarke to opt out of the Covid-19 vaccine, because the stakes were so high given that her employer refused to accommodate her.

213. However, the guidance from prayer and reflection was too clear for her to waiver from her faith, despite the severe consequences.

214. On or about October 4, 2021, Ms. Clarke was involuntarily placed on leave without pay, and informed that because she had failed to comply with the Mandate, she could not report to work, receive compensation, use annual leave, CAR or sick time, enter a work site or work anywhere else to try to earn money.

215. In other words, Ms. Clarke, a tenured educator, was removed from her position and placed on disciplinary leave without pay without the benefit of hearing, as required by New York State Education Law § 3020-a, and without a pathway to grieve the action.

216. She filed an article 78/75 petition, challenging termination without a 3020 hearing, but was denied because the court held that she was still entitled to seek religious accommodation.

217. After the Second Circuit issued its' decision in *Kane*, in November or December of 2021, Ms. Clarke immediately wrote to the DOE, Chancelor, Mayor, Dr. Chokshi, attorneys for the City and DOE, and several other high level decision makers at each to request that her application be re-reviewed under lawful standards.

218. This notice functionally complied with notice of claim requirements under the Education Law, and the DOE failed to adjust the claims within ninety days of receipt.

219. In her letter, Ms. Clarke explained that the original policy discriminated against her personally held religious beliefs, and she was entitled to receive a fair evaluation under lawful standards by the newly created Citywide Panel.

220. Despite their promise to the Second Circuit, and Ms. Clarke's request for a fresh review, the Citywide Panel failed to review Ms. Clarke's application.

221. They did not even offer her the courtesy of a response.

222. Instead, after waiting nearly a year on leave without pay while awaiting the promised fresh review by the Citywide Panel, in August 2022, DOE terminated Ms. Clarke for failing to comply with the Mandate, with no response from the Citywide Panel.

223. Thus, Ms. Clarke was only ever reviewed under the unconstitutional policy.

224. Ms. Clarke could have been accommodated in person or remotely. She worked for over a year in person with her students in person during the height of the pandemic, without posing

43

a threat to anyone. During the entirety of the year, Ms. Clarke tested weekly for Covid-19. Moreover, by the fall of 2021, Ms. Clarke (and most of her class, who had already been back at school in person for over a year) had already recovered from Covid-19 and had natural immunity.

225. Ms. Clarke was ready, willing and able to continue testing and symptoms check as she had been doing, and as every other school district in the state allowed teachers to do.

226. She was also ready, willing and able to consider any other accommodation available.

227. DOE did not consider any science or evidence to conclude that no safe accommodation was possible before denying Ms. Clarke accommodation.

228. Moreover, the Mandate itself acknowledged that it allowed for reasonable accommodation, which did not preclude in person accommodation.

229. As discussed elsewhere in this complaint, many teachers were accommodated under the policy throughout the duration of the Mandate, at least one of them in person in a school building.

230. Nothing about Ms. Clarke made her any more dangerous to the school than the unvaccinated teachers allowed to work in person or at administrative offices.

231. Additionally, even if DOE could have proven that it was unsafe to allow Ms. Clarke to work in person in the classroom, DOE would still have to prove that it was a substantial and significant economic hardship to allow Ms. Clarke to work outside of the classroom. This they did not even attempt.

232. Neither the City nor DOE examined any economic evidence or factors to determine that Ms. Clarke could not be accommodated, while 165 others who had favored religious beliefs under the discriminatory policy could be.

233. Rather, according to Defendants' own attorney testimony, Defendants used the wrong undue hardship standard to presume that any accommodation would presumably meet the erroneous "de minimis" burden standard since it would involve some kind of expense or hassle.

234. Other teachers who were accommodated after being impermissibly favored under the Stricken Standards were provided with long-term substitutes or other co-teachers so that they could teach through Google classroom or other remote platforms while the co-teacher or assistant was physically present to keep order in the classroom.

235. Ms. Clarke could have done the same. In fact, she already had a co-teacher, so a long-term substitute would not even be necessary in her case. Ms. Clarke could have also been reassigned to write IEP's, teach students in the remote education program for home-bound students, or zoom into classrooms to teach particular break out groups.

236. Ms. Clarke was unlawfully denied again in 2022. In August 2022, shortly after they terminated her, DOE offered to reinstate Ms. Clarke as long as she was vaccinated by September 6, 2022.

237. Though Defendants knew Ms. Clarke required religious accommodation, they did not offer Ms. Clarke any accommodation.

238. DOE further retaliated by attaching a problem code to Ms. Clarke's employment files which has not been removed to date.

239. The retaliatory nature of Defendants' actions is further evidenced by the ongoing impact of 'problem codes' placed on Plaintiffs' employment files following their termination for seeking religious accommodation. On February 5, 2025, Plaintiff Clarke was informed by an onboarding coordinator for a Special Education Itinerant Teacher (SEIT) position that

her background check through the Personnel Eligibility Tracking System (PETS) flagged a 'problem code'. This code served as a functional 'blacklist,' preventing Clarke—a tenured educator in good standing—from securing employment within the greater New York City educational system even years after her initial termination. These codes are not the result of misconduct but are a direct, continuing consequence of Defendants' refusal to accommodate Plaintiffs' religious beliefs and the subsequent retaliatory classification of their terminations. This ongoing interference with Clarke's ability to earn a livelihood constitutes a fresh act of retaliation and demonstrates that the harm caused by Defendants' discriminatory policies remains active and unremedied

240. Ms. Clarke suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies for which she deserves compensation under numerous causes of action.

241. In the fall of 2021, and again in the fall of 2022, both within the statutory deadline to file an EEOC complaint or a notice of claim, Ms. Clarke submitted an EEOC complaint, asserting that the City and the DOE had violated Title VII, along with the religious rights of its' employees, and engaged in unlawful retaliation.

242. She stated that all DOE's denials were unlawful, including hers, and that she had sincerely held religious beliefs that had to be accommodated.

243. These notices also complied with the functional notice of claim requirement governing state law claims.

244. The Defendants failed to adjust her claims within the statutory period.

245. The EEOC complaints were consolidated by administrative action into one. On December 30, 2024, Ms. Clarke received a right to sue letter from the EEOC on her consolidated complaint.

246. This lawsuit was filed within ninety days of receipt of the right to sue letter.

**Jennifer Kline**

247. Ms. Kline reiterates all other paragraphs of this complaint as if fully set forth herein.

248. Before she was callously denied religious accommodation and terminated, Ms. Kline had served DOE for nearly seventeen years. Dually certified as a special education and general education teacher, Ms. Kline was teaching Special Education in 2021.

249. Ms. Kline was a beloved teacher and had been nominated for the Big Apple teacher of the year award. She also has many letters from parents thanking and praising her, and copies of letters requesting she be the students' teacher during her time at DOE.

250. Ms. Kline is also an extremely devout Christian.

251. Ms. Kline began working with special education students based on her guidance from prayer.

252. She was so dedicated to her job that she intentionally decided not to have children so that she could give her full attention and focus on helping the children in her classrooms.

253. During the 2020-2021 school year, Ms. Kline could have requested to work remotely, as many other teachers did.

254. But she did not take this course.

255. Instead, Ms. Kline worked in person with students throughout the entire school year of 2020-2021. She was not vaccinated during this entire period.

256. In the fall of 2021, Ms. Kline returned to teach in person unvaccinated without issue.

47

257. Ms. Kline had natural immunity, which was known even at the time to be far superior and more long lasting than vaccine immunity. Most of Ms. Kline's students also had natural immunity by the fall of 2021 and had attended school in person the previous year.

258. Ms. Kline could not take a Covid-19 vaccine because of her religious beliefs.

259. Like Ms. Clarke, Ms. Kline believes that God created our bodies and immune systems, and they should not be tampered with proactively.

260. She also believes in the sanctity of the blood as a religious vessel of God, and that it is a sin to inject unholy materials, especially products derived from or produced with the use of aborted fetal cell lines.

261. In September 2021, Ms. Kline promptly submitted a detailed request for religious accommodation.

262. She did not have a clergy letter, as her religious beliefs were derived from guidance received through personal reflection and prayer.

263. Ms. Kline was denied through the same autogenerated email sent to all employees, even those who already worked remotely.

264. She timely appealed, and was denied without any explanation whatsoever, and no opportunity for a zoom hearing. Just an "x" next to the word "denied."

265. Indeed, she did not qualify under the Stricken Standards, and could not have been accommodated under that discriminatory policy.

266. In or around November 2021, Ms. Kline learned about the Second Circuit's decision in *Kane* and the City's promise to provide a fresh review using lawful standards.

267. Ms. Kline heard that the SOLAS system was accepting new applications for a review by the Citywide Panel.

48

268. She submitted her religious accommodation request through the system in or around November 2021. Many employees (including Plaintiff Clarke) were barred from being able to apply through SOLAS to seek Citywide Panel review. But Ms. Kline was able to upload her application and see it was accepted by the system.

269. In or around December 2021, as an extra precaution, Ms. Kline sent a notice of claim to multiple high level agents of the DOE and the City, including but not limited to the legal department and the Chancellor of the DOE, and the Mayor and Commissioner of Health at the City.

270. In this letter, Ms. Kline explained that she required religious accommodation, and that she had been discriminated against and demanded that she get a fresh evaluation by the Citywide Panel, as the City had been ordered to provide to the *Kane* plaintiffs.

271. Ms. Kline explained that she had personally held religious beliefs, that the original accommodation policy excluded such beliefs, and that this violated her constitutional and statutory rights. She further demanded that the Defendants remedy this harm by providing her with a Citywide Panel review using lawful standards.

272. The Citywide Panel never responded to her letter or her application nor did anyone from the DOE.

273. Instead, on or about February 11, 2022, the DOE terminated Ms. Kline without providing her any response to her request for fresh review.

274. To date, Ms. Kline still has not received any answer from the Citywide Panel.

275. Ms. Kline was therefore only ever reviewed under the Stricken Standards, which even Defendants have admitted were unconstitutional.

49

276. Ms. Kline has sincerely held religious beliefs that conflict with receiving a Covid-19 vaccine.

277. Ms. Kline did not pose a direct threat to anyone, as further detailed throughout the complaint. As one of many examples, Ms. Kline worked in person unvaccinated for over a year in a classroom with her students without issue before the mandate was adopted.

278. Ms. Kline could have continued to safely teach in person, and was ready, willing and able to submit to regular testing, handwashing, symptom checks or any other reasonable accommodation deemed necessary.

279. Ms. Kline also could have taught remotely. She already had an assistant, and she could have taught classes through Google classroom or another remote platform already in existence at the DOE while her assistant was present to handle any behavioral issues.

280. Ms. Kline could have also been assigned to remotely instruct homebound students, or those still engaging in remote learning, which was still an option at DOE, or she could have been reassigned to do administrative work or write IEP's.

281. Defendants allowed 165 other employees who had been unlawfully privileged under the discriminatory policy to continue on payroll through all of these options.

282. Defendants failed to present any evidence that any of these options would have been an undue hardship to allow Ms. Kline the same opportunity.

283. Instead, Defendants failed to evaluate Ms. Kline's request in good faith or provide a fresh review after they admitted to having used an unconstitutional policy to judge her initial application.

284. The DOE then failed to accommodate Ms. Kline again. In or around August 2022, DOE offered to reinstate Ms. Kline and other employees who were terminated for failing to get

vaccinated in violation of their sincerely held religious beliefs as long as they would get vaccinated by September 6, 2022.

285. Despite the fact that the CDC guidance at the time instructed employers not to differentiated between vaccinated and unvaccinated employees, since both could equally catch and spread Covid-19, DOE refused to accommodate Ms. Kline's religious objection to the Covid-19. DOE knew Ms. Kline needed the accommodation at the time.

286. Not only did they terminate her and fail to accommodate her multiple times over, but, upon information and belief, the DOE then attached an insidious "problem code" to her files.

287. As further discussed above, these problem codes are impacting teachers' ability to get work in the greater New York City area and are the subject of a Congressional and Citywide investigation.

288. Ms. Kline has suffered enormously as a direct result of Defendants' discriminatory actions.

289. After she was terminated, she could not find comparable work anywhere despite her qualifications.

290. Without any income or way to support herself, she had to liquidate a large portion of her retirement account just to survive, then lost her rent controlled apartment, and was forced to leave the state and start over, carrying substantial debt.

291. Ms. Kline suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies for which she deserves compensation under numerous causes of action.

## **FIRST CAUSE OF ACTION**

### **(Failure to Accommodate in Violation of Title VII)**

292. Plaintiffs incorporate all other paragraphs of this Complaint as if fully set forth herein.

51

293. Plaintiffs assert that municipal Defendants violated Title VII by failing to accommodate their sincerely held religious beliefs.

294. Defendants subjected Plaintiffs to three distinct failures to accommodate:

- Initial Denial and Termination: Defendants denied Plaintiffs' initial requests using the "Stricken Standards"—unconstitutional criteria that categorically excluded personally held beliefs and objections to fetal cell lines—and subsequently terminated them based on a pretextual "undue hardship" finding under an unlawful de minimis standard that did not meet statutory standards.

- Failure to Provide Remedial Review: Following the Second Circuit's holding in *Kane*, Defendants failed to provide Plaintiffs with the promised remedial "Citywide Panel" review, thereby maintaining the original unconstitutional denials.

- Failure to Accommodate Prospective Employees: In August 2022, Defendants offered reinstatement but again refused to provide religious accommodation to those wishing to return, violating their duty to accommodate both current and prospective employees .

295. Defendants' "undue hardship" defense is pretextual; Defendants accommodated at least 165 similarly situated employees whose beliefs were favored under the discriminatory criteria, while failing to perform any individualized assessment or consider alternatives for Plaintiffs. As set forth in detail in the factual allegations of this complaint, Plaintiffs could have been safely accommodated without substantially burdening DOE's budget in multiple ways, and Defendants did not assess any evidence (safety or economic) to deny them.

296. Single Filing Rule: Pursuant to the "single filing" or "piggybacking" rule, Plaintiff Kline and other similarly situated individuals are entitled to Title VII relief based on the timely

EEOC charges filed by Plaintiff Clarke and others, as these claims arise from the same discriminatory policies and time frame. Plaintiffs further request consolidation with *Hogan v. City of New York*, 23-cv-8727, as they are part of the class identified in that proposed class action lawsuit (which also tolls deadlines for all proposed class members).

## SECOND CAUSE OF ACTION

### (Discrimination in Violation of Title VII)

297. Plaintiffs reincorporate all paragraphs of this Complaint as if fully written herein.

298. Plaintiffs assert straight religious discrimination claims against the municipal Defendants, including but not limited to "pattern and practice" and "disparate treatment" theories.

299. **Direct Evidence of Discrimination:** Defendants' adoption and enforcement of the "Stricken Standards" constitutes direct evidence of discrimination because the policy made express classifications based on protected religious characteristics, favoring certain "established" sects while categorically excluding unorthodox or "personally held" beliefs.

300. **Discriminatory Animus:** The discrimination is further evidenced by hostile comments from high-level City and DOE agents regarding the validity of prayer-based beliefs and objections to fetal cell lines, and refusal to reinstate employees after Covid-19 vaccination was clearly no longer required explicitly because they failed to "follow the rules" by violating their faith.

## THIRD CAUSE OF ACTION

### (Retaliation and Harassment in Violation of Title VII)

301. Plaintiffs incorporate all other paragraphs of this Complaint as if fully set forth herein.

302. Plaintiffs engaged in protected activity by seeking religious accommodation from the vaccine mandate pursuant to statute.

303. Defendants were aware of this protected activity and responded with a series of adverse and retaliatory actions, including:

- **Denial and Termination:** Summary denial of accommodation followed by termination of employment.

- **Retaliatory Problem Codes:** Attaching damaging and coercive "problem codes" to Plaintiffs' employment files to hinder future employment.

- **Deprivation of Due Process:** Denying tenured Plaintiffs a 3020a hearing before taking adverse action or attaching findings of "misconduct".

- **Coercive Waivers:** Implementing a waiver requirement that prevents employees with religious objections from returning unless they waive their right to seek redress for discrimination.

## FOURTH CAUSE OF ACTION

**(Violation of New York State Human Rights Law – Failure to Accommodate, Discrimination, Harassment, Retaliation and Aiding and Abetting)**

304. Plaintiffs repeat and reallege all paragraphs of this Complaint as if fully set forth herein.

305. At all relevant times, the New York State Human Rights Law ("SHRL") has applied to Defendants' conduct, and Defendants worked in concert to deprive Plaintiffs of reasonable accommodation.

306. Under the SHRL, it is an unlawful discriminatory practice to require an employee to violate a sincerely held religious practice as a condition of employment unless the employer demonstrates an inability to accommodate without undue hardship, defined as "significant expense or difficulty".

307. Unlike Title VII, individual Defendants **Dave Chokshi** and **Eric Eichenholtz** are

personally liable under the SHRL because the statute expressly prohibits any person from aiding, abetting, inciting, compelling, or coercing the doing of any of the acts forbidden thereunder.

- **Individual Liability of Defendant Chokshi:** Defendant Chokshi aided and abetted the discriminatory denials by issuing a letter to decision-makers and arbitrators that used his official authority to take sides in a religious dispute, arguing that religious objections to abortion were invalid. He also used his discretion to continue renewing the DOE mandate long after it was abundantly clear it was unnecessary and even though he knew that thousands of DOE employees were being denied religious accommodation and were at imminent risk of termination for failure to violate their faith by complying.

- **Individual Liability of Defendant Eichenholtz:** Defendant Eichenholtz aided and abetted the discrimination as a high-level policymaker who oversaw the entire religious accommodation scheme at DOE and the Citywide Panel levels, drafted the discriminatory "Stricken Standards," oversaw the flawed Citywide Panel, and directed the exclusion of Plaintiffs from remedial review.

308. Monell liability is also asserted in this complaint, including but not limited to the following facts establishing same:

- The formal adoption and enforcement of the facially discriminatory 'Stricken Standards' as the exclusive method for religious accommodation;

- The actions of final policymakers, including **Eric Eichenholtz**, who had final authority to design the accommodation process and the remedial Citywide Panel;

- The ratification of the discriminatory process by **ex-Mayor de Blasio**, who

55

publicly endorsed the 'ground rules' set by the arbitration process; and

- The failure of the City to train or supervise the DOE to ensure constitutional neutrality in the accommodation process, despite the City being a direct party to the joint Arbitrator's Award."

309. **Municipal and Individual** Defendants collectively violated the SHRL's accommodation requirements through three distinct failures:

- **Initial Denial and Termination:** Refusing accommodation under the unconstitutional Stricken Standards without engaging in a bona fide effort or individualized assessment as required by law.

- **Remedial Failure:** Exercising discretion to deny Plaintiffs the remedial Citywide Panel review.

- **Reinstatement Failure:** Refusing to accommodate Plaintiffs as prospective employees during the August 2022 offer of reinstatement.

310. Defendants also failed to engage in the required cooperative dialogue and did not prove that accommodating Plaintiffs would significantly interfere with the safe or efficient operation of the workplace, particularly as at least 165 similarly situated employees were accommodated.

311. Defendants each also engaged in straight discrimination and harassment and retaliation as set forth in the three counts above and through the factual allegations of this complaint.

## <u>FIFTH CAUSE OF ACTION</u>

**(Violation of the New York City Human Rights Law – Failure to Accommodate, Discrimination, Harassment, Retaliation, Aiding and Abetting)**

312. For the reasons set forth in the first four causes of action, *supra*, Plaintiffs assert claims

under the CHRL against all defendants for failure to accommodate, discrimination, harassment, retaliation and aiding and abetting discrimination in violation of the CHRL.

313. Plaintiffs repeat and realleges all paragraphs of this Complaint as if fully set forth herein.

314. At all relevant times, the New York City Human Rights Law ("CHRL") has been in full force and effect and applies to Defendants' conduct.

315. The CHRL is to be construed independently from state and federal statutes and must be interpreted "liberally for the accomplishment of the uniquely broad and remedial purposes thereof".

316. Defendants collectively violated the CHRL through the same three separate and distinct failures to accommodate set forth above.

317. Failure to Engage in Cooperative Dialogue: Under the CHRL, the failure to engage in a "good faith" cooperative dialogue—including analysis and good faith discussion of the person's accommodation needs and potential alternatives—is an independent basis for finding liability, even if undue hardship could have ultimately been proven. Defendants failed to engage in this process with Plaintiffs at any stage of review.

318. Individual Liability of Chokshi and Eichenholtz: Pursuant to N.Y.C. Admin Code § 8-107(6), individual Defendants Dave Chokshi and Eric Eichenholtz are personally liable for aiding and abetting the discriminatory and retaliatory acts described herein.

319. Defendant Chokshi aided the discrimination by issuing his directive to deny religious objections based on fetal cell lines and maintaining and reissuing the mandates when he knew they were unnecessary were harming religious employees like Plaintiffs.

320. Defendant Eichenholtz aided the discrimination by drafting the unconstitutional standards and intentionally excluding Plaintiffs from the Citywide Panel remediation, among other

facts set forth in this complaint.

321. Monell liability is also asserted in this complaint, including but not limited to the following facts establishing same:

- The formal adoption and enforcement of the facially discriminatory 'Stricken Standards' as the exclusive method for religious accommodation;

- The actions of final policymakers, including **Eric Eichenholtz**, who had final authority to design the accommodation process and the remedial Citywide Panel;

- The ratification of the discriminatory process by **ex-Mayor de Blasio**, who publicly endorsed the 'ground rules' set by the arbitration process; and

- The failure of the City to train or supervise the DOE to ensure constitutional neutrality in the accommodation process, despite the City being a direct party to the joint Arbitrator's Award."

322. Strict Undue Hardship Standard: like the SHRL, the CHRL imposes a "stiffer standard" for undue hardship, requiring the employer to prove "significant expense or difficulty". Defendants have not and cannot meet this burden, particularly as they successfully accommodated 163 similarly situated employees.

## SIXTH CAUSE OF ACTION

### (Violation of the U.S. Constitution - Equal Protection Clause)

323. Plaintiffs reincorporate all paragraphs of this Complaint as if fully written herein.

324. Plaintiffs assert that Defendants, acting under color of state law, violated the Equal Protection Clause of the Fourteenth Amendment by adopting and enforcing a facially discriminatory religious accommodation policy.

325. **Direct Evidence of Discrimination:** The "Stricken Standards" created express

58

classifications based on protected characteristics by singling out unorthodox beliefs and minority faiths for disparate treatment while specifically favoring "established" religions such as Christian Science.

326. **Lack of Neutrality:** The policy and its enforcement were not neutral or generally applicable, as they "passed judgment upon" the legitimacy of Plaintiffs' religious beliefs, particularly those derived from personal prayer or concerns regarding the use of aborted fetal cell lines.

327. **Individual Liability of Chokshi and Eichenholtz:** Pursuant to 42 U.S.C. § 1983, individual Defendants **Dave Chokshi** and **Eric Eichenholtz** are personally liable for their personal involvement in these constitutional deprivations:

- **Defendant Chokshi:** Personally stepped outside his role as a neutral policymaker to actively advocate for the denial of specific religious beliefs by disseminating the "Chokshi Letter" to decision-makers and arbitrators.

- **Defendant Eichenholtz:** Personally involved as the architect of the "Stricken Standards" who drafted and proposed the discriminatory criteria, oversaw the Citywide Panel and made the specific decision to exclude thousands of employees, including Plaintiffs, from receiving a "fresh review."

328. Monell liability is also asserted in this complaint, including but not limited to the following facts establishing same:

- The formal adoption and enforcement of the facially discriminatory 'Stricken Standards' as the exclusive method for religious accommodation;

- The actions of final policymakers, including **Eric Eichenholtz**, who had final authority to design the accommodation process and the remedial Citywide Panel;

59

- The ratification of the discriminatory process by **ex-Mayor de Blasio**, who publicly endorsed the 'ground rules' set by the arbitration process; and

- The failure of the City to train or supervise the DOE to ensure constitutional neutrality in the accommodation process, despite the City being a direct party to the joint Arbitrator's Award."

329. **The Two-Tiered System:** Defendants also violated Equal Protection by subjecting Plaintiffs and others denied under the original scheme to a more onerous "undue hardship" standard than the 165 favored employees who were accommodated without such a burden, solely because Plaintiffs' beliefs did not fit Defendants' preferred religious classifications.

330. **Strict Scrutiny:** Because the policy makes express classifications based on religion and exhibits animus, it must be subjected to strict scrutiny. Defendants cannot demonstrate that their denial of accommodation to Plaintiffs was the least restrictive means of furthering a compelling state interest.

## SEVENTH CAUSE OF ACTION

### (Infringement of Free Exercise Clause – United States Constitution)

331. Plaintiffs repeat and realleges all paragraphs of this Complaint as if fully set forth herein.

332. Plaintiffs' sincerely held religious beliefs prohibit them from receiving a Covid-19 vaccine.

333. Defendants, acting under color of state law, substantially burdened Plaintiffs' free exercise of religion by forcing them to choose between their faith and their livelihoods .

334. Lack of Neutrality and General Applicability: The religious accommodation policies were neither neutral nor generally applicable because they were governed by a discretionary,

individualized exemption mechanism and were infected by a facially discriminatory policy that favored specific religious dogmas .

335. Individual Liability of Chokshi and Eichenholtz: Pursuant to 42 U.S.C. § 1983, Defendants Chokshi and Eichenholtz are personally liable for their direct involvement in this constitutional infringement. Among other facts in this complaint:

- Defendant Chokshi: Personally issued instructions to decision-makers to deny objections based on fetal cell lines, thereby substituting his own judgment for the religious conscience of the Plaintiffs .

- Defendant Eichenholtz: Personally drafted the unconstitutional "Stricken Standards" and exercised his discretion to intentionally exclude Plaintiffs from the remedial Citywide Panel review .

336. Monell liability is also asserted in this complaint, including but not limited to the following facts establishing same:

- The formal adoption and enforcement of the facially discriminatory 'Stricken Standards' as the exclusive method for religious accommodation;

- The actions of final policymakers, including **Eric Eichenholtz**, who had final authority to design the accommodation process and the remedial Citywide Panel;

- The ratification of the discriminatory process by **ex-Mayor de Blasio**, who publicly endorsed the 'ground rules' set by the arbitration process; and

- The failure of the City to train or supervise the DOE to ensure constitutional neutrality in the accommodation process, despite the City being a direct party to the joint Arbitrator's Award."

337. Strict Scrutiny: Because the policies were not neutral or generally applicable, and were motivated by religious animus, Defendants must meet the burden of strict scrutiny . Defendants cannot demonstrate that the summary denial of Plaintiffs' requests—without considering weekly testing or remote work—was the least restrictive means of furthering a compelling state interest.

## EIGHTH CAUSE OF ACTION

### (Violation of the Establishment Clause of the United States Constitution)

338. Plaintiffs repeat and reallege all paragraphs of this Complaint as if fully set forth herein.

339. Plaintiffs repeat and reallege each preceding paragraph of this Complaint as if fully set forth herein.

340. The Establishment Clause of the First Amendment prohibits the State from preferencing any particular religion or religious dogma, or abridging rights to the free exercise of religion.

341. Defendants violated the Establishment Clause by expressing a preference for specific faiths and leaders while expressing animus toward those with unorthodox religious objections to vaccination.

342. Impermissible Entanglement: Defendant Chokshi and the City provided instructions and letters to decision-makers and arbitrators that impermissibly took positions on religious matters.

343. Specifically, Defendant Chokshi disseminated a letter informing arbitrators that the City did not consider abortion to be a "valid" religious concern and used the vaccination status of Pope Francis to undermine the individual religious conscience of Catholic and non-Catholic applicants alike.

344. Denominational Preference: The DOE and the City adopted a facially discriminatory policy that favored Christian Scientists and Jehovah's Witnesses on its face while requiring discrimination against minority and unorthodox faiths.

345. Individual Liability of Chokshi and Eichenholtz: Pursuant to 42 U.S.C. § 1983, individual Defendants Chokshi and Eichenholtz are personally liable for their direct involvement in this constitutional violation. In addition to other relevant facts:

- Defendant Chokshi: Personally authored and disseminated the letter that lent the power of the State to one side of a doctrinal dispute regarding vaccines and fetal cell lines.

- Defendant Eichenholtz: Personally supervised the drafting of the "Stricken Standards," which enshrined denominational preferences into official municipal policy.

346. Monell liability is also asserted in this complaint, including but not limited to the following facts establishing same:

- The formal adoption and enforcement of the facially discriminatory 'Stricken Standards' as the exclusive method for religious accommodation;

- The actions of final policymakers, including **Eric Eichenholtz**, who had final authority to design the accommodation process and the remedial Citywide Panel;

- The ratification of the discriminatory process by **ex-Mayor de Blasio**, who publicly endorsed the 'ground rules' set by the arbitration process; and

- The failure of the City to train or supervise the DOE to ensure constitutional neutrality in the accommodation process, despite the City being a direct party to the joint Arbitrator's Award."

63

347. These preferences trigger strict scrutiny, and Defendants cannot prove that their actions were narrowly tailored to further a compelling state interest.

**WHEREFORE,** for all causes of action pleaded above, Plaintiffs prays that this Court grant judgment to her containing the following relief:

- Declaratory Judgments: A judgment declaring that Defendants' three distinct failures to accommodate Plaintiffs—the initial denial/termination, the failure to provide remedial review, and the failure to accommodate upon reinstatement—are void ab initio and violate Title VII, the NYS Human Rights Law, the NYC Human Rights Law, and the United States Constitution.

- Injunctive Relief: An order for immediate reinstatement to former positions with full seniority, no break in service, and restoration of all status, retirement credits, and benefits along with lost salary.

- Damages: An award of actual, nominal, and compensatory damages (including back pay, front pay, and pain and suffering) in an amount to be determined at trial.

- Punitive Damages: An award of punitive damages against the individual Defendants for their malice or reckless indifference to Plaintiffs' federally protected rights.

- Interest, Costs, and Fees: An award of pre- and post-judgment interest, reasonable attorneys' fees, expert fees, and costs.

- Civil Penalties: An order for civil fines and penalties pursuant to New York Executive Law § 297(9).

- For such other further or different relief as this Court may deem just.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and Rule 38(b) of the Local

Rules, Plaintiffs demand a trial by jury for all the issues pleaded herein so triable.

Dated: Ithaca, New York
        December 29, 2025

                      Respectfully Submitted,
                      Gibson Law Firm, PLLC

By:    */s/ Sujata S. Gibson*
                  Sujata S. Gibson
                  120 E Buffalo Street, Suite 201
                  Ithaca, NY 14850
                  (607) 327-4125
                  sujata@gibsonfirm.law

                  **Attorneys for the Plaintiffs**